# NFPA 921
# Guide for Fire and Explosion Investigations
## 2001 Edition

# NFPA 921

## Guide for

## Fire and Explosion Investigations

### 2001 Edition

NOTICE: An asterisk (*) following the number or letter designating a paragraph indicates that explanatory material on the paragraph can be found in Appendix A.

Changes other than editorial are indicated by a vertical rule in the margin of the pages on which they appear. These lines are included as an aid to the user in identifying changes from the previous edition.

Information on referenced publications can be found in Chapter 25 and Appendix C.

### Chapter 1   Administration

**1.1 Scope.** This document is designed to assist individuals who are charged with the responsibility of investigating and analyzing fire and explosion incidents and rendering opinions as to the origin, cause, responsibility, or prevention of such incidents.

**1.2 Purpose.** The purpose of this document is to establish guidelines and recommendations for the safe and systematic investigation or analysis of fire and explosion incidents. Fire investigation or analysis and the accurate listing of causes is fundamental to the protection of lives and property from the threat of hostile fire or explosions. It is through an efficient and accurate determination of the cause and responsibility that future fire incidents can be avoided. This document has been developed as a model for the advancement and practice of fire and explosion investigation, fire science, technology, and methodology.

Proper determination of fire origin and cause is also essential for the meaningful compilation of fire statistics. Accurate statistics form part of the basis of fire prevention codes, standards, and training.

This document is designed to produce a systematic, working framework or outline by which effective fire and explosion investigation and origin and cause analysis can be accomplished. It contains specific procedures to assist in the investigation of fires and explosions. These procedures represent the judgment developed from the NFPA consensus process system, that if followed can improve the probability of reaching sound conclusions. Deviations from these procedures, however, are not necessarily wrong or inferior but need to be justified.

The reader should note that frequently the phrase *fire investigation* is used in this document when the context indicates that the relevant text refers to the investigation of both fires and explosions.

As every fire and explosion incident is in some way different and unique from any other, this document is not designed to encompass all the necessary components of a complete investigation or analysis of any one case.

Not every portion of this document may be applicable to every fire or explosion incident. It is up to investigators (depending on their responsibility, as well as the purpose and scope of their investigation) to apply the appropriate recommended procedures in this guide to a particular incident.

In addition, it is recognized that time and resource limitations or existing policies may limit the degree to which the recommendations in this document will be applied in a given investigation. This document has been developed as a model for the advancement and practice of fire and explosion investigation, fire science, technology, and methodology.

**1.3 Definitions.**

**1.3.1 Accelerant.** An agent, often an ignitable liquid, used to initiate a fire or increase the rate of growth or spread of fire.

**1.3.2 Accident.** An unplanned event that interrupts an activity and sometimes causes injury or damage. A chance occurrence arising from unknown causes; an unexpected happening due to carelessness, ignorance, and the like.

**1.3.3 Ambient.** Someone's or something's surroundings, especially as they pertain to the local environment, for example, ambient air and ambient temperature.

**1.3.4 Ampacity.** The current, in amperes (A), that a conductor can carry continuously under the conditions of use without exceeding its temperature rating.

**1.3.5 Ampere.** The unit of electric current that is equivalent to a flow of one coulomb per second. One coulomb is defined as $6.24 \times 10^{18}$ electrons.

**1.3.6\* Approved.** Acceptable to the authority having jurisdiction.

**1.3.7 Arc.** A high-temperature luminous electric discharge across a gap.

**1.3.8 Arcing through Char.** Arcing associated with a matrix of charred material (e.g., charred conductor insulation) that acts as a semiconductive medium.

**1.3.9 Arrow Pattern.** A fire pattern displayed on the cross section of a burned wooden structural member.

**1.3.10\* Arson.** The crime of maliciously and intentionally, or recklessly, starting a fire or causing an explosion.

**1.3.11 Autoignition Temperature.** See 1.3.118.2.

**1.3.12 Backdraft.** An explosion resulting from the sudden introduction of air (i.e., oxygen) into a confined space containing oxygen-deficient superheated products of incomplete combustion.

**1.3.13 Bead.** A rounded globule of re-solidified metal at the end of the remains of an electrical conductor that was caused by arcing and is characterized by a sharp line of demarcation between the melted and unmelted conductor surfaces.

**1.3.14 Blast Pressure Front.** The expanding leading edge of an explosion reaction that separates a major difference in pressure between normal ambient pressure ahead of the front and potentially damaging high pressure at and behind the front.

**1.3.15 BLEVE.** Boiling liquid expanding vapor explosion.

**1.3.16 British Thermal Unit (Btu).** The quantity of heat required to raise the temperature of one pound of water 1°F at the pressure of 1 atmosphere and temperature of 60°F. A British thermal unit is equal to 1055 joules, 1.055 kilojoules, and 252.15 calories.

**1.3.17 Burning Rate.** See 1.3.74, Heat Release Rate.

**1.3.18 Calorie.** The amount of heat necessary to raise 1 gram of water 1°C at 15°C. A calorie is 4.184 joules and there are 252.15 calories in a British thermal unit (Btu).

**1.3.19 Cause.** The circumstances, conditions, or agencies that bring together a fuel, ignition source, and oxidizer (such as air or oxygen) resulting in a fire or a combustion explosion.

**4.2.2.1\* Effects of Room Ventilation on Pattern Magnitude and Location.** The ventilation of the room of fire origin has a great effect on the growth and heat release rate of a fire, and for this reason greatly affects pattern formation. It was found in limited, full-scale testing that patterns that indicated areas of intense burning remote from the point of origin were observed and appeared to be from ventilation effects only. This result was observed in rooms that had flashover conditions where clean burn areas were produced under a window that had been broken during the fire, away from the origin. It was observed as areas of intense burning on furniture items near a door opening as truncated cone patterns on walls opposite door openings.

The effect of ventilation on the intensity of the fire, as well as the location, shape, and damage magnitude of patterns being used to determine the origin of the fire should be considered. Where fresh air ventilation is available to a fire, it is not uncommon to find locally heavy damage patterns on combustible items close to the ventilation opening, patterns which may have no relevance to the point of origin.

**4.2.3 Hot Gas Layer–Generated Patterns.** The radiant flux from the overhead hot gas layer can produce damage to the upper surfaces of contents and floor covering materials. This process commonly begins as the environment within the room approaches flashover conditions. Similar damage to floor surfaces from radiant heat frequently occurs in adjacent spaces outside rooms that are fully involved in fire. Damage to hallway floors and porches are examples. If the fire does not progress to full room involvement (*see 3.5.3.2*), the damage may include blistering, charring, or melting. Protected surfaces may exhibit no damage. At this time in the fire development, a line of demarcation representing the lower extent of the hot gas layer may form on vertical surfaces. The degree of damage generally will be uniform except where there is drop down, burning of isolated items that are easily ignited, or protected areas. Damage to the undersides of furnishings below the bottom of the hot layer is unlikely.

**4.2.4 Patterns Generated by Full Room Involvement.** If a fire progresses to full room involvement (*see 3.5.3.2*), damage found at low levels in the room down to and including the floor can be more extensive due to the effects of high radiative flux and the convected heat from the descending hot gas layer. Damage can include charring of the undersides of furniture, burning of carpet under furniture, uniform burning around table legs, burning of baseboards and the undersides of doors, and burning on floor covering in corners. Holes can be burned through carpet and floors. The effects of protected areas and floor clutter on low burn patterns should be considered (*see 4.17.7.2 and 4.18.2*). Although the degree of damage will increase with time, the extreme conditions of the full room involvement can produce major damage in a few minutes, depending on ventilation and fuels present.

**4.3 Fire Patterns Defined.** Fire patterns are the visible or measurable physical effects that remain after a fire. These include thermal effects on materials, such as charring, oxidation, consumption of combustibles, smoke and soot deposits, distortion, melting, color changes, changes in the character of materials, structural collapse, and other effects.

**4.3.1 Lines or Areas of Demarcation.** Lines or areas of demarcation are the borders defining the differences in certain heat and smoke effects of the fire on various materials. They appear between the affected area and adjacent unaffected or less affected areas.

The production of lines and areas of demarcation, and the subsequent fire patterns that they define, depend on a combination of variables: the material itself, the rate of heat release of the fire, fire suppression activities, temperature of the heat source, ventilation, and the amount of time that the material is exposed to the heat.

For example, a particular material may display the same heat exposure patterns from exposure to a low-temperature heat source for a long period of time as to a high-temperature heat source for a shorter period of time. The investigator should keep this concept in mind while analyzing the nature of fire patterns.

**4.3.2 Surface Effect.** The nature and material of the surface that contains the fire pattern will have a bearing on the shape and nature of the pattern itself.

The shape and texture of the surface can affect the actual shape of the lines of demarcation displayed or increase or decrease the amount of pyrolysis and combustion by differing surface areas. If both a smooth and rough surface of the same material are exposed to the same source of heat, the rougher surface will sustain more damage. This is a result of the turbulence of the hot gases interacting with the surface as well as an increase in the surface-to-mass ratio. Differing surface coverings, such as paint, tiles, brick, wallpaper, plaster, and so forth, may increase or decrease the rate of heat treatment or burning.

Combustible surfaces will be darkened by the beginnings of pyrolysis, be burned, or be in various stages of charring, including the total loss of material. Noncombustible surfaces, such as mineral materials or metals, may exhibit color changes, oxidation, physical distortions, or melting.

**4.3.3 Penetrations of Horizontal Surfaces.** Penetration of horizontal surfaces, from above or below, can be caused by radiant heat, direct flame impingement, or localized smoldering with or without the effects of ventilation.

Penetrations in a downward direction are often considered unusual because the more natural direction of heat movement is upward through the action of buoyancy. In fully flashed-over compartments, however, hot gases may be forced through small, pre-existing openings in a floor, resulting in a penetration. Penetrations may also arise as the result of intense burning under furniture items such as polyurethane mattresses, couches, or chairs. Flaming or smoldering under collapsed floors or roofs can also lead to floor penetrations. Downward penetration, such as a hole burned into a floor or tabletop, may need to be noted and analyzed by the investigator.

Whether a hole burned into a horizontal surface was created from above or below may be identified by an examination of the sloping sides of the hole. Sides that slope downward from above toward the hole are indicators that the fire was from above. Sides that are wider at the bottom and slope upward toward the center of the hole indicate that the fire was from below. (*See Figure 4.3.3.*)

Another reliable means of determining whether a fire moved up through or down through a surface is to compare the extent of destruction on the two levels separated by the surface. If fire moved up through the surface, the damage to the bottom side of the penetrated surface will be more extensive when compared to the top side. The converse is true where the fire moved downward.

It is, of course, possible for both upward and downward movement to occur through a hole during the course of a fire. The investigator should keep in mind that only the last movement through the hole may be evident.



FIGURE 4.3.3 Burn pattern with fire from above and below.

**4.3.4 Loss of Material.** Typically, when wood or other combustible surfaces burn, they lose material and mass. The shapes and quantities of remaining combustibles can themselves produce lines of demarcation and, ultimately, fire patterns to be analyzed by the investigator.

For example, the fact that the tops of wooden wall studs are burned away at progressively lower heights can be used in the "pointer and arrow" fire pattern analysis of fire spread.

**4.3.5 Victim Injuries.** The investigator should carefully note and document the position and condition of any fire victims and their relationship to other objects or victims. Autopsy reports and medical records may provide useful information regarding burn damage. For example, burn damage patterns and protected areas can be used in a similar way as damage to furniture and other items discussed in previous sections.

**4.4 Types of Fire Patterns.** There are two basic types of fire patterns: movement patterns and intensity patterns. These types of patterns are defined largely by the fire dynamics discussed in Chapter 3. Often a systematic use of more than one type of fire pattern at a fire scene can be used in combination to lead back to the heat source that produced them.

**4.4.1 Movement Patterns.** Flame and heat movement patterns are produced by the growth and movement of fire and the products of combustion away from an initial heat source. If accurately identified and analyzed, these patterns can be traced back to the origin of the heat source that produced them.

**4.4.2 Intensity (Heat) Patterns.** Flame and heat intensity patterns are produced by the response of materials to the effects of various intensities of heat exposure. The various heat effects on a certain material can produce lines of demarcation. These lines of demarcation may be helpful to the investigator in determining the characteristics and quantities of fuel materials, as well as the direction of fire spread.

**4.5 Surface Effect of Char.** Many surfaces are decomposed in the heat of a fire. The binder in paint will char and darken the color of the painted surface. Wallpaper and the paper surface of gypsum wallboard will char when heated. Vinyl and other plastic surfaces on walls, floors, tables, or counters also will discolor, melt, or char. Wood surfaces will char, but, because of the greater significance of wood char, it is being treated in greater detail in 4.5.1 through 4.5.5.

The degree of discoloration and charring can be compared to adjacent areas to find the areas of greatest burning.

**4.5.1 Wood Char.** Charred wood is likely to be found in nearly all structural fires. When exposed to elevated temperatures, wood undergoes chemical decomposition that drives off gases, water vapor, and various pyrolysis products as smoke. The solid residue that remains is mainly carbon. Char shrinks as it forms, and develops cracks and blisters.

**4.5.2* Rate of Charring.** The depth of char measurements should not be relied on to determine the duration of the burning. The rule of 1 in. (2.54 cm) in 45 minutes for the rate of charring of pine is based on one set of laboratory conditions in a test furnace. Fires may burn with more or less intensity during the course of an uncontrolled fire than under a controlled laboratory fire. Actual laboratory char rates from exposure to heat from one side vary from 0.4 in. (1 cm) per hour at 750°F (390°C) to 10 in. (25.4 cm) per hour at temperatures approaching 2000°F (1090°C) in intense fires. Even these figures will vary with the species of the wood, orientation of the grain, moisture content, and other variables. Charring rate is also a function of the velocity of hot gases and the ventilation conditions. Fast-moving gases or ventilation can lead to rapid charring.

The rate of charring and burning of wood in general has no relation to its age once the wood has been dried. Wood tends to gain or lose moisture according to the ambient temperature and humidity. Thus, old dry wood is no more combustible than new kiln-dried wood if they have both been exposed to the same atmospheric conditions.

Overall, the use of the nature of char to make determinations about fuels involved in a fire should be done with careful consideration of all the possible variables that can affect the speed and severity of burning.

**4.5.3 Depth of Char.** Analysis of the depth of charring is most reliable for evaluating fire spread, rather than for the establishment of specific burn times or intensity of heat from adjacent burning materials. By measuring the relative depth and extent of charring, the investigator may be able to determine what portions of a material or construction were exposed the longest to a heat source. The relative depth of char from point to point is the key to appropriate use of charring — locating the places where the damage was most severe due to exposure, ventilation, or fuel placement. The investigator may then deduce the direction of fire spread, with decreasing char depths being farther away from the heat source.

**4.5.3.1 Depth of Char Diagram.** Lines of demarcation that may not be obvious can often be identified for analysis by a process of measuring and charting depths of char on a grid diagram. By drawing lines connecting points of equal char depth (isochars) on the grid diagram, lines of demarcation may be identified.

**4.5.3.2 Depth of Char Analysis.** Certain key variables affect the validity of depth of char pattern analysis. These factors include the following.

(a) Single versus multiple heat or fuel sources creating the char patterns being measured. Depth of char measurements may be useful in determining more than one fire or heat source.

(b) Comparison of char measurements, which should be done only for identical materials. It would not be valid to compare the depth of char from a 2 in. by 4 in. stud to the depth of char of an adjacent wooden wall panel.

(c) Ventilation factors influencing the rate of burning. Wood can exhibit deeper charring when adjacent to a ventilation source or an opening where hot fire gases can escape.

(d) Consistency of measuring technique and method. Each comparable depth of char measurement should be made with the same tool and same technique. *(See Chapter 13.)*

FIGURE 4.5.5  Variability of char blister.



FIGURE 4.6  Spalling on ceiling.



The presence or absence of spalling at a fire scene should not, in and of itself, be construed as an indicator of the presence or absence of liquid fuel accelerant. The presence of ignitable liquids will not normally cause spalling beneath the surface of the liquid. The ability of the surface to absorb or hold the liquid may be a factor in the production of spalling, especially on horizontal surfaces such as concrete floors. For example, a painted or sealed concrete floor is unlikely to spall. Rapid and intense heat development from an ignitable liquid fire may cause spalling on adjacent surfaces, or a resultant fire may cause spalling on the surface after the ignitable liquid burns away.

Since spalling can occur from sources other than fires, it is desirable to determine whether spalling was present prior to the fire.

Overall, it should be noted that the importance of spalling to the fire investigator lies in the documentation and analysis of a heat source.

The investigator is cautioned that no specific time of burning can be determined based solely on depth of char.

**4.6 Spalling.** Spalling is the breakdown in surface tensile strength of concrete, masonry, or brick caused by exposure to high temperatures and rates of heating resulting in mechanical forces within the material. These forces are believed to result from one or more of the following:

(1) Moisture present in uncured or "green" concrete
(2) Differential expansion between reinforcing rods or steel mesh and the surrounding concrete
(3) Differential expansion between the concrete mix and the aggregate (This is most common with silicon aggregates.)
(4) Differential expansion between the fine-grained surface finished layers and the coarser-grained interior layers
(5) Differential expansion between the fire exposed surface and the interior of the slab

Spalling of concrete or masonry surfaces may be caused by heat, freezing chemicals, or abrasion. It may be induced more readily in poorly formulated or finished surfaces. Spalling is characterized by distinct lines of striation and the loss of surface material, resulting in cracking, breaking, and chipping or in the formation of craters on the surface.

Spalling of concrete, masonry, or brick has often been linked to unusually high temperatures caused by burning accelerant. While spalling can involve high rates of heat release or a rapid change in temperature, an accelerant need not be involved. The primary mechanism of spalling is the expansion or contraction of the surface while the rest of the mass expands or contracts at a different rate.

Spalled areas may appear lighter in color than adjacent areas. This lightening can be caused by exposure of clean subsurface material. Adjacent areas may also tend to be sooted.

Another factor in the spalling of concrete is the loading and stress in the material at the time of the fire. Since these high-stress or high-load areas may not be related to the fire location, spalling of concrete on the underside of ceilings or beams may not be directly over the origin of the fire. *(See Figure 4.6.)*

**4.6.1\* Interpretations of Spalling.** In the past, spalling of concrete at a fire scene has been thought to be a positive indicator of a liquid accelerant–involved fire.

The rapid cooling of a heated mass of concrete, brick, or masonry can also cause spalling. A common source of rapid cooling in a fire is extinguishment by water.

**4.7 Oxidation.** Oxidation is the basic chemical process associated with combustion. Oxidation of some materials that do not burn can produce lines of demarcation and fire patterns of use to fire investigators. For these purposes, oxidation may be defined as a combination of oxygen with substances such as metals, rock, or soil that is brought about by high temperatures.

The effects of oxidation include change of color and change of texture. The higher the temperature and the longer the time of exposure, the more pronounced the effects of oxidation will be. Bare galvanized steel with mild heating will get a dull whitish surface from oxidation of the zinc coating. This oxidation also eliminates the protection that the zinc gave the steel. If the unprotected steel is wet for some time, it will then rust. Thus there can be a pattern of rusted compared to non-rusted galvanized steel.

When uncoated iron or steel is oxidized in a fire, the surface first gets a blue-gray dullness. Oxidation can proceed to thick layers of oxide that can flake off. After the fire, if the metal has been wet, the usual rust-colored oxide may appear.

On stainless steel surfaces, mild oxidation can give color fringes, and severe oxidation will give a dull gray color.

Copper forms a dark red or black oxide when exposed to heat. The color is not significant. What is significant is that the oxidation can form a line of demarcation. The thickness of the oxide can show larger fire or more heat. The more it is heated, the greater the oxidation. These color changes can form lines of demarcation. Burn patterns created on metal appliance cabinets may be helpful in determining fire origin and direction of travel.

Rocks and soil, when heated to very high temperatures, will often change colors that may range from yellowish to red.

Soot and char are also subject to oxidation. The dark char of the paper surface of gypsum wallboard, soot deposits, and paint can be oxidized by continued exposure to fire heat. The carbon will be oxidized to gases and disappear from whatever surface it was on. This will result in what is known as clean burn. *(See Section 4.11.)*

**4.8 Melting of Materials.** The melting of a material is a physical change caused by heat. The border between the melted and solid portions of a fusible material can produce lines of heat and temperature demarcation that the investigator can use to define fire patterns.

Many solid materials soften or melt at elevated temperatures ranging from a little over room temperature to thousands of degrees. A specific melting temperature or range is characteristic for each material. *(See Table 4.8.)*

Melting temperatures of common metals range from as low as 338°F to 370°F (170°C to 188°C) for solder to as high as 2660°F (1460°C) for steel. When the metals or their residues are found in fire debris, some inferences concerning the temperatures in the fire can be drawn.

Thermoplastics melt at rather low temperatures, ranging from around 200°F (93°C) to near 750°F (400°C). They can also be consumed in a fire. Thus, the melting of plastics can give information on temperatures, but mainly where there have been hot gases and little or no flame in that immediate area.

Glass melts or softens over a range of temperatures. Nevertheless, glass can give useful information on temperatures during a fire.

**4.8.1 Temperature Determination.** If the investigator knows the approximate melting temperature of a material, an estimate can be made of the temperature to which the melted material was subjected. This knowledge may assist in evaluating the intensity and duration of the heating, the extent of heat movement, or the relative rates of heat release from fuels.

When using such variable materials as glass, plastics, and white pot metals for making temperature determinations, the investigator is cautioned that there is a wide variety of melting temperatures for these generic materials. The best method for utilizing such materials as temperature indicators is to take a sample of the material and have its melting temperature ascertained by a competent laboratory, materials scientist, or metallurgist.

Wood and gasoline burn at essentially the same flame temperature. The turbulent diffusion flame temperatures of all hydrocarbon fuels (plastics and ignitable liquids) and cellulosic fuels are approximately the same, although the fuels release heat at different rates.

The temperature achieved by an item at a given location within a structure or fire area depends on how much it is heated. The amount of heating depends on the temperature and velocity of the airflow, the geometry and physical properties of the heated item, its proximity to the source of heat, and the amount of heat energy present. Burning metals and highly exothermic chemical reactions can produce temperatures significantly higher than those created by hydrocarbon- or cellulosic-fueled fires.

Identifiable temperatures achieved in structural fires rarely remain above 1900°F (1040°C) for long periods of time. These identifiable temperatures are sometimes called *effective fire temperatures*, for they reflect physical effects that can be defined by specific temperature ranges. The investigator can use the analysis of the melting and fusion of materials to assist in establishing whether higher than expected heat energy was present.

**Table 4.8 Approximate Melting Temperatures of Common Materials**

| Material | °F | °C |
|---|---|---|
| Aluminum (alloys)[b] | 1050–1200 | 566–650 |
| Aluminum[a] | 1220 | 660 |
| Brass (yellow)[b] | 1710 | 932 |
| Brass (red)[b] | 1825 | 996 |
| Bronze (aluminum)[b] | 1800 | 982 |
| Cast iron (gray)[a] | 2460–2550 | 1350–1400 |
| Cast iron (white)[a] | 1920–2010 | 1050–1100 |
| Chromium[a] | 3350 | 1845 |
| Copper[a] | 1981 | 1082 |
| Fire brick (insulating)[a] | 2980–3000 | 1638–1650 |
| Glass[a] | 1100–2600 | 593–1427 |
| Gold[a] | 1945 | 1063 |
| Iron[a] | 2802 | 1540 |
| Lead[a] | 621 | 327 |
| Magnesium (AZ31B alloy)[b] | 1160 | 627 |
| Nickel[a] | 2651 | 1455 |
| Paraffin[a] | 129 | 54 |
| Plastics (thermo) | | |
| ABS[d] | 190–257 | 88–125 |
| Acrylic[d] | 194–221 | 90–105 |
| Nylon[d] | 349–509 | 176–265 |
| Polyethylene[d] | 251–275 | 122–135 |
| Polystyrene[d] | 248–320 | 120–160 |
| Polyvinylchloride[d] | 167–221 | 75–105 |
| Platinum[a] | 3224 | 1773 |
| Porcelain[a] | 2820 | 1550 |
| Pot metal[e] | 562–752 | 300–400 |
| Quartz (SiO$_2$)[a] | 3060–3090 | 1682–1700 |
| Silver[a] | 1760 | 960 |
| Solder (tin)[a] | 275–350 | 135–177 |
| Steel (stainless)[b] | 2600 | 1427 |
| Steel (carbon)[b] | 2760 | 1516 |
| Tin[a] | 449 | 232 |
| Wax (paraffin)[c] | 120–167 | 49–75 |
| White pot metal[e] | 562–752 | 300–400 |
| Zinc[a] | 707 | 375 |

[a]From Baumeister, Avallone, and Baumeister III, *Mark's Standard Handbook for Mechanical Engineers*.
[b]From Lide, ed., *Handbook of Chemistry and Physics*.
[c]From NFPA *Fire Protection Guide to Hazardous Materials*.
[d]From *Plastics Handbook*.
[e]From Glick and Gieck, *Engineering Formulas*.

**4.8.2 Alloying of Metals.** The melting of certain metals may not always be caused by fire temperatures higher than the metals' stated melting point. It may be caused by alloying.

During a fire, a metal with a relatively low melting point may drip onto other metals that do not often melt in fires. This phenomenon can also occur when component parts of a heated object are in contact with each other. If the lower-melting-temperature metal can mix with the higher-

melting-temperature metal, that mixture (alloy) will melt at a temperature less than the melting temperature of the higher-melting-temperature metal and in some cases less than that of either metal. Examples of relatively low-melting-temperature metals are aluminum, zinc, and lead. *(See Table 4.8.)* Metals that can be affected by alloying include copper and iron (steel). Copper alloying is often found, but iron (steel) alloying might be found in only a few cases of sustained fire.

Copper wiring and tubing or piping are often affected by alloying. Drips of low-melting-temperature metal may simply stick to the surface if the heating has been brief. With further heating, the low-melting-temperature metal will wet the surface and begin to mix. Aluminum can mix through the wire or wall of the tubing to give a yellow alloy at about 10 percent aluminum, but that is not often found. More commonly, the aluminum will mix in higher proportions and give a brittle silvery alloy. The surface of the spot of aluminum on the surface of the copper may appear gray, and the surface may be fairly dark near the copper–aluminum interface. Copper that has been alloyed with aluminum will be very brittle. For example, bending copper wire at the point of alloying will likely cause it to break there.

When zinc alloys with copper, a yellowish brass will result. Because zinc is less common in buildings than is aluminum, zinc alloying is not often encountered.

Alloys do not form readily with steel in fires. However, if aluminum or zinc is heated for a long time with a steel object, that object may develop pits or holes from alloying.

If fire evidence containing aluminum-alloyed copper is exposed to weather, the alloy may corrode away, leaving neat holes in tubing or blunt ends on wires. Those edges will not have the appearance of melting.

Alloying may be confirmed by metallurgical analysis, and the alloy may be identified. When metals with high melting temperatures are found to have melted due to alloying, it is not an indication that accelerants or unusually high temperatures were present in the fire.

**4.9 Thermal Expansion and Deformation of Materials.** Many materials change shape temporarily or permanently during fires. Nearly all common materials expand when heated. That expansion can affect the integrity of solid structures when they are made from different materials. If one material expands more than another material in a structure, the difference in expansion can cause the structure to fail.

The bending of steel beams and columns in a fire above about 1000°F (538°C) is caused by the progressive loss of strength of the steel. The more the load on any unrestrained steel object, the more will be the deformation for a given time and temperature. Bending is not a matter of melting. Thermal expansion can also be a factor in the bending of the beam, if the ends of the beam are restrained.

Plastered surfaces are also subject to thermal expansion. Locally heated portions of plaster walls and ceilings may expand and separate from their support lath. This breaking away of the plaster can produce lines or areas of heat demarcation displaying V patterns, U patterns, and truncated cone patterns.

**4.10 Smoke and Soot.** Fuels that contain carbon can form soot in their flames. Petroleum products and most plastics form soot most readily. When flames touch walls and ceilings, soot will commonly deposit. A specific deposit shows where there has been a particular fuel load. Soot also deposits on surfaces by settling. Such general soot deposits show merely that soot formed nearby but do not indicate the specific source.

Smoke and soot can collect on cooler surfaces of a building or its contents, often on upper parts of walls in rooms adjacent to the fire. Smoke, especially from smoldering fires, tends to condense on walls, windows, and other cooler surfaces. Because deposits of pyrolysis products tend to be widely distributed, they do not help locate the exact point of origin.

Smoke condensates are shades of brown, whereas soot is black. Smoke condensates can be wet and sticky, thin or thick, or dried and resinous. These deposits, after drying, are not easily wiped off. Where there has been open flame, the deposits will likely be a mixture of soot and smoke. When smoke deposits are subsequently heated in a fire, the brown deposit may be changed in color, texture, and composition and may become darker or charred.

Some fires might produce only dry soot deposits that wipe easily from windows or other surfaces. Floors and top surfaces of contents often get a coating of soot that settles on them during and after sooty fires.

Both the carbonized smoke deposit and soot deposits can be burned off of windows or other surfaces by prolonged exposure to fire.

**4.11 Clean Burn.** Clean burn is a phenomenon that appears on noncombustible surfaces when the soot and smoke condensate that would normally be found adhering to the surface is burned off. This produces a clean area adjacent to areas darkened by products of combustion, as shown in Figure 4.11. Clean burn is produced most commonly by direct flame contact or intense radiated heat.

**FIGURE 4.11** Clean burn on wall surface.



Although they can be indicative of intense heating in an area, clean burn areas by themselves do not necessarily indicate areas of origin. The lines of demarcation between the clean burn and sooted areas may be used by the investigator to determine direction of fire spread or differences in intensity or time of burning.

## Chapter 6   Electricity and Fire

**6.1 Introduction.** This chapter discusses the analysis of electrical systems and equipment. The primary emphasis is on buildings with 120/240-volt, single-phase electrical systems. These voltages are typical in residential and commercial buildings. This chapter also discusses the basic principles of physics that relate to electricity and fire.

Prior to beginning an analysis of a specific electrical item, it is assumed that the person responsible for determining the cause of the fire will have already defined the area or point of origin. Electrical equipment should be considered as an ignition source equally with all other possible sources and not as either a first or last choice. The presence of electrical wiring or equipment at or near the origin of a fire does not necessarily mean that the fire was caused by electrical energy. Often the fire may destroy insulation or cause changes in the appearance of conductors or equipment that can lead to false assumptions. Careful evaluation is warranted.

Electrical conductors and equipment that are used appropriately and protected by properly sized and operating fuses or circuit breakers do not normally present a fire hazard. However, the conductors and equipment can provide ignition sources if easily ignitable materials are present where they have been improperly installed or used. A condition in the electrical wiring that does not conform to the NFPA 70, *National Electrical Code®*, might or might not be related to the cause of a fire.

**6.2 Basic Electricity.**

**6.2.1** The purpose of this section is to present basic electrical terms and concepts briefly and simply in order to develop a working understanding of them.

**6.2.2** Water flowing through a pipe is familiar to everyone. This phenomenon has some similarities to electrical current flowing in an electrical system. Because of these similarities, a limited comparison between a hydraulic system and an electrical system can be used to understand an electrical system.

**6.2.3** Table 6.2.3 shows the basic elements of a hydraulic system along with the corresponding elements of an electrical system.

**6.2.4** In a hydraulic system, a pump is used to create the hydraulic pressure necessary to force water through pipes. In an electrical system, a generator is used to create the necessary electrical pressure to force electrons through a conductor. This electrical pressure is voltage. The amount of hydraulic pressure is expressed in pounds per square inch (psi) and can be measured with a pressure gauge. The amount of electrical pressure is expressed in volts and is measured with a voltmeter.

**6.2.5** In the hydraulic system, it is water that flows in a useful way. In the electrical system, it is electrons that flow in a useful way. This flow is called electrical current. The amount of water flow is expressed in gallons per minute (gpm) and may be measured with a flowmeter. The amount of electrical current is expressed in amperes (A) and may be measured with an ammeter. Electric current can be either direct current (dc), such as supplied by a battery, or alternating current (ac), such as supplied by the electric utility companies.

**Table 6.2.3 Elements of Hydraulic and Electrical Systems Compared**

| Elements of a Hydraulic System | Elements of an Electrical System |
|---|---|
| Pump | Generator |
| Pressure | Voltage (potential or electromotive force) |
| Pounds per square inch (psi) | Volts (V) |
| Pressure gauge | Voltmeter |
| Water | Electrons |
| Flow | Current |
| Gallons per minute (gpm) | Amperes (A) |
| Flowmeter | Ammeter |
| Valve | Switch |
| Friction | Resistance (ohms) |
| Friction loss | Voltage drop |
| Pipe size — inside diameter | Conductor size — AWG No. |

**6.2.6** Direct current flows in only one direction, as in a circulating water system, while alternating current flows back and forth with a specific frequency. In the United States, the frequency of 60 hertz, or 60 cycles per second, is used. For the majority of applications encountered in this text, it is satisfactory to visualize ac circuits as if they were the more easily understood dc circuits. Notable exceptions include transformers and many electric motors that will not work on direct current. In addition, three-phase circuits and single-phase circuits that are not principally resistive cannot be analyzed in the same way as direct current circuits or common single-phase ac circuits. The specific differences between the behavior of alternating current versus direct current are beyond the scope of this document.

**6.2.7** The water pipe provides the pathway for the water to flow. In the electrical system, conductors such as wires provide the pathway for the current.

**6.2.8** In a closed circulating hydraulic system (as opposed to a fire hose delivery system where water is discharged out of the end), water flows in a loop, returning to the pump, where it is circulated again through the loop. When the valve is closed, the flow stops everywhere in the system. When the valve is opened, the flow resumes. An electrical system must be a closed system, in that the current must flow in a loop or in a completed circuit. When the switch is turned on, the circuit is completed and the current flows. When the switch is turned off, the circuit is opened and current flow stops everywhere in the circuit. This voltage drop is called potential or electromotive force, as shown in Figure 6.2.8.

**6.2.9** Friction losses in pipes result in pressure drops. Electrical friction (i.e., resistance) in conductors and other parts also results in electrical pressure drops or voltage drops. To express resistance as a voltage drop, Ohm's law must be used. *(See 6.2.13.)*

When electricity flows through a conducting material, such as a conductor, a pipe, or any piece of metal, heat is generated. The amount of heat depends on the resistance of the material through which the current is flowing and the amount of current. Some electrical equipment, such as a heating unit, is designed with appropriate resistance to convert electricity to heat.

The type of insulation on individual conductors is marked in a code, along with the temperature rating, the manufacturer, and other information. Nonmetallic sheathed cable has the identifications printed on the sheath. The coding for the insulation material is given in Table 310.13 of NFPA 70.

Insulation on individual conductors is made in a variety of colors, some of which indicate specific uses. A grounding conductor must be green. A grounded conductor (neutral) may be white or light gray. An ungrounded conductor (hot) may be any color except green, white, or gray. In 120 V circuits it is commonly black. In 240 V circuits with nonmetallic cable, the two hot legs are commonly black and red. Where individual conductors are pulled through the conduit, the colors might vary more widely, especially if more than one circuit is in the conduit.

**6.7.5.1 Polyvinyl Chloride.** Polyvinyl chloride, or PVC, is a commonly used thermoplastic insulating material for wiring. PVC must be blended with plasticizers to make it soft. Pigments and other modifiers may also be added. PVC, on aging, can slowly lose the plasticizers and become hard and brittle. In a fire, PVC may char and give off hydrogen chloride, a corrosive gas.

**6.7.5.2 Rubber.** Rubber was the most common insulating material until approximately the 1950s. Rubber insulation contains pigments and various modifiers and antioxidants. In time it may become oxidized and brittle, especially if it was hot for long periods. Embrittled rubber has little strength and can be broken off the conductor if it is bent or scraped. Rubber insulation chars when exposed to fire or very high temperatures and leaves an ash when the rubber is burned away.

**6.7.5.3 Other Materials.** Polyethylene and other closely related polyolefins are used as insulation, more commonly on large cables than on insulation for residential circuits. Nylon jackets are put around other insulating materials (usually PVC) to increase the thermal stability of the insulation.

Silicone and fluorinated polyolefin (e.g., Teflon®) insulations are used on conductors that are expected to be installed where elevated temperatures will persist, particularly in appliances.

**6.8 Outlets and Devices.**

**6.8.1 Switches.** Switches are installed to turn the current on or off in parts of circuits that supply installed lights and equipment. Sometimes one or more receptacles are fed from a switch so that a table lamp can be turned on or off. The hot (black) conductor goes to both terminals of the switch while the neutral (white) conductor goes on to the light or device being controlled. The switch should always be put in the run of the black conductor for safety, although the switch will perform properly if put in the run of the white conductor. The switches may have screw terminals or push-in terminals.

**6.8.2 Receptacles.** Receptacles for 15 A and 20 A circuits, illustrated in Figures 6.8.2(a) and 6.8.2(b), are usually duplex. Receptacles for large appliances (30 A or more) are single. Receptacles now must be polarized and of the grounding type, although there are still many nongrounding and nonpolarized receptacles in older installations. The grounding type has a third hole that allows any appliance with a grounding prong in its plug to ground that appliance. In polarized receptacles, the neutral slot is longer than the hot slot. A two-prong plug with a wide neutral prong (polarized plug) can be inserted into the receptacle only with the wide prong in the wide slot and not in the reverse way. All grounding receptacles and plugs are inherently polarized.

**FIGURE 6.8.2(a)   Nongrounding-type receptacle.**

| 15 A ||
|---|---|
| Receptacle | Plug |
| 1-15R | 1-15P |

**FIGURE 6.8.2(b)   Grounding-type receptacle.**

| 15 A || 20 A ||
|---|---|---|---|
| Receptacle | Plug | Receptacle | Plug |
| 5-15R | 5-15P | 5-20R | 5-20P |

In bathrooms or other areas where personal safety is a concern, receptacles may have a built-in ground fault circuit interrupter. (See 6.6.2.3.)

Receptacles may have either screw terminals or push-in terminals and sometimes both. The hot conductor (usually black insulation) should be connected to the brass screw, and the neutral conductor (white insulation) to the colorless metal screw. On grounding-type receptacles, there is a screw with a green head for connecting the grounding conductor of the wiring cable.

**6.8.3 Other Outlets, Devices, or Equipment.** Permanent lighting fixtures are attached to electrical boxes in the wall or ceiling as appropriate with a wall switch in its individual part of the circuit. Thermostats may be mounted in walls to control permanently installed heating units.

In commercial and industrial installations, much of the electrically powered equipment is permanently connected to the basic wiring. Because of the large current draws, much of the equipment may be switched on and off by contactors rather than directly by switches.

In installations where explosive atmospheres might occur, explosionproof outlets and fixtures must be used. The outlet boxes, fittings, and attached devices are designed so that even if explosive concentrations of gases get into the system, an internal ignition will not let a flame front out to ignite the surrounding atmosphere.

**6.9 Ignition by Electrical Energy.**

**6.9.1 General.** For ignition to be from an electrical source, the following must occur:

(1) The electrical wiring, equipment, or component must have been energized from a building's wiring, an emergency system, a battery, or some other source.
(2) Sufficient heat and temperature to ignite a close combustible material must have been produced by electrical energy at the point of origin by the electrical source.

Ignition by electrical energy involves generating both a sufficiently high temperature and heat (i.e., competent ignition source) by passage of electrical current to ignite material that

is close. Sufficient heat and temperature may be generated by a wide variety of means, such as short-circuit and ground-fault parting arcs, excessive current through wiring or equipment, resistance heating, or by ordinary sources such as lightbulbs, heaters, and cooking equipment. The requirement for ignition is that the temperature of the electrical source be maintained long enough to bring the adjacent fuel up to its ignition temperature, with air present to allow combustion.

The presence of sufficient energy for ignition does not assure ignition. Distribution of energy and heat loss factors need to be considered. For example, an electric blanket spread out on a bed can continuously dissipate 180 W safely. If that same blanket is wadded up, the heating will be concentrated in a smaller space. Most of the heat will be held in by the outer layers of the blanket, which will lead to higher internal temperatures and possibly ignition. In contrast to the 180 W used by a typical electric blanket, just a few watts used by a small flashlight bulb will cause the filament to glow white hot, indicating temperatures in excess of 4000°F (2204°C).

In considering the possibility of electrical ignition, the temperature and duration of the heating must be great enough to ignite the initial fuels. The type and geometry of the fuel must be evaluated to be sure that the heat was sufficient to generate combustible vapors and for the heat source still to be hot enough to ignite those vapors. If the suspect electrical component is not a competent ignition source, other causes should be investigated.

**6.9.2 Resistance Heating.**

**6.9.2.1 General.** Whenever electric current flows through a conductive material, heat will be produced. See 6.2.13 for the relationships of current, voltage, resistance, and power (i.e., heating). With proper design and compliance with the codes, wiring systems and devices will have resistances low enough that current-carrying parts and connections should not overheat. Some specific parts such as lamp filaments and heating elements are designed to become very hot. However, when properly designed and manufactured and when used according to directions, those hot parts should not cause fires.

The use of copper or aluminum conductors of sufficient size in wiring systems (e.g., 12 AWG for up to 20 A for copper) will keep the resistance low. What little heat is generated should be readily dissipated to the air around the conductor under normal conditions. When conductors are thermally insulated and operating at rated currents, enough energy may be available to cause a fault or ignition.

**6.9.2.2 Heat-Producing Devices.** Common heat-producing devices can cause fires when misused or when certain malfunctions occur during proper use. Examples include combustibles placed too close to incandescent lamps or to heaters or coffee makers, and deep-fat fryers whose temperature controls fail or are bypassed. *(See Chapter 21.)*

**6.9.2.3 Poor Connections.** When a circuit has a poor connection such as a loose screw at a terminal, increased resistance causes increased heating at the contact, which promotes formation of an oxide interface. The oxide conducts current and keeps the circuit functional, but the resistance of the oxide at that point is significantly greater than in the metals. A spot of heating develops at that oxide interface that can become hot enough to glow. If combustible materials are close enough to the hot spot, they can be ignited. Generally, the connection will be in a box or appliance, and the probability of ignition is greatly reduced. The wattage of well-developed heating connections in wiring can be up to 30–40 W with currents of 15–20 A. Heating connections of lower wattage have also been noted at currents as low as about 1 A.

**6.9.3 Overcurrent and Overload.** Overcurrent is the condition in which more current flows in a conductor than is allowed by accepted safety standards. The magnitude and duration of the overcurrent determines whether there is a possible ignition source. For example, an overcurrent at 25 A in a 14 AWG copper conductor should pose no fire danger except in circumstances that do not allow dissipation of the heat, such as when thermally insulated or when bundled in cable applications. A large overload of 120 A in a 14 AWG conductor, for example, would cause the conductor to glow red hot and could ignite adjacent combustibles.

Large overcurrents that persist (i.e., overload) can bring a conductor up to its melting temperature. There is a brief parting arc as the conductor melts in two. The melting opens the circuit and stops further heating.

In order to get a large overcurrent, either there must be a fault that bypasses the normal loads (i.e., short circuit) or far too many loads must be put on the circuit. To have a sustained overcurrent (i.e., overload), the protection (i.e., fuses or circuit breakers) must fail to open or must have been defeated. Ignition by overload is rare in circuits that have the proper size conductors throughout the circuit, because most of the time the protection opens and stops further heating before ignition conditions are obtained. When there is a reduction in the conductor size between the load and the circuit protection, such as an extension cord, the smaller size conductor may be heated beyond its temperature rating. This can occur without activating the overcurrent protection. For an example, see 6.2.16.

**6.9.4 Arcs.** An arc is a high-temperature luminous electric discharge across a gap. Temperatures within the arc are in the range of several thousand degrees, depending on circumstances including current, voltage drop, and metal involved. For an arc to jump even the smallest gap in air spontaneously, there must be a voltage difference of at least 350 V. In the 120/240 V systems being considered here, arcs do not form spontaneously under normal circumstances. *(See Section 6.12.)* In spite of the very high temperatures in an arc path, arcs may not be competent ignition sources for many fuels. In most cases, the arcing is so brief and localized that solid fuels such as wood structural members cannot be ignited. Fuels with high surface-area-to-mass ratio, such as cotton batting and tissue paper and combustible gases and vapors, may be ignited when in contact with the arc.

**6.9.4.1 High-Voltage Arcs.** High voltages can get into a 120/240 V system through accidental contact between the distribution system of the power company and the system on the premises. Whether there is a momentary discharge or a sustained high voltage, an arc may occur in a device for which the separation of conductive parts is safe at 240 V but not at many thousands of volts. If easily ignitable materials are present along the arc path, a fire can be started.

Lightning can send extremely high voltage surges into an electrical installation. Because the voltages and currents from lightning strikes are so high, arcs can jump at many places, cause mechanical damage, and ignite many kinds of combustibles. *(See 6.12.8.)*

Demonstrative evidence should be authenticated. Evidence is authenticated in one of two ways: through witness identification (i.e., recognition testimony) or by establishing a chain of custody (an unbroken chain of possession from the taking of the item from the fire scene to the exhibiting of the item).

**9.3.2.1.1 Photographs/Illustrative Forms of Evidence.** Among the most frequently utilized types of illustrative demonstrative evidence are maps, sketches, diagrams, and models. They are generally admissible on the basis of testimony that they are substantially accurate representations of what the witness is endeavoring to describe.

Photographs and movies are viewed as a graphic portrayal of oral testimony and become admissible when a witness has testified that they are correct and accurate representations of relevant facts personally observed by the witness. The witness often need not be the photographer but should know about the facts represented or the scene or objects photographed. Once this knowledge is shown, the witness can state whether a photograph correctly and accurately portrays those facts.

**9.3.2.1.2 Samples.** Chain of custody is especially important regarding samples. To ensure admissibility of a sample an unbroken chain of possession should be established.

**9.3.2.2 Documentary Evidence.** Documentary evidence is any evidence in written form. It may include business records such as sales receipts, inventory lists, invoices, bank records, including checks and deposit slips; insurance policies; personal items such as diaries, calendars, telephone records; fire department records such as the fire investigator's report, the investigator's notes, the fire incident report, witness statement reduced to writing; or any law enforcement agency reports, including investigation reports, police officer operational reports, fire or police department dispatcher logs; division of motor vehicle records; written transcripts of audio- or videotape recordings. Any information in a written form related to the fire or explosion incident is considered documentary evidence. Documentary evidence is generally admissible if the documents are maintained in the normal course of business.

All witness statements should be properly signed by the witness, dated, and witnessed by a third party when possible. It is important to obtain the full name, address, and telephone number of the witness. Any additional identifying information (e.g., date of birth, social security number, and automobile license number) may prove helpful in the event that difficulties are later encountered in locating the witness. Statements actually written by the witness may be required in certain jurisdictions.

**9.3.2.3 Testimonial Evidence.** Testimonial evidence is that given by a competent live witness speaking under oath or affirmation. Investigators are frequently called on to give testimonial evidence regarding the nature, scope, conduct, and results of their investigation. It is incumbent on all witnesses to respond completely and honestly to all questions.

**9.3.3 Post-fire Interviews and Witness Statements.** Post-fire interviews of witnesses and the taking of witness statements are an important aspect of the fire investigation process. For specific procedures and techniques to be utilized when conducting interviews, see Section 11.3.

**9.3.4 Constitutional Considerations.** Within the United States and its territories, investigators should be aware of the constitutional safeguards that are generally applicable to any witness when the interview is conducted by a representative, employee, or agent of any governmental entity. This includes members of public fire services and generally extends to most investigators functioning in a public capacity.

Within the United States and its territories, witnesses being interviewed have constitutional guarantees under the Fifth and Sixth Amendments. These guarantees include the right to have an attorney present during questioning. Questions regarding personal identification are not subject to constitutional protection.

In light of the numerous criminal charges that can be made as a result of a fire, each investigator should ascertain whether he or she is required to give warning under the Miranda Rule and, if so, when to give it and how to give it.

The Miranda Rule requires that, prior to any custodial interrogation, the person/witness should be warned of the following:

(1) That they have a right to remain silent
(2) That any statement they do make may be used as evidence against them
(3) That they have the right to the presence of an attorney
(4) That, if they cannot afford an attorney, one will be appointed for them prior to any questioning if they so desire

Unless and until these warnings or a waiver of these rights are demonstrated at trial, no evidence obtained in the interrogation may be used against the accused (formerly the witness) (*Miranda v. Arizona*, 384 U.S. 436).

Witnesses interviewed in "custodial settings" should be advised of their constitutional rights. Though interviews conducted on a fire scene are not generally considered to be custodial, depending on the circumstances, they may be custodial. The custodial setting depends on many variables, including the location of the interview, the length of the interview, who is present and who participates, and the witness's perception of whether he or she will be restrained if he or she attempts to leave. If there is any doubt in the mind of the investigator as to whether the witness is being questioned in a custodial setting, the witness should be advised of his or her constitutional rights. It is recommended that, when a witness is advised of his or her constitutional rights, as required by the Miranda Rule, they be on a written form that can be signed by the witness.

**9.3.5 Burden of Proof.** The burdens of proof in civil cases differ from those in criminal cases.

In a criminal case, because the civil liberties of the defendant are at stake, the prosecutor must prove the defendant's guilt beyond a reasonable doubt.

Civil cases typically involve disputes over money. In most civil cases, the plaintiff must prove his claims by a preponderance of the evidence, which means, "more likely than not."

**9.3.6 Spoliation of Evidence.**

**9.3.6.1** Spoliation of evidence refers to the loss, destruction, or material alteration of an object or document that is evidence or potential evidence in a legal proceeding by one who has the responsibility for its preservation. Spoliation of evidence may occur when the movement, change, or destruction of evidence, or the alteration of the scene significantly impairs the opportunity of other interested parties to obtain the same evidentiary value from the evidence, as did any prior investigator.

**9.3.6.2** The responsibility of the investigator (or anyone who handles or examines evidence) for evidence preservation, and the scope of that responsibility varies based on such factors as

valuable information to the investigator. Industry experts can be found within companies, trade groups, or associations.

**12.5.7 Attorney.** An attorney can provide needed legal assistance with regard to rules of evidence, search and seizure laws, gaining access to a fire scene, and obtaining court orders.

**12.5.8 Insurance Agent/Adjuster.** An insurance agent or adjuster may be able to provide the investigator with information concerning the building and its contents prior to the fire, fire protection systems in the building, and the condition of those systems. Additional information regarding insurance coverage and prior losses may be available.

**12.5.9 Canine Teams.** Trained canine/handler teams may assist investigators in locating areas for collection of samples for laboratory analysis to identify the presence of ignitable liquids.

**12.6\* Case Management.** A method should be employed to organize the information generated throughout the investigation and to coordinate the efforts of the various people involved. This topic of case management is addressed in the context of major loss investigations in Chapter 24 of this guide. It is also the focus of some of the reference material listed at the back of this guide.

## Chapter 13   Recording the Scene

**13.1\* Introduction.** In recording any fire or explosion scene, the investigator's goal is to record the scene through a medium that will allow the investigator to recall his or her observations at a later date and to document the conditions at the scene. Common methods of accomplishing this goal include the use of photographs, videotapes, diagrams, maps, overlays, tape recordings, and notes.

Thorough and accurate recording of the scene is critical because it is from this compilation of factual data that investigative opinions and conclusions will be supported and verified. There are a number of resources to assist the investigator in recording the scene.

**13.2 Photography.** A visual documentation of the fire scene can be made using either film or video photography. Images can portray the scene better than words. They are the most efficient reminders of what the investigator saw while at the scene. Patterns and items may become evident that were overlooked at the time the photographs or videos were made. They can also substantiate reports and statements of the investigator.

Taking a basic photography or video course through a vocational school, camera club, or camera store would be most helpful in getting the photographer familiar with the equipment.

As many photographs should be taken as are necessary to document and record the fire scene adequately. It is recognized that time and expense considerations may impact the number of photographs taken, and the photographer should exercise discretion. It is far preferable to err on the side of taking too many photographs rather than too few.

The exclusive use of videotapes, motion pictures, or slides is not recommended. They are more effective when used in conjunction with still photographs. Also, additional equipment is obviously required to review and utilize videos, films, and slides.

**13.2.1 Timing.** Taking photographs during or as soon as possible after a fire is important when recording the fire scene, as the scene may become altered, disturbed, or even destroyed. Some reasons why time is important include the following.

(a) The building is in danger of imminent collapse or the structure must be demolished for safety reasons.

(b) The condition of the building contents creates an environmental hazard that needs immediate attention.

(c) Evidence should be documented when discovered as layers of debris are removed, as is done at an archaeological dig. Documenting the layers can also assist in understanding the course of the fire.

**13.2.2 Basics.** The most fundamental aspect of photography that an investigator should comprehend is how a camera works. The easiest way to learn how a camera works is to compare the camera to the human eye.

One of the most important aspects to remember about fire investigation photography is light. The average fire scene consists of blackened subjects and blackened background, creating much less than ideal conditions for taking a photograph. As one can imagine, walking into a dark room causes the human eye to expand its pupil in order to gather more light; likewise, the camera requires similar operation. The person in a dark room normally turns on the light to enhance vision, just as a photographer uses flash or floodlight to enhance the imitated vision of the camera.

Both the human eye and the camera project an inverted image on the light-sensitive surface: the film in the camera, and the retina in the eye. The amount of light admitted is regulated by the iris (eye) or diaphragm (camera). In both, the chamber through which the light passes is coated with a black lining to absorb the stray light and avoid reflection.

Regardless of camera type, film speed, or whether slides or prints are being taken, it is recommended that the investigator use color film. The advantage of color film is that the final product can more realistically depict the fire scene by showing color variations between objects and smoke stains.

**13.2.2.1 Types of Cameras.** There is a multitude of camera types available to the investigator, from small, inexpensive models to elaborate versions with a wide range of attachments.

Some cameras are fully automatic, giving some investigators a sense of comfort knowing that all they need to do is point and shoot. These cameras will set the film speed from a code on the film canister, adjust the lens opening (f-stop), and focus the lens by means of a beam of infrared light.

Manual operation is sometimes desired by the investigator so that specialty photographs can be obtained that the automatic camera, with its built-in options, cannot perform. For example, with a manual camera, bracketing (taking a series of photographs with sequentially adjusted exposures) can be performed to ensure at least one properly exposed photograph when the correct exposure is difficult to measure. There are some cameras that can be operated in a manual as well as an automatic mode, providing a choice from the same camera. Most investigators prefer an automatic camera.

A 35 mm single-lens reflex camera is preferred over other formats, but the investigator who has a non–35 mm camera should continue to take photographs as recommended. A back-up camera that instantly develops prints can be advantageous, especially for an important photograph of a valuable piece of evidence.

**13.2.2.2 Film.** There are many types of film and film speeds available in both slide and print film. There are numerous speeds of film (ASA ratings) especially in the 35 mm range. Since 35 mm (which designates the size of the film) is most recognized and utilized by fire investigators, film speeds will be discussed using this size only. The common speeds range

## Chapter 15  Origin Determination

**15.1 Introduction.** This chapter recommends a procedure to follow in determining the origin of a fire. Chapter 16 further develops the investigative efforts based on the results from the origin determination. Generally, if the origin of a fire cannot be determined, the cause cannot be determined.

Determination of the origin of the fire frequently involves the coordination of information derived from the following:

(1) The physical marks (fire patterns) left by the fire

(2) The observations reported by persons who witnessed the fire or were aware of conditions present at the time of the fire

(3) The analysis of the physics and chemistry of fire initiation, development, and growth as an instrument to related known or hypothesized fire conditions capable of producing those conditions

(4) Noting the location where electrical arcing has caused damage and the electrical circuit involved (*see Section 6.10*)

In some instances, a single item, such as an irrefutable article of physical evidence or dependable eyewitness to the initiation, can be the basis for a conclusive determination of origin. In most cases, however, no single item is sufficient in itself. The investigator then should use all of the available resources in developing potential scenarios and determining which scenarios plausibly fit all of the evidence available. When an apparently plausible scenario fails to fit some item of evidence, it is critical that the investigator determine whether the scenario or the evidence is erroneous. In some cases, it will be impossible to unquestionably fix the origin of a fire. It is important that the determination of a single point of origin not be made unless the evidence is conclusive. Where a single point cannot be identified, it can still be valuable for many purposes to identify possible sources of origin. In such instances, the investigator should provide a complete list of plausible explanations for the origin with the supporting evidence for each option.

The various activities of origin determination often occur simultaneously with those of cause investigation and failure analysis. Likewise, recording the scene, note taking, photography, and evidence identification and collection are performed simultaneously with these efforts. Generally, the various activities of origin determination will follow a routine sequence, while the specific actions within each activity are taking place at the same time.

The area of origin is almost always determined by examining the fire pattern evidence of the fire scene, starting with the areas of least damage and moving toward the areas of greatest damage. If identifiable, movement and intensity fire patterns should be traced back to an area or point of origin. Once the area of origin has been established, the investigator should be able to understand and document the fire spread. The purpose of determining the origin of the fire is to identify the geographical location where the fire began. Once the area of origin has been determined, based on the patterns produced by the movement of heat, flame, and smoke, then the specific location of the origin can be identified. The specific origin will be where the heat ignited the first fuel and is commonly referred to as the point of origin.

Investigators should establish a systematic procedure to follow for each type of incident. By following a familiar procedure, the investigator can concentrate on the incident at hand and need not dwell on the details of what the next step in the procedure will be. More important, the investigator may avoid inadvertently overlooking a significant facet of the investigation.

This chapter discusses a recommended procedure for the examination of the fire scene evidence. Basically, this procedure consists of a preliminary scene examination, development of a preliminary fire-spread scenario, an in-depth examination of the fire scene, a fire scene reconstruction, development of a final fire-spread scenario, and identification of the fire's origin.

Throughout this chapter, the discussion addresses the recommended technique to follow when examining fire scene evidence. This technique serves to inform the investigator but is not meant to limit the origin determination to only this procedure. All aspects of the fire event should be considered by the investigator during the investigation. Such aspects as witness statements, the investigator's expertise, and fire-fighting procedures play important roles in the determination of the fire origin. However, these aspects are addressed in other areas of this guide and in other texts on these subjects.

**15.2 Fire Damage Assessment.** Investigators will be making assessments of fire spread throughout the examination of the scene. These assessments include recognizing and documenting heat movement and intensity patterns and analyzing the importance and direction of each pattern found. (*See Chapters 4 and 13.*)

**15.2.1 Notes.** During this process, the investigator should be making detailed, written or tape-recorded notes. These notes should list all the pertinent observations, including the type, location, description, and measurements of the patterns; the material on which the patterns are displayed; and the investigator's analysis of the direction and intensity of the patterns.

**15.2.2 Photography.** The patterns should be photographed several different ways to effectively show their shape, size, relationship to other patterns, and the location within the fire scene. These variations should include changes in the viewing angle of the camera when documenting the pattern and different lighting techniques to highlight the texture of the pattern.

**15.2.3\* Vector Diagrams.** The use of heat and flame vector diagrams can be a very useful tool for analysis by the investigator. Vectoring is applied by constructing a diagram of the scene. The diagram should include walls, doorways and doors, windows, and any pertinent furnishings or contents. Then, through the use of arrows, the investigator notes his or her interpretations of the direction of heat or flame spread based upon the identifiable fire patterns present. The arrows can point in the direction of fire travel from the heat source, or point back toward the heat source, as long as the direction of the vectors is consistent throughout the diagram. The arrows can be labeled to show any one of several variable factors, such as temperature, duration of heating, heat flux, or intensity. An example is shown in Figure 15.2.3.



**FIGURE 15.2.3** Heat and vector analysis diagram showing vectors of the physical size and direction of heat travel of the fire pattern. *(Source: Kennedy and Shanley, "USFA Fire Burn Pattern Tests — Program for the Study of Fire Patterns.")*

Complementary vectors can be added together to show actual heat movement directions. In that case, the investigator should clearly identify which vectors represent actual fire patterns and which vectors represent heat flow derived from the investigator's interpretations of these patterns. A vector diagram can give the investigator an overall viewpoint to analyze. The diagram can also be used to identify any conflicting patterns that need to be explained.

An important point to be made regarding this discussion is the terminology *heat source* and *source of heat*. These terms are not synonymous with the origin of the fire. Instead, these terms relate to any heat source that creates an identifiable fire pattern. The heat source may or may not be generated by the initial fuel. An example of this would be a fire that spreads into a garage and ignites the flammable liquids stored there. These flammable liquids then produce a new heat source that produces fire patterns on the garage's surfaces. Therefore it is imperative that the use of heat and flame vector analysis be tempered by an accurate understanding of the progress of the fire and basic fire dynamics.

**15.2.4 Depth-of-Char Survey Grid Diagrams.** The investigator should record in his or her notes the results of any depth-of-char surveys that are conducted. This notation should be documented in the notes as well as on a drawn diagram. For analysis purposes, the investigator can construct a depth-of-char grid diagram. On this diagram, the char measurements are recorded on graph paper to a convenient scale. Once the depth-of-char measurements have been recorded on the diagram, lines are drawn connecting points of equal, or nearly equal, char depths. The resulting "isochars" may display identifiable lines of demarcation and intensity patterns.

**15.3 Preliminary Scene Assessment.** An initial assessment should be made of the fire scene. This assessment should begin from the areas of least damage to the areas of greatest damage and should include an overall look at the structure, both exterior and interior, and at all pertinent areas surrounding the building. The purpose of this initial examination is to determine the scope of the investigation, such as equipment and manpower needed, to determine the safety of the fire scene, and to determine the areas that warrant further study.

Descriptions of all locations should be as precise as possible. Directions should be oriented to a compass or to a reference, such as the front of the structure. In every instance, the location, and any related discussion, should be stated in such a fashion that others using the description can clearly locate the area in question.

**15.3.1 Surrounding Areas.** Investigators should include in their examination the areas around the structure. These areas may exhibit significant evidence or fire patterns, away from the involved structure, that enable the investigator to better define the site and the investigation. Anything of interest should be documented as to its location in reference to the structure.

Surrounding areas should be examined for evidence that may relate to the incident, such as contents from the burned structure and fire patterns. This phase of the examination can be used to canvas the neighborhood for witnesses to the fire and for persons who could provide information about the building that burned.

**15.3.2 Weather.** Analyze weather factors that may have influenced the fire. The surrounding area may provide evidence of the weather conditions. Wind direction may be indicated by smoke movement or by fire damage on the surrounding structures or vegetation.

**15.3.3 Structural Exterior.** A walk around the entire structure may reveal the extent and location of damage and may help determine the size of the scene that should be examined as well as the possibility of extension from an outside fire source. The construction and use of the structure should be noted. The construction refers to how the building was built, types of materials used, exterior surfaces, previous remodeling, and any unusual features that may have affected how the fire began and spread. A significant consideration is the degree of destruction that can occur in a structure consisting of mixed types and methods of construction. For instance, if a structure consists of two parts, one built in the early 1900s and the second built in the 1960s, the degree of destruction can vary considerably within these two areas, with all other influencing factors being equal.

The nature of occupancy refers to the current use of the building. Use is defined as the activities conducted; the manner in which such activities are undertaken; and the type, number, and condition of those individuals occupying the space. If the use of the building has changed from what it was originally built for, this change should be considered.

The fire damage on the exterior should be noted to assist in determining those areas that warrant further study. An in-depth examination of the damage is not necessary at this point in the investigation.

**15.3.4 Structure Interior.** On the initial assessment, investigators should examine all rooms and areas of the structure. The investigator should be observant of conditions of occupancy, including methods of storage, nature of contents, and shape of living conditions. The type of construction and surface covering should be noted. Moving from the least burned to the most burned areas, indicators of smoke and heat movement, areas of fire damage, and extent of damage in each area — severe, moderate, minor, or none — should be noted. This damage should be compared with the damage seen on the exterior. The investigator should use this opportunity to assess the soundness of the structure so that the safety of the structure can be determined. See Chapter 10 for further information regarding safety.

The primary purpose of the preliminary interior assessment is to identify the areas that require closer examination. Therefore, the investigator should be observant for possible

and unnatural openings. Window, door, and vent openings provide natural passages for smoke and heat and can be indicators of the flow of fire and fire products. Unnatural openings include holes created by the fire and holes created during the suppression effort. Holes created by the fire indicate an area of intense burning inside the structure. Separate and distant holes created by fire can be indicative of multiple origins, concentrated fuel loads, or simply a spreading fire that developed more than one intense impact on a vulnerable point in the structure envelope.

Holes created by fire suppression activities are generally associated with forced entry attempts, ventilation of the combustion gases, or spot-fire extinguishment. Ventilation attempts can greatly affect fire movement inside the building, thereby creating fire patterns that appear abnormal. Investigators should use care in evaluating such fire damage by conferring with the fire combat personnel to learn what happened inside the structure when the ventilation took place. Such evidence can be helpful in appraising, through methods such as vectoring, the flow of fire and fire effects.

**15.6 Detailed Interior Surface Examination.** An interior surface examination generally is performed before any attempt is made to formulate an opinion as to fire origin. In the majority of structure fires, the origin is within the structure, and no finite origin determination is possible by just an exterior examination. In the event the fire clearly did not begin inside, the interior should still be evaluated and documented. Many issues can arise from a fire's occurrence that do not relate to origin determination. Photographs and diagrams of the interior can provide answers to questions that arise from these issues.

The interior surface examination will follow a procedure similar to the exterior surface examination. The analysis of the fire damage should utilize the same techniques discussed in Section 15.5.

**15.6.1 Pre-fire Conditions.** The pre-fire conditions in the interior of the structure should be documented, especially in the areas where there was fire development and spread. The housekeeping, or lack of it, should be noted. The presence of any evidence of concentrations of easily ignitable materials, such as trash, should be noted. The investigator should note whether the electrical devices are properly utilized. Any indications that might relate to electrical overloading, power cord abuse, appliance abuse, and so forth should be noted. These do not solely determine a fire cause, but they can be supportive, or contradictory, to subsequent cause determinations.

Any interior fire suppression or fire protection devices such as smoke alarms, fire extinguishing systems, fire doors, and so forth should be located. The investigator should determine whether they are in working order and whether they functioned properly during the fire. The investigator should note whether they have been disabled or inadequately maintained.

The investigator should look at the fuel loads present in the structure and should note whether they are consistent with what is expected in this structure and whether they added to the fire's development. The fuel load considerations should include the interior surface covering and furnishings.

The ultimate determination is whether the pre-fire conditions created the fire or greatly contributed to the fire's origin, cause, or spread.

**15.6.2 Utilities.** The condition of the utility services in the structure should be located and documented. Documentation may involve simply photographing the electrical distribution panel for a home, or it may involve studying a complex electrical distribution system for a large industrial building. In either event, the type and method used to distribute electricity should be determined, and damage to the systems should be documented.

The fuel gas utility should be identified and documented. The purpose of this examination is to assist in determining whether the fuel gas contributed to the fire's spread. If the examination reveals that fuel gases may have had a role in the fire's spread, then the distribution system should be examined in detail, including pressure testing for leaks. Remember, fires can, and usually do cause a perfectly good gas distribution system to leak.

**15.6.3 Explosion.** The procedure used in the exterior surface examination should also be used inside the building. Any displacement of interior structures should be noted, including the distance of the displacement and the direction. The center of explosion damage should be located if possible.

Once the investigation has determined that an explosion has occurred, the investigator should try to determine whether the explosion preceded a fire or followed a fire's inception. This can sometimes be determined by noting the condition of normally hidden or protected surfaces, such as inside the walls. Unburned components from the structure, found outside the perimeter of the structure, can also be an indication of a pre-fire explosion. Post-fire explosions can produce flaming brands that have been propelled outside the structure. See Chapter 18 for a detailed discussion on the investigation of explosions.

**15.7 Fire Scene Reconstruction.** The purpose of fire scene reconstruction is to recreate as nearly as possible the state that existed prior to the fire. Such fire scene reconstruction allows the investigator to see the fire patterns on the exposed surfaces and enables the investigator to make a more accurate origin analysis. A further benefit is the probability that complete exposure of the fire scene will enable other persons to better visualize the fire patterns. Interviews, diagrams, photographs, and other means can be helpful in establishing pre-fire conditions.

Since the preliminary scene assessment has identified the areas warranting further study, the task of fire scene reconstruction may not require the removal of debris and the replacement of the contents throughout the entire structure. As mentioned previously, the preliminary scene assessment should not be done hastily. Careful analysis of the fire scene may help to reduce to a practical level the strenuous task of debris removal. If the area to be reconstructed cannot be reduced, then the investigator should accept the necessity of removing the debris from the entire area of destruction.

**15.7.1 Safety.** Another important consideration is safety during the reconstruction effort. Debris removal can weaken a structure and cause it to collapse. Debris removal can uncover holes in the floor and can expose energized electrical wiring. A recent development is the recognition of the risk to the investigator from hazardous substances. Risks encountered during an investigation should be minimized before the investigation continues. See Chapter 10 for a detailed discussion on safety.

**15.7.2 Debris Removal.** Adequate debris removal is essential. Inadequate removal of debris and the resultant exposure of only portions of the fire patterns can lead to gross misinterpretation of the fire patterns. A fire scene investigation involves dirty, strenuous work. Acceptance of this fact is the first step in conducting a proper fire investigation.

The removal of debris during overhaul is an area of concern to the fire investigator. Fire crews that remove all debris and contents from the fire scene may remove evidence, thus making origin determination more difficult. During the suppression stage of the fire ground activities, no more site alteration should be made than necessary to ensure extinguishment of the fire. When circumstances call for substantial site alterations, an attempt should be made to document the fire scene prior to the alterations if possible.

Use some thought as to where debris will be placed during reconstruction. Moving debris twice is counterproductive. Debris removal should be performed in a deliberate and systematic fashion. This means that debris should be removed in layers, with adequate documentation as the process continues. If more than one investigator is doing the removal, they should discuss the purpose for the debris removal and what they expect to find. A discussion may prevent one investigator from throwing away something the other investigator considers important.

**15.7.3 Contents.** Any contents or their remains that are uncovered during debris removal should be noted as to their location, condition, and orientation. This precaution is important to the replacement of these contents in their pre-fire positions. Once the debris has been removed, the contents should be placed in their pre-fire positions for analysis of the fire patterns on them.

When the contents have been displaced during fire suppression activities, post-fire replacement becomes much more difficult. Usually the position where the item sat will bear a mark from the item, such as table legs leaving small clear spots on the floor. The problem is knowing which leg goes to which spot. If a definite determination is not possible, then the item should not be included in the fire scene reconstruction. A guess as to how contents were oriented can be wrong, thereby contributing false data to the analysis process. An alternative is to document the contents in all probable positions in the hope that later information will pinpoint the true location.

**15.7.4 Models in Reconstruction.** In recent years, the development of fire science and technology has produced a number of analytical tools derived from the physics and chemistry of fire and the measurement of the property of materials. Many of these are in the form of collected interrelated calculations frequently called *fire models*. The analytical reconstruction techniques provide an additional tool in the analysis of the fire and origin determinations. Until very recently, the computational methods required large computers and a high level of science expertise to use and understand the meaning and validity of the outputs.

Currently a series of more user-friendly, simpler-to-operate analytical tools have emerged. Some can be executed with simple handheld calculators. Most, however, require the modern personal computer as the minimum tool. As emerging tools, these fire models require varying degrees of expertise by the user. In general, the user of a fire model is responsible for ascertaining that the method used is appropriate, that the data input is proper, and that the output is properly interpreted. Those who are not sufficiently informed to have an adequate level of confidence so that they can support the use of the fire models and their validity, if challenged, should not unilaterally use such methods. Users who do not have that competence should not use these analytical tools without the guidance and assistance of a person who can take that responsibility. Because of the value of these tools, however, practitioners are urged to become aware of them and to study, understand, and use those most appropriate to their needs and capabilities.

**15.8 Fire-Spread Scenario.** Once the factual information is compiled from the exterior and interior surface examinations, the investigator should finalize the fire-spread scenario on how the fire spread in and on the structure. The purpose of the fire-spread scenario is to determine an area of fire origin. Contradictions to the scenario should be recognized and resolved. If resolution is not possible, then the scenario should be re-evaluated to minimize the contradictions. To resolve contradictions, the data should be re-examined to see whether another reason can be found for why the damage exists as it does. Other investigators can be enlisted to assist in the evaluation of the fire damage and its explanation. Ultimately, a weighing of the scenario against the remaining contradictions should be made to decide whether the determination of an area of origin is valid.

If an area of origin is identified, then all potential ignition sources should be located and identified for a further reduction of the area of origin to a point of origin.

If no determination is made as to the fire's origin, then the determination of the fire's cause becomes very difficult. In some instances, where no origin determination is possible, a witness may be found who saw the fire in its incipient stage and can provide the investigator with an area of fire origin. Such circumstances create a burden on the fire investigator to conduct as thorough an investigation as possible to find facts that can support or refute the witness's statements.

**15.9 Total Burns.** A fire that is allowed to burn unimpeded until it self-extinguishes due to a lack of fuel can present unique problems to the investigator. This does not mean, however, that such fire scenes are not worthy of investigation. While such circumstances generally produce fire scenes incapable of origin and cause determinations, some will render valuable information when subjected to a systematic and thorough analysis.

The information to be obtained includes the physical description of the structure and the type of construction. This information may be obtained from the insurance carrier, local zoning authorities, and local building officials. The local utilities should be consulted for information on the building's past and recent utility requirements.

In the case of the occupancy of the building, the insurance carrier, real estate officials, and neighbors should be consulted.

Even though the initial view of the site may show nothing other than a hole in the ground containing fire debris, the site should be approached systematically. A slow methodical search from the perimeter should be made by walking around the entire remains. All recognizable items should be noted and inspected. A site plan should be made with these items located on it.

Inspection within the perimeter may verify the floor plan of the structure. The noncombustible contents of the structure generally will be found almost directly beneath their pre-fire location. This generally will allow the investigator to identify the bathrooms, kitchens, and utility rooms.

Sometimes the vertical locations of contents will assist the investigator in determining what level they had occupied within the structure. For instance, bed frames from second story bedrooms will generally end up on top of the first story contents with debris sandwiched between them.

Once the initial site assessment is complete, the debris should be removed carefully and the contents located, identified, and studied. One of the benefits of this type of structural destruction is that the site is rarely altered by earlier investigations or overhaul operations.

A purpose of the examination of the contents is to determine whether the noncombustible contents found correspond to the type and amount of contents expected in a structure of the same occupancy. Residential structures contain essential contents such as refrigerators and heating systems, and most contain other contents such as televisions and cooking appliances. These items will survive to some degree even in the most severe fires.

Another purpose for studying the contents is to note the differing degrees of heating effects on them. If contents in one area of the structure exhibit melted metal remains while others do not, then the investigator can make the assumption that temperatures in one area exceeded temperatures in another. If the metal remains of the contents are badly oxidized, such examinations may not be possible.

Total burn fire scenes present their own unique problems, but then so do many other fire scenes. Although the primary objective of the fire investigator is to determine the origin and cause of a fire, there are areas of interest to other involved parties that deserve to be considered. Careful examination of totally burned sites can answer questions that may arise from these other parties long after the fire scene has been cleaned up.

## Chapter 16   Cause Determination

**16.1 General.** While the focus of this chapter is on determining the cause of a fire or explosion incident, it is recognized that the purpose of fire investigations is often much broader. The ideal goal of any particular fire investigation is to come to a correct conclusion about the significant features of a particular fire or explosion incident. The significant features can be grouped under four headings, as follows.

(a) *The cause of the fire or explosion.* This feature involves a consideration of the circumstances, conditions, or agencies that bring together a fuel, ignition source, and oxidizer (such as air or oxygen), resulting in a fire or a combustion explosion.

(b) *The cause of damage to property resulting from the incident.* This feature involves a consideration of those factors that were responsible for the spread of the fire and for the extent of the loss, including the adequacy of fire protection, the sufficiency of building construction, and the contribution of any products to flame spread and to smoke propagation.

(c) *The cause of bodily injury or loss of life.* This feature addresses life safety components such as the adequacy of alarm systems, sufficiency of means of egress or in-place protective confinement, the role of products that emit toxic by-products that endanger human life, and the reason for fire fighter injuries or fatalities.

(d) *The degree to which human fault contributed to any one or more of the causal issues described in (a), (b), and (c).* This feature deals with the human factor in the cause or spread of fire or in bodily injury and loss of life. It encompasses acts and omissions that contribute to a loss, such as incendiarism and negligence.

The cause of a fire or the causes of damage or casualties may be grouped in broad categories for general discussion, for assignment of legal responsibility or culpability, or for reporting purposes. Local, state, or federal reporting systems or legal systems may have alternative definitions that should be applied as required.

The determination of the cause of a fire requires the identification of those circumstances and factors that were necessary for the fire to have occurred. Those circumstances and factors include, but are not limited to, the device or equipment involved in the ignition, the presence of a competent ignition source, the type and form of the material first ignited, and the circumstances or human actions that allowed the factors to come together to allow the fire to occur. An individual investigator may not have responsibility for, or be required to address, all of the issues described in this section. A particular investigation may or may not require that all of these issues be addressed.

The cause of any particular fire may involve several circumstances and factors. For example, consider a fire that starts when a blanket is ignited by an incandescent lamp in a closet. The various factors include having a lamp hanging down too close to the shelf, putting combustibles too close to the lamp, and leaving the lamp on while not using the closet. The absence of any one of those factors would have prevented the fire. The function of the investigator is to identify those factors and circumstances that contributed to the cause.

**16.2 Classification of the Cause.** The cause of a fire may be classified as accidental, natural, incendiary (arson), or undetermined. Use of the term *suspicious* is not an accurate description of a fire cause. Mere suspicion is not an acceptable level of proof for making a determination of cause within the scope of this guide and should be avoided. Such fires should be classified as undetermined.

**16.2.1 Accidental Fire Cause.** Accidental fires involve all those for which the proven cause does not involve a deliberate human act to ignite or spread fire into an area where the fire should not be. In most cases, this classification will be clear, but some deliberately ignited fires can still be accidental. For example, in a legal setting, a trash fire might be spread by a sudden gust of wind. The spread of fire was accidental even though the initial fire was deliberate.

**16.2.2 Natural Fire Cause.** Natural fire causes involve fires caused without direct human intervention, such as lightning, earthquake, wind, and the like.

**16.2.3 Incendiary Fire Cause.** The incendiary fire is one deliberately ignited under circumstances in which the person knows that the fire should not be ignited.

**16.2.4 Undetermined Fire Cause.** Whenever the cause cannot be proven, the proper classification is *undetermined.* The fire might still be under investigation, and the cause may be determined later. In the instance in which the investigator fails to identify all of the components of the cause of the fire, it need not always be classified as undetermined. If the physical evidence establishes one factor, such as the presence of an accelerant, that may be sufficient to establish the cause even where other factors such as ignition source cannot be determined. Those situations are also encountered to a lesser degree in accidentally caused fires. Determinations under such situations are more subjective. Therefore, investigators should strive to keep an open unbiased thought process during an investigation.

**16.2.5 Process of Elimination.** Any determination of fire cause should be based on evidence rather than on the absence of evidence; however, when the origin of a fire is clearly defined, it is occasionally possible to make a credible determination regarding the cause of the fire, even when there is no physical evidence of that cause available. This finding may be accomplished through the credible elimination of all other potential causes, provided that the remaining cause is consistent with all known facts.