UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
**Northern Division**

| | |
|---|---|
| DARRELL M. GROSS, | : |
| Plaintiff, | : |
| v. | : Case No.: MJG 01CV3203 |
| DAIMLERCHRYSLER CORPORATION, et al. | : |
| Defendants | : |

**DEFENDANT DAIMLERCHRYSLER CORPORATION'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR DISMISSAL OR SANCTIONS FOR SPOLIATION OF EVIDENCE**

In response to DaimlerChrysler Corporation's ("DCC") spoliation motion, plaintiff Darrell "Mike" Gross makes only a token effort to dispute that his vehicle has been irreparably altered from its post-fire condition to the point of destruction. After Gross half-heartedly asserts that the photographs taken by his experts – as well as the almost unviewable videotape – are sufficient to document the post-fire condition of the car, he focuses his attention on the argument that his spoliation of the evidence has not caused sufficient prejudice to DCC to require sanctions. But plaintiff's claim that DCC is not severely prejudiced is simply incorrect. As a direct result of plaintiff's action (and the actions of his experts), DCC has been deprived of the opportunity to develop a complete defense. DCC has been denied the opportunity to present the jury with a cohesive theory of how the fire in question happened. Instead, DCC has been restricted to attempting to disprove plaintiff's theory with only the remnants of the most important evidence and, with respect to some parts of the vehicle, not even that. Accordingly, DCC has been severely prejudiced by Gross's actions and, given the extent of the destruction and the clear prejudice to DCC, a jury instruction will not sufficiently resolve the prejudice. The only sanctions

that will re-level the playing field are dismissal of the case outright or exclusion of all evidence related to the vehicle.

I.   **GROSS'S EXPERTS DESTROYED MATERIAL RELEVANT EVIDENCE**

There is little question that Gross knowingly allowed the destruction of relevant evidence without notifying DCC.  In his opposition, Gross first argues unconvincingly that he should not be sanctioned because he did not know DCC would be a party to any future litigation until the conclusion of his experts' investigation.[1]   This argument is without merit because a plaintiff is required to preserve relevant evidence or provide notice to all "potential" defendants and "interested parties."[2]  Gross may not have decided to bring suit against DCC before the car was dismantled, but he cannot legitimately claim that he did not know that DCC was an interested party until the demolition was complete.[3]

---

[1]   Opposition of Plaintiff Darrell M. Gross To Motion of Defendant DaimlerChrysler Corporation For Dismissal or Sanctions For Spoliation of Evidence ("Pl.'s Opp.") at 3.

[2]   Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001) ("Spoliation refers to the destruction or material alteration of evidence . . . for another's use as evidence in pending or reasonably foreseeable litigation." (emphasis added); NFPA 921: Guide for Fire and Explosion Investigations, § 24.2 (2001 ed.) (relevant portions previously filed as Ex. 4 to DCC's Appendix of Exhibits submitted Jan. 9, 2003, additional pages attached as Ex. 41) ("Interested parties should be allowed to participate in the investigation and examine the evidence in its undisturbed condition.  No party should remove evidence or materials without adequate notice to other interested parties.") (emphasis added); see also Baliotis v. McNeil, 870 F. Supp. 1285, 1290 (M.D. Pa. 1994) (insurer's contention that it had not decided to pursue subrogation claim when fire scene was destroyed is insufficient to defend against spoliation claim; "[T]he knowledge of a potential subrogation claim is deemed sufficient to impose a duty to preserve evidence." (emphasis in original)).

[3]   The claim that Gross had not identified DCC as a target before the wiring harness was violently ripped from the vehicle without any attempted preservation of evidence is also belied by his expert's own notes, which state in part, "Examined under dash area.  Found wiring harness that showed evidence of internal overheat." See Notes of Christopher Schemel (previously filed as Ex. 10).  Besides reaching a premature conclusion about the import of the visual evidence, this statement suggests that Schemel and his team had reached some conclusion about the cause of the fire and who was responsible before the destruction of the wiring harness.

Gross's Dodge Intrepid was designed and assembled by DCC – a fact that was readily known to Gross and his counsel. Moreover, there can be little doubt that DCC was seen as a potential defendant from the moment when Gross first retained counsel. Thus, Gross cannot so easily brush aside his failure to notify DCC before the destruction began.

Furthermore, Gross's second argument – that no relevant evidence was lost because (1) none of the parts that were removed from the vehicle were destroyed, (2) the vehicle chassis has not been disposed of, and (3) plaintiff's experts took numerous still photographs of the vehicle during the disassembly – also misses the mark. It is not only the total destruction of a piece of evidence that constitutes spoliation, but rather any "movement" or "change" or "material alteration."[4] The post-fire condition of a location or object is of the utmost importance in any fire investigation, and spoliation may occur due to nothing more than simple debris removal.[5] In fact, the National Fire Protection Association's Guide for Fire and Explosion Investigations ("NFPA 921") specifically cautions against removal of debris before consulting with other investigators:

> If more than one investigator is doing the removal, they should discuss the purpose for the debris removal and what they expect to find. A discussion may prevent one investigator from throwing away something the other investigator considers important.[6]

---

[4] Silvestri, 271 F.3d at 590; NFPA 921, § 9.3.6.1 (2001 ed.).

[5] See NFPA 921 § 15.7.2 ("Debris removal should be performed in a deliberate and systematic fashion. This means that debris should be removed in layers, with adequate documentation as the process continues."); Hoffman v. Ford Motor Co., 587 N.W.2d 66, 69 (Minn. Ct. App. 1998) (finding prejudice from spoliation "even though there were photographs of fire debris" because "they did not show the debris in layers, and ordinarily fire debris is inspected layer by layer.").

[6] NFPA 921 § 15.7.2.

\\\DC - 58376/0119 - 1702765 v1

Here, it is undisputed that plaintiff dismantled the vehicle and disturbed much relevant evidence in the process without consulting DCC or any other potentially interested party. Gross does not contest that there are piles of removed debris lying around the inside of the storage unit where the vehicle has been kept.[7] The video clips provided to the Court show various instances where parts were removed without any regard for whether sensitive residue and burn patterns would be destroyed (or irreparably altered). Further, it is not contested that wire connections and circuitry, the outer and inner condition of wiring and insulation exposed to the fire, the wrapping and covering on many wires, as well as the proximity of various components to sources of open flame were all destroyed before DCC was given an opportunity to observe the vehicle. Thus, even if the removed parts and the chassis of the vehicle are still available for visual inspection, it is clear that there have been material changes and alterations to the post-fire condition of the vehicle. Gross cannot argue that there was no spoliation merely because the pieces of the car have not been thrown away.[8]

Moreover, the photographs and videotapes taken by Gross's experts are insufficient alternative sources of information. As DCC explained in detail in its Memorandum of Points and Authorities in Support of Its Motion For Dismissal or For Sanctions For Spoliation of Evidence, the videotapes taken

---

[7]   See Deposition of Robert D. Banta (Sept. 19, 2002) at 122-23 ("So while it is probable that everything in the car is there, it's not in a form or a location where it can now be put back. For example, all of this charred material is in huge bags. I spread it out on the ground and looked over and said, my God, I can't believe this. All of this stuff is . . . no longer with the car. It's just piled up in bags in the corner of the facility.") (relevant portions previously filed as Ex. 18, additional pages attached as Ex. 38).

[8]   American Family Ins. Co. v. Village Pontiac GMC, Inc., 585 N.E.2d 1115, 1118 (Ill. App. Ct. 1992) (finding spoliation even though wires from the burned vehicle were saved and plaintiffs took photographs of the vehicle).

by Gross's experts are of no use whatsoever because of their poor quality.[9] In addition, the photographs and tapes show only what Gross's experts chose to photograph or tape, and they present the evidence in only two dimensions.[10] Other courts faced with this issue have found that photographs are not the equivalent of an in-person inspection of the unaltered evidence.[11] Further, even though Gross makes a point of discussing Dr. Roby's membership in the NFPA and his association with the NFPA 921 committee, Gross has not provided any explanation for why the NFPA guidelines were not followed in their entirety. For example, Gross does explain why his experts did not follow NFPA 921's special instructions for electrical wiring and electrical conductors.[12] In particular, Gross does not have any

---

[9]  See Mem. of Points & Auth. In Support of Defendant DaimlerChrysler Corporation's Motion For Dismissal or Sanctions For Spoliation of Evidence at 17-18.

[10]  See Hoffman, 587 N.W.2d at 69 (affirming exclusion of evidence and testimony where "[a]ll of the experts agreed that the best evidence of the origin and cause of a fire is the fire scene itself, including . . . burn patterns, residuals of combustibles, and fire debris. No expert believed that an adequate investigation could be conducted based solely on photographs taken by others. The experts agreed that an investigator relies on multiple senses in fire inspections as he looks at, smells and touches various areas and items.").

[11]  Id.; see also Bridgestone/Firestone N. Am. Tire v. Campbell, 574 S.E.2d 923, 926 (Ga. Ct. App. 2002) ("Although the existence of photographs may mitigate the loss, they are no substitute for the actual evidence."); Kirkland v. New York City Hous. Auth., 666 N.Y.S.2d 609, 611 (N.Y. App. Div. 1997) ("[P]hysical evidence often is the most eloquent impartial 'witness' to what really occurred."); Capitol Chevrolet, Inc. v. Smedley, 614 So. 2d 439, 441 (Ala. 1993) (defendant's expert explained that photographs were inadequate because they reflected the findings of plaintiff's expert and "did not present a complete picture of the van in the detail necessary for him to determine the exact cause and origin" of the fire); American Family, 585 N.E.2d at 1118 ("The physical object itself in the precise condition immediately after an accident may be far more instructive and persuasive to a jury than oral or photograph descriptions."); Aetna Life & Cas. Co. v. IMET Mason Contractors, 707 A.2d 180, 185 (N.J. Super. Ct. App. Div. 1998) (finding photographs of engine inadequate substitute for personal observation); State Farm Fire & Cas. Co. v. Frigidaire, 146 F.R.D. 160, 163 (N.D. Ill. 1992) (concluding that "any photographs taken are not a sufficient substitute for the dishwasher in its original post-fire condition"); see also Declaration of Robert D. Banta (Jan. 7, 2003) ¶ 14 (previously filed as Ex. 15); Banta Dep. at 86-88.

[12]  NFPA 921 §§ 22.5.3-22.5.3.2.

\\\DC - 58376/0119 - 1702765 v1

explanation for why his experts did not follow the instructions in § 14.5.5, which require that, before a wire is cut, a photograph should be taken of the wire, and <u>then both ends of the wire should be tagged with the following information</u>: (1) the device or appliance to which it was attached or from which it was severed; (2) the circuit breaker or fuse number or location to which the wire was attached or from which it was severed; and (3) the wire's path or the route it took between the device and the circuit protector.[13]  In the absence of such steps, neither the photographs, the tapes, nor any of the remaining physical evidence would allow DCC's experts to put the vehicle back in its post-fire condition (if such a thing were actually possible, which it is not).

## II. GROSS'S KNOWING DESTRUCTION OF RELEVANT EVIDENCE CAUSED SIGNIFICANT PREJUDICE TO DCC

Just as there should be no doubt that crucial evidence has been lost, there should also be no doubt that DCC has been irreparably prejudiced by Gross's spoliation.  DCC has been prejudiced in two ways: (1) DCC cannot completely disprove Gross's theory that the fire started in the wiring harness somewhere in the upper rear quadrant of the engine compartment; and (2) DCC cannot adequately prepare its own cause analysis.

In their expert report, and more clearly in Gross's opposition to DCC's dispositive motions, Gross's experts suggest that a design or a manufacturing defect existed in the wiring harness at the point of ignition.  They claim that the manner in which the wires were bundled at the point of ignition could have "prevented the appropriate dissipation of heat in the even[t] of an unintended high resistant [sic]

---

13    <u>Id</u>. § 14.5.5.

fault."[14]  Gross's experts have not, however, identified a point of ignition.[15]  While they have pointed to a general area of the engine compartment, they have not been able to say exactly where they believe the fire started and whether it started in the wiring harness itself or in some other component.[16]  When asked to explain their inability to identify the component that caused the alleged overcurrent, the conductor on which the overcurrent was carried, the spot where the fire started, and/or the first material that ignited after the gases from the wiring insulation caught fire, Gross's experts cannot.  They have suggested, in some cases, that the answers were lost in the fire[17] – an answer that DCC is prevented from challenging because the post-fire condition of the vehicle was never observed by anyone from DCC nor was it properly documented.  It is very convenient for Gross's experts to claim that they cannot complete their analysis now that the post-fire condition of the vehicle has been irreparably altered.  It may be that the parts in question were in fact destroyed in the fire, but there is no way for DCC to make that determination at this point.  No expert retained by DCC has at his disposal the tools necessary to challenge this assertion because the engine compartment has been stripped nearly bare.[18]  There is no evidence that DCC can rely on to determine what was missing immediately after the fire as compared to what is missing now.  Accordingly, DCC has been denied the tools it needs to affirmatively disprove

---

[14]  See, e.g., Plaintiff's Opposition to Defendant DaimlerChrysler Corporation's Motion For Summary Judgment ("Opp. to Sum. J.") at 8.

[15]  Deposition of Richard J. Roby (May 28, 2002) at 73, 100-104, 108, 124-125 (relevant portions previously filed as Ex. 23, additional pages attached as Ex. 40).

[16]  Id.  Additional discussion of the holes in Gross's experts' testimony is included in DCC's reply briefs in support of its motions for summary judgment and its motion to exclude the testimony of plaintiff's experts.  That discussion is adopted here by reference.

[17]  Id.

[18]  Banta Decl. ¶¶ 7-10, 13-14.

\\\DC - 58376/0119 - 1702765 v1

plaintiff's theory that the fire most likely started in an unidentified bundle of wires somewhere in the upper rear portion of the engine compartment, and DCC has thus been prejudiced.

Similarly, DCC has been deprived of the opportunity to trace particular circuits in the vehicle. For example, because the wiring has been ripped out of the car, DCC cannot trace the on which evidence of post-sale splicing has been found. By the same token, DCC cannot trace the circuit or circuits on which Gross's experts claim have found bubbling. If DCC could have followed these circuits before they were disrupted, DCC may have been able to determine whether the after-market stereo equipment played any role in this fire, how close the bubbling was to any heat or flame during the fire, whether the heat from the fire was itself the cause of any internal heating of the wires rather than an overcurrent, etc. Each of these determinations would have helped DCC to build its defense, and plaintiff's preemptive destruction of the evidence has caused DCC significant prejudice.

DCC has also been prejudiced in its investigation of this fire because, while it can identify the "area of origin," the "point of origin," and the "heat producing device," DCC's experts cannot determine the "first material ignited," or the "cause" of the fire. Plaintiff has tried to blur the line between these concepts in an effort to obscure the impact of his experts' destruction, but there are an important differences between these concepts. During a fire investigation, it is important to identify each of these things, but one of the "ideal goals" of any fire investigation is to determine the cause.[19]

The area of origin is the "geographical location where the fire began."[20] It is usually determined by "movement and intensity fire patterns" if such patterns are identifiable.[21] Here, DCC's experts used

---

[19]    NFPA 921 § 16.1.

[20]    Id. § 15.1.

[21]    Id.

the remaining burn patterns to identify the area of origin as "the area of the right exhaust manifold at its forward portion."[22]  Within the area of origin, the point of origin is the more specific location where the heat ignited the first fuel.[23]  Here, DCC's experts have reduced the general area of origin to a specific point of origin – the surface of the exhaust manifold itself:  "The initial flame was judged to be small and was initially located on the manifold."[24]  DCC's experts have also been able to determine the "ignition source" or the source of heat energy.[25]  The ignition source was the surface heat of the exhaust manifold.[26]  But this is where DCC's cause and origin analysis is cut short.[27]

In most cases where it is possible to determine the area and point of origin, as well as the heat source, the fire investigator will move on to determine the first material ignited and, ultimately, the cause of the fire.  The first material ignited or "initial fuel" is the first material to sustain combustion.[28]  As NFPA 921 recognizes, "[t]he initial fuel is important for understanding the events that caused the fire."[29]  But here, plaintiff has deprived DCC of the opportunity to determine the initial fuel.  By moving and removing underhood components, Gross's experts have made it impossible to determine what fuel

---

[22]   Robert D. Banta, Preliminary Rule 26 Report (June 3, 2002) at 5 (previously filed as Ex. 7).

[23]   NFPA 921 § 15.1.

[24]   Banta Report at 5.

[25]   NFPA 921 § 16.3.

[26]   Banta Report at 5.

[27]   Banta Dep. at 95 ("Unfortunately, I can't go any further than that because I wasn't there when all of this stuff was disassembled and taken apart, and it's likely that we've lost forever the ability to understand what happened to that manifold.").

[28]   NFPA 921 § 16.4

[29]   Id.

sources were located sufficiently close to the exhaust manifold to ignite. By disturbing fire debris and residue, Gross's experts may have wiped away any tell-tale signs the initial fuel left behind.[30]

Furthermore, by preventing DCC's experts from determining what served as the initial fuel, Gross's experts have made it impossible to determine the cause of the fire. As NFPA 921 explains:

> A fuel by itself or an ignition source by itself does not create a fire. Fire results from the combination of fuel and an ignition source. . . . The sequence of events that allow the source of ignition and the fuel to get together establishes the cause.[31]

By preventing DCC from determining the initial fuel, Gross's experts have prevented DCC from determining the cause of the fire.[32] The initial fuel is a critical component. Without it an expert can only speculate as to the series of events that brought the known ignition source (e.g., the surface heat of the exhaust manifold) together with a number of possible unidentified fuels. In other words, cause can never be conclusively established. And, where cause cannot be established, the fire investigator cannot determine responsibility for the fire. Without an identified cause, the investigator cannot determine what person or entity is accountable for the event or sequence of events that cause the fire, the spread of the fire, and any bodily injuries or property damage that arose from the fire.[33]

Notwithstanding plaintiff's assertions to the contrary, none of DCC's experts has been able to determine the cause of the fire. In fact, none of DCC's experts has gone beyond the ignition source. Joseph Reynolds, DCC's electrical engineering expert, did not offer any opinions about the cause and

---

[30] Id.

[31] Id. at § 16.5; see also Banta Dep. at 89 ("There's much more to understanding the cause and origin of the fire than understanding merely the ignition method or the igniting device.")

[32] See Banta Dep. at 122-23 ("[T]he first material ignited at the manifold has not been located. It's likely that the material existed after the fire, but it is not there now . . . .")

[33] NFPA 921 §§ 16.6, 16.6.1.

origin of the fire, other than to rule out the possibility that the cause was electrical.[34] Reynolds was able to make this determination despite the destruction of the vehicle because he found no evidence in what remained of "examples of an overloaded circuit."[35] Reynolds looked at the evidence Gross cited as probative of his theory of the case and came to a different conclusion.[36] The mere fact that Reynolds was able to reach this conclusion given the condition of the vehicle (and without viewing the barely viewable videotapes) does not demonstrate lack of prejudice. Although DCC can disprove some aspects of plaintiff's theory of the case by relying on Reynolds's report and testimony, DCC will still be prejudiced because it has been prohibited from disproving all aspects of Gross's claim and from fully developing its own defense theory.

Bob Banta, DCC's in-house automotive fire expert, has determined the origin of the fire, but not the cause: "[P]laintiff's destruction of the car has entirely prevented me from locating the proof of its cause that is persuasive in a courtroom."[37] Banta has speculated as to potential fuels and, therefore, as to potential causes, but he has not been able to come to any definite conclusions.[38] While Banta did testify that his opinion about the <u>origin</u> and <u>ignition method</u> of the fire would not change if he was able to view

---

[34]  See Joseph R. Reynolds, Jr., Rule 26 Report (June 25, 2002) § 5.0 (previously filed as Ex. 8).

[35]  Id. § 4.0.

[36]  Id. ("[T]he localized melting can be explained by well-known fire behavior in equipment such as vehicles.").

[37]  Banta Decl. ¶ 15.

[38]  See Banta Dep. at 112-13, 126-27; see also id. at 89 ("There's much more to understanding the cause and origin of the fire than understanding merely the ignition method or the igniting device . . . and none of that has been successfully identified in this case [by] anyone.").

the vehicle in its unaltered post-fire condition,[39] he has consistently stated that if the vehicle had not been dismantled, evidence that would have allowed him to determine the <u>cause</u> of the fire may not have been irreparably disrupted.[40] Banta has stated that this is the "worst example of spoliation" he has seen during his entire career as an automobile fire investigator,[41] and he has stated that by altering the condition of the car, plaintiff's experts have prevented him from conducting "a proper and thorough fire investigation," which under normal circumstances would have lead to the successful determination of the fire's origin and its cause.[42]

Courts nationwide, including the Fourth Circuit, have recognized that there is a difference between making a positive case and merely attempting to negate a plaintiff's claims.[43] For example, in

---

[39] Id. at 89-90 ("You said the cause. I told you the manifold was the ignition method, but the manifold is not solely the cause of the fire. The manifold did not burst into flames.").

[40] Id. at 113 ("I would look for the typical remains of burned and partially burned solid materials on or near the manifold and perhaps even some unburned element of them; the typical things that a fire investigator in a very delicate fire like this one would look for early on before disturbing it."); id. at 122-23 ("We talked about the first material ignited at the manifold has not been located. It's likely that that material existed after the fire, but it is not there now, or at least if it is, I could not find it."); see also Banta Decl. ¶ 16 ("It is virtually certain that this material existed after the fire, but it is now no longer present.").

[41] Banta Decl. ¶ 19.

[42] Id. ¶¶ 13, 15, 18.

[43] See, e.g., Silvestri, 271 F.3d at 583; Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 155-57 (4th Cir. 1995); Shelbyville Mut. Ins. Co. v. Sunbeam Leisure Prods. Co., 634 N.E.2d 1319, 1324 (Ill. App. Ct. 1994) (upholding exclusion of evidence due to "reasonable possibility that [plaintiff's] acts foreclosed the truth as to the cause of the fire from ever being ascertained"); Smith v. American Honda Motor Co., Inc., 846 F. Supp. 1217, 1222 (M.D. Pa. 1994) (finding that "plaintiff has . . . deprived the defendant of the opportunity to properly defend th[e] case" by allowing the vehicle in question to be dismantled; noting that if defendant had access to the vehicle, it could not only have attempted to disprove plaintiff's allegations of a defect in the seat belt, but defendant might have been able to prove its own theory that plaintiff was not belted at the time of the collision).

\\\DC - 58376/0119 - 1702765 v1

Silvestri, the plaintiff brought suit against General Motors alleging that his air bag failed to deploy when he hit a utility pole.[44] Silvestri argued that if the air bag had properly deployed, he would not have sustained the severe facial lacerations and bone fractures that permanently disfigured his face.[45] Following discovery, GM asked that Silvestri's case be dismissed due to spoliation of critical evidence (including the sale and repair of the vehicle).[46] The district court concluded, "Silvestri had breached his duty either to preserve the vehicle or to notify General Motors about its availability and his claim."[47] The court then dismissed the case on that basis.

On appeal, the Fourth Circuit affirmed the lower court's dismissal. The appellate court agreed that the spoliation was "highly prejudicial" because "[i]t denied General Motors access to the only evidence from which it could develop its defenses adequately."[48] The court noted that even though GM's expert had offered opinions – that the oblique impact of the vehicle with the utility pole was not the type of impact that should have caused the air bag to deploy and that the information stored in the air bag diagnostic module indicated the system was working properly at the time of the impact – GM was still severely prejudiced because it could not develop a "crush model" to support its defense.[49] The crush model would have allowed GM to more fully develop its theory of the case by confirming that the

---

[44]   271 F.3d at 586.

[45]   Id.

[46]   Id. at 588-89.

[47]   Id. at 589.

[48]   Id. at 594.

[49]   Id. at 587-88, 594.

air bag system acted as it should have.[50]  The Fourth Circuit also found that GM was prejudiced because, due to the spoliation of the vehicle, "General Motors could not resolve the critical question of how Silvestri injured his head."[51]  While GM's expert opined that Silvestri "was injured not by an impact with a telephone pole but rather when the vehicle ran through a wooden fence, violently projecting portions of the fence into the passenger compartment of the vehicle," GM was prohibited from producing positive evidence in support of this theory because it had no access to the car.[52]  The Fourth Circuit concluded, "To require General Motors to rely on the evidence collected by Silvestri's experts in lieu of what it could have collected would result in irreparable prejudice."[53]

The same reasoning was applied by the Fourth Circuit with the same result in Vodusek.[54]  There, the owner of a boat that had suffered an explosion allowed her expert to use "destructive methods" during his examination of the vessel.[55]  The district court noted that plaintiff's expert "made it impossible for his own theory to be verified <u>or for the Defendants to make a full and fair inspection to develop alternative theories based on the evidence</u>."[56]  The district court allowed the defendants to

---

[50]  Id. at 594.

[51]  Id.

[52]  Id. at 587-88, 594.

[53]  Id. at 594.

[54]  71 F.3d at 155-57.

[55]  Id. at 155.

[56]  Id. (emphasis added).

amend their complaint to include an affirmative defense of spoliation of evidence. On appeal, the Fourth Circuit affirmed the lower court's decision.[57] The court explained:

> While [plaintiff's expert] may have decided that the destroyed portions of the boat were not relevant to his theory of the case, that conclusion ignored the possibility that others might have entertained different theories to which the destroyed portions might have been relevant. In this case, both the defendants and the district court concluded that the destroyed portions were significant to the effort to explain where and why the boat explosion occurred. Indeed, throughout the course of this case, even [plaintiff's expert's] opinion of where the explosion occurred changed several times.[58]

Here, DCC's experts have offered opinions that tend to disprove plaintiff's theory that the fire was caused by an electrical fault. But DCC has been prevented from putting on its own explanation of how the fire occurred. Even though DCC's expert automobile fire investigator has offered opinions as to how the fire may have happened, DCC can no longer support these theories with physical evidence. It is forced instead to rely on speculation and presumptions – the same outcome that was found to be "highly prejudicial" in Silvestri and Vodusek. For the same reasons, the Court should find that plaintiff's spoliation is highly prejudicial in this case.

---

[57]   Id. at 157.

[58]   Id. at 156; see also Hoffman, 587 N.W.2d at 71 (affirming finding of significant prejudice warranting exclusion of testimony and evidence even though defendant's experts were "able to formulate opinions as to the origin and cause of the fire despite the evidentiary deficiencies" because defendant would still "be confronted with the challenge of meeting probative and convincing firsthand evidence with sketchy, relatively speculative secondhand evidence.").

- 15 -

### III. DISMISSAL OR EXCLUSION OF EVIDENCE ARE APPROPRIATE SANCTIONS DUE TO THE DEGREE OF PREJUDICE TO DCC

Contrary to plaintiff's assertion, dismissal and the exclusion of expert testimony are not "unusually rare" sanctions.[59] While such sanctions are serious, they are appropriate in any case where the spoliation of evidence is highly prejudicial. And, as explained above, plaintiff's careless treatment of sensitive evidence has severely prejudiced DCC.[60] This case is very similar to Silvestri where dismissal was granted because plaintiff's spoliation prevented GM from adequately developing its own

---

[59] In its Memorandum of Points and Authorities in Support of this motion, DCC identified numerous cases where dismissal or exclusion of expert testimony was imposed as a sanction. See DCC's Mem. of Points & Auth. at 22-26; see also Bridgestone/Firestone, 574 S.E.2d 923 (Ga. Ct. App. 2002) (affirming lower court's application of sanction of limiting testimony); DeLong v. A-Top Air Conditioning Co., 710 So. 2d 706, 707 (Fla. Dist. Ct. App. 1998) (dismissal with prejudice warranted "where [defendants] demonstrated their inability to completely set forth their defense without having had the opportunity to examine and test the lost evidence"); Chapman v. Auto Owners Ins. Co., 469 S.E.2d 783, 786 (Ga. Ct. App. 1996) ("[I]n certain circumstances, allowing the case to proceed or an expert to testify about destroyed evidence which the opposing party is unable to test may result in trial by ambush which cannot be cured by a jury instruction."); Schwartz v. Subaru of Am., Inc., 851 F. Supp. 191, 192-93 (E.D. Pa. 1994) (destruction of automobile warranted summary judgment for automobile manufacturer); Capitol Chevrolet, 614 So. 2d at 442 (noting that sanction of dismissal is severe, but "in some cases such a sever sanction may be the only appropriate remedy"); Stubli v. Big D Int'l Trucks, Inc., 810 P.2d 785, 788 (Nev. 1991) (dismissal of products liability action was appropriate sanction for spoliation of evidence); Headley v. Chrysler Motor Corp., 141 F.R.D. 362, 365 (D. Mass. 1991) (finding exclusion of any and all expert testimony to be proper sanction in product liability case); Patton v. Newmar Corp., 538 N.W.2d 116, 117 (Minn. 1995) (reinstating order excluding expert testimony and granting summary judgment).

[60] Plaintiff incorrectly asserts that Vodusek stands for the proposition that a finding of bad faith is required before an adverse inference can be drawn from the destruction of evidence. The actual holding in Vodusek is that a showing of bad faith is not necessary to justify a trial court's instruction to a jury that it could draw an adverse inference from a party's destruction of evidence. 71 F.3d at 156. In addition, while the Fourth Circuit has recognized that dismissal due to spoliation is appropriate "in circumstances of bad faith of other 'like action'," the court has also held that "even when conduct is less culpable, dismissal may be necessary if the prejudice to the defendant is extraordinary, denying it the ability to adequately defend its case." Silvestri, 271 F.3d at 593 (citation omitted).

theory of the case.[61]  Accordingly, the sanction of dismissal is equally warranted here.  Furthermore, should the Court find that dismissal is too strong a sanction, then, at a minimum, plaintiff's experts should be barred from offering any testimony relating to the spoliated evidence.[62]  No sanction less than exclusion will effect deterrence and restore DCC to the same position it would have been in absent the destruction of the car.

## IV.     CONCLUSION

For the foregoing reasons, as well as the reasons set for in DCC's Memorandum of Points and Authorities in Support of Its Motion For Dismissal of Sanctions For Spoliation of Evidence, DCC urges the Court to either dismiss this lawsuit in its entirety or enter summary judgment based upon plaintiff's

---

[61]     Silvestri, 271 F.3d at 593 (holding that dismissal is appropriate when either (1) "the spoliator's conduct was so egregious as to amount to a forfeiture of his claim," or (2) "the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim.").

[62]     Headley, 141 F.R.D. at 363, 366-67 (setting out rule that exclusion of expert testimony is appropriate when "(1) defendant was, in fact, prejudiced by reason of the fact that its experts have been deprived of an opportunity to review relevant evidence; (2) that that prejudice cannot be cured; and (3) that the evidence which was destroyed was crucial . . . to the case").

\\\DC - 58376/0119 - 1702765 v1

intentional spoliation of the vehicle that is the subject of this case.  Alternatively, DCC requests that all secondary evidence and expert testimony relating to the spoliated evidence be excluded.

          Respectfully Submitted,

          HOGAN & HARTSON L.L.P.

          By:  /s/ Margaret E. DiPentima
              James A. Hourihan (Bar No. 02704)
              Margaret E. DiPentima (Bar No. 26027)
              555 Thirteenth Street, N.W.
              Washington, DC  20004
              Tel:  (202) 637-5600
              Fax:  (202) 637-5910

          Attorneys for Defendant DaimlerChrysler Corporation

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of March, 2003, a copy of the foregoing Defendant DaimlerChrysler Corporation's Reply Brief in Support of Its Motion for Dismissal or Sanctions for Spoliation of Evidence was served electronically and/or via first class U.S. Mail, postage prepaid, on:

> Edward C. Bacon
> Bacon, Thornton & Palmer, L.L.P.
> Capital Office Park
> 6411 Ivy Lane
> Suite 706
> Greenbelt, MD  20770-1411
> (Attorneys for Plaintiff)

    /s/ Margaret E. DiPentima
        Margaret E. DiPentima