**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division**

DARRELL M. GROSS,

              Plaintiff,

              v.

DAIMLERCHRYSLER CORPORATION, et al.

              Defendants

Case No.:  MJG 01CV3203

**DEFENDANT DAIMLERCHRYSLER CORPORATION'S REPLY BRIEF IN
SUPPORT OF ITS MOTION TO EXCLUDE THE OPINION TESTIMONY
OF RICHARD J. ROBY, CHRISTOPHER SCHEMEL AND JAMIE FERRINO**

While plaintiff is justifiably concerned that the exclusion of his experts will be the death knell of his case, nothing in his response to DaimlerChrysler Corporation's ("DCC") motion is sufficient to save his experts from exclusion under Federal Rules of Evidence 702, 703, and the standards established by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

**I.    PLAINTIFF'S EXPERTS ARE NOT QUALIFIED TO OFFER OPINIONS
CONCERNING THE CAUSE AND ORIGIN OF THE FIRE AT ISSUE**

Despite plaintiff's attempt to play up the qualifications of his experts by unfairly denigrating DCC's experts, the fact remains that Jamie Ferrino, Christopher Schemel, and Richard Roby are not qualified to offer opinions concerning the cause and origin of the Gross vehicle fire.  Even an expert who is qualified to give opinions about some fires is not necessarily qualified to give opinions about all fires.[1]  Gross must establish that his experts are qualified to give an opinion concerning the potential for

---

[1]    See 3 David L. Faigman et al., § 32-1.3 Other Aspects of Admissibility and Exclusion of Fire Experts; Qualifications of the Expert, Modern Scientific Evidence:  The Law And Science Of Expert

a standard automobile instrument panel wiring harness to start a fire in the engine compartment of a vehicle.  Because he cannot do that – despite some of his experts' qualifications in the fields of fire protection engineering and fire-related investigation – his experts must be excluded.  In evaluating DCC's motion, the Court must scrutinize not only the Gross's expert's credentials, but also the basis of their proffered testimony.[2]  Before allowing Gross's experts to testify, the Court should evaluate the basis of their asserted knowledge, the content of their knowledge, and determine whether their knowledge base is sufficiently sound that any opinions flowing from it will be dependable.[3]  It is DCC's contention that Gross's experts are not sufficiently qualified to give dependable opinions concerning the fire in issue.

### A.    Jamie Ferrino

DCC does not dispute that fire protection engineering encompasses elements of mechanical, chemical, and electrical engineering, but a degree in fire protection engineering does not alone serve to qualify its holder as an expert in any those disciplines.  Much as fire protection engineering is a hodge-podge of different disciplines,[4] a fire protection engineer has only limited expertise in each of these areas individually.  In other words, while it is agreed that a fire protection engineer may have studied concepts that traditionally fall under the heading of "mechanical engineering," it would never be

---

Testimony, (2d ed. 2002) ("The implications of <u>Kumho Tire</u> suggest[ ] that the proffered expert must be qualified on precisely the expert issue at bar, rather than some general or global expertise in fire investigation.").

[2]    <u>See id</u>.

[3]    <u>Id</u>.

[4]    <u>See</u> Opposition of Plaintiff Darrell M. Gross to Motion of Defendant DaimlerChrysler Corporation To Exclude the Opinion Testimony of Richard J. Roby, Christopher Schemel and Jamie Ferrino ("Pl.'s Opp.") at 6, 9.

\\\DC - 58376/0119 - 1686804 v1

appropriate to qualify a fire protection engineer as an expert in a case where a mechanical engineer was needed to perform an accident reconstruction.  Such is the situation in this case.  DCC does not dispute that Ferrino has an advanced degree in fire protection engineering, but she is not an expert in electrical engineering or in the investigation of automotive fires – the two areas of expertise that are appropriate for this case.  To use Gross's own words, Ferrino "has been involved in 3 motor vehicle fire investigations in connection with her employment at CSE."[5]  In comparison, DCC's expert Robert D. Banta has been involved in approximately 2500 fire investigations during his employment with DCC.[6] And Gross does not dispute that Ferrino has never been qualified by a court as a fire cause and origin analysis investigation expert while Banta has been qualified approximately a dozen times.[7]

Furthermore, Ferrino's experience as a firefighter is not sufficient to qualify her as an expert in fire cause and origin analysis.[8]  Nor is she qualified by reason of the research she performed as part of her master's thesis.  While Ferrino's work may have been brought to the attention of the National Fire Protection Association's 921 committee (most likely due to Roby's connections with the committee), consideration by the NFPA is not equivalent to peer-review.  During the years between editions of NFPA 921:  Guide for Fire and Explosion Investigations, the drafting committee accepts written

---

[5]    Pl.'s Opp. at 10.

[6]    Supplemental Declaration of Robert D. Banta (Mar. 13, 2003) ¶ 2 (attached as Ex. 37).  Banta also states that despite his considerable experience investigating vehicle fires, he is not aware of a single instance, other than this case, in which a fire was alleged to have started in a vehicle wiring harness because of the manner in which the wires were bundled.  Id. ¶¶ 11-12.

[7]    Deposition of Robert D. Banta (Sept. 19, 2002) at 14 (relevant portions previously filed as Ex. 18 to DCC's Appendix of Exhibits submitted Jan. 9, 2003; additional pages attached as Ex. 38).

[8]    See Jay M. Zitter, Annotation, Admissibility of Expert and Opinion Evidence As To Cause or Origin of Fire – Modern Civil Cases, 84 A.L.R. 5th 69 (2000) ("[N]ot all persons who deal with fires and firefighters are experts in their fields.").

submissions from individuals who believe that additions or changes should be made in the next edition of the document.  Annually, the entire membership of the NFPA is given a chance to review and comment on any changes that have been proposed in the last year.  Proposed changes are circulated to the membership well in advance of the annual meeting so that members can have an opportunity to consider the proposals and weigh in with their own comments.  Only after a proposal has been considered by the entire NFPA membership and then voted on by the membership is it added to the list of changes to be made in the next addition of NFPA 921.  Ferrino's work has not been submitted to the entire membership for consideration nor has it been discussed, voted on or accepted.  The mere fact that she has been given the special opportunity to present her work to the NFPA 921 committee due to her boss's connections with the committee should not give her work an unwarranted respectability.  Moreover, Ferrino's work may be in the "review process for publication by <u>Fire Technology</u>,[9] but there has been no testimony that the peer-review panel of that publication has accepted her work.  Mere submission for review does not make the work any more authoritative.

### B.    Christopher Schemel

Gross's response to DCC's motion does little more than underscore Schemel's background in chemical engineering.  As Gross explains, the bulk of Schemel's work prior to joining CSE was performed either directly or indirectly for the Department of Energy.[10]  Schemel himself testified that his primary job responsibility when working for the DOE was to analyze the fire risks presented by various

---

[9]    Pl.'s Opp. at 10.

[10]    <u>Id</u>. at 8.

chemicals in use at various facilities.[11]  Although NFPA 921 recognizes that chemical engineering may

be relevant to determining the cause and origin of some fires, there is no suggestion of any chemical

involvement in this case.  Accordingly, Schemel's background and experience in the area of chemical

engineering does not qualify him to offer any expert opinions relevant to the issues here.  Furthermore,

Gross does not dispute that Schemel had no experience investigating automobile fires prior to 1999,[12]

and that he has participated as an assistant in only one investigation of a vehicle prior to his work on the

Gross case.[13]  Gross also does not dispute that Schemel has never been qualified as an expert by any

court.[14]

### C.    Richard J. Roby

It is interesting that Gross puts so much emphasis on Roby's involvement with the NFPA and the

NFPA 921 committee when his experts did not follow many of even the most basic guidelines set out in

NFPA 921.[15]  Despite the statements in his recent declaration, the record clearly indicates that Roby did

not participate directly in the Gross investigation.[16]  Roby only saw the vehicle two times at most, and

he never performed a detailed inspection of the vehicle in its undisturbed post-fire condition.[17]  And, as

---

[11]    Deposition of Christopher Schemel (May 15, 2002) at 27-28, 32 (relevant portions previously filed as Ex. 24, additional pages attached as Ex. 39).

[12]    Id. at 40-41.

[13]    Id. at 41-42.

[14]    Id. at 52.

[15]    The failure of Gross's experts to adhere to the dictates of NFPA 921 is explained in more detail below and in DCC's Motion for Dismissal or For Sanctions for Spoliation of Evidence.

[16]    Deposition of Richard J. Roby (May 28, 2002) at 54-66 (relevant portions previously filed as Ex. 23; additional pages attached as Ex. 40).

[17]    Id. at 56-57, 62-65.

the video clips submitted by DCC show, Roby did not ensure that his employees were using the proper fire investigation methodology or that they were properly handling and preserving the evidence.[18]  Roby may be on the NFPA 921 drafting committee, but the importance of following the detailed guidelines established by the NFPA seems to have been lost on him and his staff.

DCC does not dispute that Roby may be qualified to offer expert testimony concerning some fires, and he may have been qualified as an expert before, but that does not change the fact that Roby is not qualified to offer the opinions he seeks to offer about this automobile fire.  Roby has only very limited experience investigating automobile fires.  In addition, his opinion here requires knowledge that Roby admits he does not have.  As DCC first suggested in its Motion to Exclude, the Eighth Circuit case of Weisgram v. Marley Co.,[19] although it is not an automobile fire case, is similar to this case in many respects.  In Weisgram, the local fire captain offered the opinion that a "malfunction" in a baseboard heater caused the fire that killed Bonny Weisgram.[20]  He testified that a throw rug in the entrance hallway of Weisgram's home "was very possibly pushed up against th[e] heater."[21]  He said that the rug could have prevented the proper dissipation of heat from the heater, causing a heat build-up that would have caused the glue that held the linoleum flooring in place to vaporize and "off-gas."[22]  In the fire captain's opinion, the gases from the glue could have been ignited by heat from the heater.[23]

---

[18]    See Video Clips #1-5 (previously filed as Ex. 36).

[19]    169 F.3d 514, 519 (8th Cir. 1999).

[20]    Id. at 518.

[21]    Id.

[22]    Id. at 518-19.

[23]    Id.

\\\DC - 58376/0119 - 1686804 v1

The Eighth Circuit held that the trial court should not have permitted the fire captain to testify that the fire was caused by a "runaway" heater.[24]  The court held that the fire captain was qualified to give some cause and origin testimony.  "[A]s a qualified expert in fire investigation, [the fire captain] was free to testify – as he did – that the burn and smoke patterns and other physical evidence indicated that, in his opinion, the fire started in the entryway and radiated to the sofa."[25]  The court was clear, however, that the fire captain was not qualified to offer any opinions about the rug, the linoleum flooring, or the glue used on the flooring because those opinions were "patent speculation."[26]

The same logic should apply to exclude Roby's opinions in this matter.  Roby's opinions about a potential overcurrent, the off-gassing of vapors from the insulation of individual wires within the wiring harness, the ignition of such vapors by an unknown heat source, and the possibility that the wiring harness was "installed . . . in an area where bundling the wires prevented the appropriate dissipation of heat"[27] should all be excluded because Roby has no basis for these opinions.  Roby is not qualified to offer opinions on any of these points because he has very limited experience with automobile fire investigation and almost no experience with this vehicle or this fire.  Roby does not know specifically where the harness was installed,[28] whether the fire started in the harness or some other component,[29]

---

[24]     Id. at 518.

[25]     Id. at 519.

[26]     Id.

[27]     Declaration of Richard J. Roby, P.E., Ph.D. ¶ 24 (previously filed as Ex. 3 to Plaintiff's Appendix of Exhibits submitted Feb. 10, 2003).

[28]     Roby Dep. at 74-78, 81-82, 141-42.

[29]     Id. at 73, 108.

what type of air flow existed in the area where the fire started,[30] which circuits carried the overcurrent and whether they were energized at the time of the fire,[31] what material the insulation was made out of,[32] the specific ignition temperature of the insulation material,[33] and where the harness was inside a conduit and/or wrapped in tape.[34]  Like the fire captain in Weisgram, Roby cannot be permitted to "'run away' with his own unsubstantiated theories."[35]  Even qualification as a fire investigator does not give an expert "free rein to speculate before the jury as to the cause of the fire by relying on inferences that have absolutely no record support."[36]

## II.    THE OPINIONS OF PLAINTIFF'S EXPERTS ARE NOT RELIABLE

In addition to requiring each expert to be properly qualified, Daubert and Rule 702 require both the "principles" and the "methods" relied on by the expert to be reliable.  "If the opinion is not squarely grounded in the principles and methodology of the relevant discipline, the opinion is 'inadmissible no matter how imposing [the] credentials of the proffered expert.'"[37]  Here, Gross's experts did not use a reliable methodology or reliable principles.  Accordingly, their opinions should be excluded.

---

[30]    Id. at 100-04.

[31]    Id. at 130.

[32]    Id. at 125-26.

[33]    Id. at 181-82.

[34]    Id. at 76-78, 84.

[35]    169 F.3d at 519.

[36]    Id.

[37]    S.E.C. v. Lipson, 46 F. Supp. 2d 758, 762 (N.D. Ill. 1999), quoting Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318-19 (7th Cir. 1996).

\\\DC - 58376/0119 - 1686804 v1

### A.    Gross's Experts Did Not Use The "Scientific Method" As It Is Practiced By Any Scientists In The Fields of Fire Investigation and Electrical Engineering

There appears to be no dispute that NFPA 921 sets forth an established and reliable methodology for the investigation of a fire.  The dispute here is whether or not Roby and his employees at CSE followed that methodology.  In his twenty-one page response, Gross dedicates little more than a page to his contention that an accepted and appropriate methodology was followed.[38]  Gross simply states that NFPA 921 endorses the use of the "scientific method" (i.e., recognize the need, define the problem, collect data, analyze the data, develop a hypothesis, test the hypothesis, select final hypothesis) and his experts performed each of these steps.  While Gross is correct that NFPA 921 is derived from the scientific method, the Court's analysis cannot stop there.  An expert must show not only that he has followed the scientific method, but also that "he has followed the scientific method as it is practiced by (at least) a recognized minority of scientists in his field."[39]

While Gross's experts argue that they have followed the scientific method in general, Gross essentially concedes that they have not followed the more detailed adaptation of the scientific method that is used by experts in fire investigation.  NFPA 921 contains over 200 pages of specialized instructions for investigators to follow when they are applying the scientific method to a fire cause and origin analysis, but Gross's experts did not adhere to many of NFPA 921's dictates.  For example, they did not notify DCC even though it was an obvious interested party.  They did not take detailed notes, listing "all the pertinent observations, including the type, location, description, and measurements of the patterns; the material on which the patterns are displayed; and the investigator's analysis of the direction

---

[38]    See Pl.'s Opp. at 15-16.

[39]    Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc., 55 F. Supp. 2d 1024, 1030 (N.D. Cal. 1999); see Daubert v. Merrell Dow Pharma., Inc. ("Daubert II"), 43 F.3d 1311, 1319 (9th Cir. 1995).

\\\DC - 58376/0119 - 1686804 v1

and intensity of the patterns."[40]  Similarly, Gross's experts failed to photograph the burn patterns

"several different ways" including changes in the camera angle and the lighting techniques.[41]  They did

not confer with DCC before disturbing important tell-tale layers of char, ash and residue or before

removing various components.[42]   They did not create any depth of char diagrams,[43] trace any circuits or

identify and label the ends of conductors before severing them,[44] photograph the allegedly defective

wiring harness in place in the vehicle before removing it,[45] package and store removed parts carefully,[46]

or complete any number of other commonly performed tasks.

Similarly, Gross's experts did not follow the scientific method because they did not test their

hypothesis once it was formulated.  DCC admits that Gross's experts conducted a test on a bundle of

wires that they claim was "similar to the vehicle wiring harness,"[47] however, they have made no

showing that this bundle was at all similar to the wiring harness in issue here.  Gross's experts did not,

as they could have, purchase a wiring harness that would have been virtually identical to the one in

Gross's vehicle, nor have they provided any explanation for why they decided to create their own.

---

[40]     NFPA 921 § 15.2.1 (relevant portions previously filed as Ex. 4; additional pages attached as Ex. 41); see also Notes of Christopher Schemel (previously filed as Ex. 10); Schemel Dep. at 9-10.

[41]     Id. § 15.2.2.

[42]     Id. § 15.7.2.

[43]     Id. § 15.2.4.

[44]     Id. § 14.5.5.

[45]     Id. §§ 14.5.5, 22.7.4.

[46]     Id. §§ 14.6, 14.7, 6.11.6.

[47]     CSE Cause and Origin Analysis of December 23, 2000 Car Fire at 1203 Nottingham Drive, Glen Burnie, Maryland at 7 (previously filed as Ex. 1).

\\\DC - 58376/0119 - 1686804 v1

Moreover, they have not identified the brand of wires used, the gauge, the number of wires used, the length of each conductor, the number of conductors in the bundle, the type of wrapping used, or whether they used a conduit. In short, Gross's experts have not provided any information that would allow DCC and the Court to determine the validity of any such testing.

Assuming, for the purposes of this discussion, that the wire bundle they tested was similar to the wire harness used in Gross's vehicle, Gross's experts still fell far short of performing the testing sufficient to satisfy the scientific method.[48] They have provided no evidence of what type of tests were conducted, how much electricity was run through the bundle, for how long, whether any fuses were used, what the testing set-up was, whether the wiring bundle was attached to anything, whether it was in a conduit, whether it was taped, what type of taping material was used, what type of air flow conditions were present during the testing, or what type of "external flame impingement" was used. They have provided no notes from this testing, no calculations, diagrams, photographs, videotapes or any other recordations of their observations.[49]

Furthermore, Roby and his staff tested only the hypothesis that prolonged currents running through a bundle of wires would cause bubbling of the insulation (an already established electrical engineering principle). They did not do any testing of the theories that (1) the fuses in this vehicle would not trip and would allow a prolonged overcurrent, (2) the wiring harness as it was placed in the vehicle would not allow excess heat to dissipate, (3) an overcurrent from the wiring harness could light any surrounding materials on fire. Gross's experts never attempted to recreate the conditions in an

---

[48]     See Weisgram, 169 F.3d at 519-20 (excluding expert's opinion because he did no testing to bolster his theory, nor could he identify appropriate testing done by anyone else).

[49]     See CSE Cause and Origin Analysis at 7.

exemplar vehicle – which they should have been able to do if this was a design defect.  As one federal

court in Florida recently recognized, testing is an important step in establishing the reliability of an

expert's conclusions.[50]   None of the testing done by Gross's experts makes any connection between

established principles and the experts' opinions about the cause of the fire in Gross's vehicle.  Merely

showing that a wiring insulation will bubble under certain conditions is not enough to show that a defect

in the electrical system of Gross's vehicle caused the fire.  Crucial links in the chain of reasoning are

missing.[51]

In addition, Gross's experts did not adhere to a recognized methodology when they identified the

wiring harness as the ignition source before they identified the area and point of origin.[52]  In the chapter

on "Electricity and Fire," NFPA 921 suggests that electrical equipment should be considered as an

ignition source only _after_ the area or point of origin has been defined.[53]  Here, CSE has never

determined the point of origin.[54]  This approach – electrical source first, point of origin later – is not in

keeping with the NFPA 921 methodology.  In fact, NFPA 921 specifically cautions, "Often the fire may

---

[50]   Lord v. Fairway Elec. Corp., 223 F. Supp. 2d 1270, 1281 (M.D. Fla. 2002) (excluding expert's testimony because, among other things, "there [were] no test results or other empirical evidence before th[e] court indicating that more likely than not the straight copper sliver described by [plaintiff's expert] ever existed.").

[51]   Gross's experts cannot point to any appropriate testing done by any third parties either.  See Banta Supp. Decl. ¶¶ 11-12.

[52]   A detailed explanation of the terms "area of origin," "point of origin," "ignition source," "first material ignited," and "initial fuel" is included in DCC's Reply Brief in Support of Its Motion For Dismissal or For Sanctions For Spoliation of Evidence, which is filed herewith.

[53]   NFPA 921 § 6.1.

[54]   Roby Dep. at 73, 100-104, 108.

\\DC - 58376/0119 - 1686804 v1

destroy insulation or cause changes in the appearance of conductors or equipment that can lead to false assumptions.  Careful evaluation is warranted."[55]

Furthermore, Gross's experts now opine that the fire may have been caused because the wire was bundled in such a manner at the point of origin so as to provide "the opportunity for heat containment and increased fuel level,"[56] but there is no identification <u>at all</u> of the point of origin, the first material ignited or the initial fuel.  While Gross has identified an area of origin the point of origin remains a mystery.  It is unclear how Gross's experts can conclude that bundling "at the point of origin" caused the fire when the point of origin is unknown.

Also, before identifying an electrical component as the ignition source, it is commonly accepted that an investigator must determine that there was sufficient temperature and heating to ignite a close combustible material.[57]  But Roby and his team have repeatedly admitted that they have not identified the first material ignited or the initial fuel.[58]  Thus, they do not know what the ignition temperature of the initial fuel is, and any conclusion that an electrical component was the ignition source is based on the unsupported assumption that the electrical component in question could have produced sufficient heat and temperature for a long enough time to reach the ignition point of the as-yet-unidentified fuel.  In other words, any opinion that it was the bundling of wires in this area that caused the fire is pure speculation because there is no data in the record to support the conclusion that any particular

---

[55]    NFPA 921 § 6.1.

[56]    Roby Decl. ¶ 20.

[57]    NFPA 921 § 6.9.1.

[58]    Roby Dep. at 73, 100-04, 108

\\\DC - 58376/0119 - 1686804 v1

component could have created the temperature and heat necessary to ignite any other component in the vehicle, and rank speculation is not a recognized technique of fire investigators.

In sum, by failing to follow the guidelines of NFPA 921, by failing to test their hypothesis properly and by concluding that the wiring harness was the ignition source too early in the investigation without identifying the point of origin and the initial fuel, Gross's experts did not conduct their cause and origin analysis in a manner that would be endorsed by even the smallest percentage of experienced fire investigators. Accordingly, any testimony concerning their investigation and/or their opinions should be stricken because it is not sufficiently reliable to satisfy the Daubert requirements.

### B. Gross's Experts' Theory Contravenes Both Logic and Basic Scientific Principles

Daubert also requires that the "theory" adopted by the expert be generally accepted within the relevant scientific community. Gross argues that his experts' conclusions are irrelevant and that only their methodology matters, but this is incorrect. To the extent that Gross's experts offer opinions that are "contrary to a scientific fact" their opinions are not sufficiently reliable.[59] In Carnegie Mellon University v. Hoffman-LaRoche, as in this case, plaintiffs argued that criticism of the correctness of a conclusion is inappropriate under Daubert.[60] There, plaintiffs alleged that "any disagreement between [an expert] and the scientific community speaks solely to the validity of his conclusions and therefore should not be considered by the Court in assessing the admissibility of his testimony."[61] The district

---

[59]    Carnegie Mellon Univ. v. Hoffman-LaRoche, 55 F. Supp. 2d 1024, 1030-32.

[60]    Id. at 1032.

[61]    Id.

court disagreed.[62]  The court noted that <u>Daubert</u> "forbids the exclusion of expert testimony on the basis of a rigid 'general acceptance' test, [but] it does not wholly remove this factor from consideration."[63]

Here, Gross's experts have opined that there is isolated bubbling in certain areas of particular wires.  It is an accepted fact that bubbling, when it occurs due to an overcurrent, will be exhibited along the entire length of the conductor all the way back to the source of the current.  Without any basis for the assertion that the insulation on the wires in question was not uniform – other than Roby's say so, which is not enough[64] – the testimony of Gross's experts is in direct contradiction of established electrical engineering facts.[65]  Therefore, their opinions cannot be sufficiently reliable to be admissible.  Moreover, it is also an accepted fact that "[e]vidence of overcurrent melting of conductors is not proof of ignition by that means."[66]  Gross's experts reached exactly the opposite conclusion – a conclusion that should be excluded from evidence by this Court.

### C.    Gross's Experts Did Not Rule Out All Other Possible Causes of the Fire

Contrary to Gross's suggestion, DCC does not claim that Gross's experts failed to rule out any other causes of the fire.  DCC argues only that Gross's experts failed to rule out all or even most of the other possible causes of the bubbling, the blown fuses, and the fire itself.  In his response, Gross does

---

[62]    <u>Id</u>. at 1033 ("[T]his Court remains convinced that the opinions of the scientific community are a valid yardstick against which to measure the reliability of [an expert's] testimony.").

[63]    <u>Id</u>. at 1032, citing <u>Daubert</u>, 509 U.S. at 594.

[64]    <u>General Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997) ("[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a . . . court to admit opinion evidence that is connected to existing data only by the <u>ipse dixit</u> of the expert.").

[65]    NFPA 921 § 6.10.5; <u>see also</u> Rule 26 Report of Joseph R. Reynolds (June 25, 2002) at 6 (previously filed as Ex. 8).

[66]    <u>NFPA 921</u> § 6.10.5.

\\\DC - 58376/0119 - 1686804 v1

not dispute that there are other explanations for why various fuses were blown.  Gross also fails to

dispute that his experts did not rule out the possibility of a fire that started at the overheated exhaust

manifold.  And Gross gives no explanation whatsoever for how his experts missed the non-standard,

post-sale splices in the wiring that they had removed from the vehicle, why his experts relied on

incorrect information concerning changes to the electrical system, and how their opinions can continue

to remain valid in light of the fact that changes were obviously made after the original sale of the car.

Gross's experts clearly based their opinions on the assumption that there had been no alterations of the

wiring in the vehicle.[67]  Thus, the validity of these opinions must be questioned because the underlying

facts have been proven to be incorrect.  In short, the opinions of Gross's experts cannot be found to be

sufficiently reliable because there are too many open questions and open possibilities that have not been

ruled out or even addressed.[68]

## III.    ROBY'S TESTIMONY IS NOT RELIABLE FOR THE ADDITIONAL REASON THAT IT IS NOT BASED ON PERSONAL OBSERVATION

While an expert may rely "not only on data and direct observations, but also on the opinions and

observations of others," those opinions and observations must be "of the type reasonably relied upon by

---

[67]    CSE Cause and Origin Analysis at 8.

[68]    See Michigan Millers Mut. Ins. Co. v. Benfield, 140 F.3d 915, 921 (11th Cir. 1998) (affirming exclusion of expert's testimony concerning cause of fire because he could not rule out other possible causes; "At trial [plaintiff's expert] was unable to describe the chandelier that hung over the table and unable to explain the methodology by which he eliminated the chandelier as a possible ignition source for the fire.  After telling the jury on direct that he believed someone poured lamp oil from the lamp oil bottle over the clothes and set the clothes ablaze, on cross-examination [the expert] admitted that he did not know even if the lamp oil bottle had contained lamp oil before the fire and that there was no scientific basis for such an opinion.  With such testimony as a backdrop, the district court granted the motion . . . to strike the testimony  . . ., find that while [the expert] held the opinion that the fire was intentionally set, he was unable to rationally explain how he came to that conclusion.").

\\\DC - 58376/0119 - 1686804 v1

experts in the particular field in forming opinions or inferences upon the subject."[69]  In the field of fire investigation, reliance on the secondhand observations of others (even individuals employed by you) without any personal inspection of the scene or vehicle is not commonly accepted as an appropriate investigation technique.[70]  In Westfield, the Fourth Circuit allowed the West Virginia Deputy Fire Marshal to testify and give opinions based roughly 90% on information provided to him by a private investigator hired by the defendant insurance company.[71]  The court concluded that in determining whether a fire had a suspicious origin the Deputy Fire Marshal routinely relied on information provided to him by outside parties.[72]  In fact, West Virginia law requires an insurance company to submit information to the Fire Marshal where it believes a fire to be of incendiary origin.[73]  Thus, it was an ordinary matter for the Fire Marshal's office to use these outside reports when completing an investigation for the state.

The opinions to be given by Gross's experts in this matter are markedly different.  There is no dispute here that the fire was not incendiary in nature (i.e. that the fire was not arson).  The issue is not whether Gross or some other person intentionally started the fire.  Instead, each party has retained experts to testify about the specific cause and origin of this fire within the vehicle.  Gross argues that the fire resulted from a defect in the vehicle, while DCC contends that plaintiff's own misuse of the vehicle was the likely cause.  As explained in more detail in DCC's spoliation motion, a cause and origin

---

[69]    Westfield Ins. Co. v. Harris, 134 F.3d 608, 612 (4th Cir. 1998); Fed. R. Evid. 703.

[70]    Banta Supp. Decl. ¶¶ 3-4.

[71]    134 F.3d at 612.

[72]    Id. at 613.

[73]    Id. at 612-13.

determination is a very detailed process during which an investigator moves from a broad area of origin to a more specific point of origin, then to the point of ignition, the first material ignited, and, if possible, to the cause.[74]  While the Deputy Fire Marshal in <u>Westfield</u> reached his conclusions by relying on information such as lack of furniture and personal items in the house and the fact that plaintiff was seen leaving the scene just before the fire was reported, the material information in this investigation cannot be as easily relayed to the testifying expert by another person.  For example, one important source of information here is (or would be if they had not been so badly disturbed) the burn patterns,[75] which can be difficult to examine in photographs and are best examined at least once in person, in various types of lighting, from different angles, etc.[76]  Other tell-tale information can be gathered from the relative depth of char – measurements that help to determine where the damage was most severe.[77]  While an investigator may review the measurements taken by others, no one from CSE created a depth of char diagram, so there was no way for Roby to analyze the relative depth of the char without making an in-person inspection.  This type of fire investigation also requires the investigator to take into account oxidation, melting, alloying, thermal expansion and deformation – all of which are best observed in

---

[74]     The cause is a technical term that can be defined as the "circumstances, conditions, or agencies that bring together a fuel, ignition source, and oxidizer (such as air or oxygen) resulting in a fire or a combustion explosion."  NFPA 921 § 1.3.19.

[75]     Burn patterns are "the visible or measurable physical effects that remain after a fire.  These include thermal effects on materials, such as charring, oxidation, consumption of combustibles, smoke and soot deposits, distortion, melting, color changes, changes in the character of materials, structural collapse and other effects."  <u>Id</u>. § 4.3.

[76]     <u>Id</u>. §§ 13.2.2., 15.2.2, 22.7.4.

[77]     <u>Id</u>. § 4.5.3.

\\\DC - 58376/0119 - 1686804 v1

person or through the use of very high quality photography.[78]  Neither technique was employed by Gross's experts in this case.

Although plaintiff may dispute it, it is commonly acknowledged within the fire investigation community that it is very difficult for a fire investigator to make a sound cause and origin determination without making a personal inspection of the scene (in this case the scene is the vehicle itself).[79]  Fire inspectors do not routinely rely on the second-hand observations of others; they routinely rely on their own senses.[80]  But Roby saw the vehicle in person only two brief times during the entire course of the investigation.[81]  He admitted at his deposition that his first visit to the vehicle was nothing more than a quick inspection to determine whether the fire had started in the passenger compartment (and was, therefore, most likely started by Gross himself).[82]  Roby's second visit to the vehicle was not until the days prior to his deposition.[83]  In the interim, he "reviewed" the project by looking at components removed from the vehicle (in some cases dictating their removal so he could view them at his leisure in

---

[78]    Id. §§ 4.7-4.9.

[79]    See, e.g., Weisgram, 169 F.3d at 519 (excluding evidence from investigator who never went to the scene of the fire); Comer v. American Elec. Power, 63 F. Supp. 2d at 933 n.7, 934 (N.D. Ind. 1999); Dura Automotive Systems of Indiana, Inc. v. CTS Corp., 285 F.3d 609, 614 (7th Cir. 2002); see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 155 (1999) (noting that reliability of expert's testimony is undermined by admission that he drafted his report prior to any hands-on examination of the allegedly defective tire); Declaration of Robert D. Banta (Jan. 7, 2003) ¶ 14 (previously filed as Ex. 15) ("The analysis of the origin of a fire is a three-dimensional process.").

[80]    Banta Supp. Decl. ¶¶ 3-5.

[81]    Roby Dep. at 62.

[82]    Id. at 62-64.

[83]    Id. at 62.

the comfort of his own office) and discussing the project with Schemel and Ferrino.[84]  As NFPA 921

explains, fire inspection is a messy job.[85]  An investigator must take a "hands-on" approach, and he can

expect to get to get dirty.  An inspector must be present at the scene to smell, touch, and see whatever is

left behind.  Mere reliance on the details observed and then repeated by others simply is not sufficient.[86]

Nor are the observations of others sources ordinarily relied upon by others in the fire investigation field

unless they are used in conjunction with personal observation.[87]

In addition, Roby is now attempting to shore up his opinions by manufacturing the appearance of

community acceptance.  Roby states that he is relying on Ferrino's work and that Ferrino's work has

been review and accepted by others.  But Roby omits to explain that Ferrino's work has been reviewed

by others at his request or, at the very least, with his participation.  Roby cannot say that Ferrino's work

has been approved by the NFPA 921 committee and, therefore, it is more valid when he is a member of

that committee and most likely played a role in bringing her work to the committee's attention.  If an

expert is going to point to the work of others in the field as evidence that his work is valid, it should be

the work of individuals with whom he has no contact or over whom he has no influence.  Roby is

attempting to create a ready-made community of support for his positions in this litigation by relying on

Ferrino's work, which he has played a large part in supervising and bringing to the attention of others.

---

[84]     Id. at 54-59, 64-65.

[85]     NFPA 921 § 15.7.2 ("A fire scene investigation involves dirty strenuous work.  Acceptance of this fact is the first step in conducting a proper fire investigation.").

[86]     Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000) (holding that an expert cannot repeat or adopt the opinions of another expert without attempting to assess the validity of the opinions relied upon).

[87]     Banta Supp. Decl. ¶¶ 3-4.

\\\DC - 58376/0119 - 1686804 v1

Moreover, it is inappropriate for Gross's experts, knowing that they are involved in this litigation, to suggest changes to NFPA 921 that will later serve as support for their positions in this case. It is intellectually dishonest to put forth an supposedly "scientific" opinion because you want to be able to cite community approval of the concept when you are paid to give expert opinions on the topic.

## IV. THE OPINIONS OF PLAINTIFF'S EXPERTS DO NOT "FIT" THE FACTS OF THIS CASE

Gross misinterprets DCC's argument about the NHTSA reports. DCC does not dispute that NHTSA reports may be an appropriate source of information in some instances, but reports of other incidents should not be relied upon unless they are "substantially similar" to the case in question.[88] The various reports Gross's experts took into account reported fires that were not similar to the Gross fire at all. For example, none of the NHTSA reports CSE cites specifically references an overcurrent resulting in melting and ignition of the wiring harness, and none of the incidents occurred while the car was idling in park for a lengthy period of time. At least two reports concern fuel-fed fires, one concerns a broken thermostat and one an electrical fire that started behind the back seat.[89] Gross has not made any showing that any other fire discussed by his experts was substantially similar to the fire in his vehicle. Accordingly, testimony concerning reports made to NHTSA is irrelevant and does not fit with the facts of this case.

---

[88] See, e.g., Lovett v. Union Pacific R.R. Co., 201 F.3d 1074, 1081 (8th Cir. 2000); Morales v. American Honda Motor Co., Inc., 151 F.3d 500, 512 (6th Cir. 1998); Moulton v. Rival Co., 116 F.3d 22, 26-27 (1st Cir. 1997); Barker v. Deere & Co., 60 F.3d 158, 162 (3rd Cir. 1995); Johnson v. Ford Motor Co., 988 F.2d 573, 578 (5th Cir. 1993); Cooper v. Firestone Tire & Rubber Co., 945 F.2d 1103, 1105 (9th Cir. 1991); Wheeler v. John Deere Co., 862 F.2d 1404, 1407 (10th Cir. 1988); Brooks v. Chrysler Corp., 786 F.2d 1191, 1195 (D.C. Cir. 1986).

[89] CSE Cause and Origin Analysis at Appendix F.

## V.   CONCLUSION

For the foregoing reasons, as well as the reasons set out in DCC's Motion to Exclude the

Opinion Testimony of Richard J. Roby, Christopher Schemel and Jamie Ferrino, the three fire cause and

origin experts identified by Gross are unqualified and their opinions are unreliable.  Their testimony

should, therefore, be excluded under F.R.E. 702, 703, and <u>Daubert</u>.  DCC agrees with plaintiff that an

evidentiary hearing on this matter would be helpful to the Court.

Respectfully Submitted,

HOGAN & HARTSON L.L.P.


By:  /s/ Margaret E. DiPentima
    James A. Hourihan (Bar No. 02704)
    Margaret E. DiPentima (Bar No. 26027)
    555 Thirteenth Street, N.W.
    Washington, DC  20004
    Tel:  (202) 637-5600
    Fax:  (202) 637-5910


Attorneys for Defendant DaimlerChrysler Corporation

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of March, 2003, a copy of the foregoing DaimlerChrysler Corporation's Reply Brief In Support of Its Motion To Exclude the Opinion Testimony of Richard J. Roby, Christopher Schemel and Jamie Ferrino was served electronically and/or via first class U.S. Mail, postage prepaid, on:

> Edward C. Bacon
> Bacon, Thornton & Palmer, L.L.P.
> Capital Office Park
> 6411 Ivy Lane
> Suite 706
> Greenbelt, MD  20770-1411
> (Attorneys for Plaintiff)

> /s/ Margaret E. DiPentima
> Margaret E. DiPentima