**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

DARRELL M. GROSS,                       :
                                                      :
           Plaintiff,              :
                                                      :
                                                      :    Case No. MJG 01CV3203
           v.                      :
                                                      :
DAIMLERCHRYSLER CORPORATION, et al.     :
                                                      :
           Defendants            :

**DEFENDANT DAIMLERCHRYSLER CORPORATION'S REPLY**
**BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

       Faced with the likelihood of summary judgment, plaintiff Darrell "Mike" Gross and his experts have scrambled to come up with a theory of the case that will allow them to get to the jury.  Relying on the testimony of his experts, Gross suggests that he has produced sufficient evidence of a defect to raise a genuine issue of material fact.  But the current evolution of Gross's theory has just as many holes as the old version.  Gross's experts cannot identify the defect that allegedly caused the overcurrent that eventually started the fire.  Gross's experts cannot identify the circuit or conductor that carried the alleged overcurrent.  Gross's experts do not know where the fire started, whether it started in a component or in the wiring harness itself, and whether the wiring harness was taped, ran through a conduit, or was otherwise bundled at the supposed point of ignition.  Gross's experts do not know whether the fuse on the circuit that carried the alleged overcurrent blew, if it did blow, when it blew, and, if it did not blow, why not.  Gross's experts have not identified the first material to ignite or any subsequent materials that may have fueled the fledgling fire.  Gross's experts have reached their conclusions solely because they observed "bubbling" on a conductor that was part of an unidentified circuit – a circuit that may or may not

have been connected to any components anywhere near where the fire is believed to have started. The opinions of Gross's experts have no basis in fact or science, and, accordingly, are insufficient to raise a genuine issue of fact precluding summary judgment. In fact, the testimony of Gross's experts is insufficient to save him from summary judgment even though Gross has offered an affidavit from Dr. Roby that attempts to create genuine issues of material fact where none previously existed. Under the clear law of the Fourth Circuit, summary judgment cannot be avoided by creating sham issues of material fact at the last minute.

In addition, Gross attempts to avoid summary judgment by relying on circumstantial evidence of a defect. Under Maryland law, a genuine issue of material fact can be raised on a manufacturing defect claim using solely circumstantial evidence of defect under certain specified conditions. To the extent that Gross is alleging a manufacturing defect in this case, circumstantial evidence cannot be used to avoid summary judgment because circumstantial evidence is insufficient as a matter of law when the product was sold so many years (and so many miles) prior to the alleged manifestation of the defect. Maryland law on this point is quite clear.

Furthermore, given the lack of certainty that Gross's experts have shown with respect to so many allegedly defect parts, it is no wonder that Gross's Opposition to DaimlerChrysler Corporation's ("DCC") Motion For Summary Judgment does not identify the alleged defect as a design or manufacturing defect. To the extent Gross is alleging a design defect caused the fire, he has also failed to raise a genuine issue of material fact because he cannot produce any of the required testimony concerning a feasible alternative safer design.

And there are many additional flaws in Gross's claims which prevent him, as a matter of law, from prevailing on any of his claims. Gross's claims (whether design or manufacturing defect claims) must fail because he has not produced sufficient evidence that any defect in the vehicle was a proximate cause of his

injuries.  Gross has attempted to downplay the fact that evidence of his intoxication is not only admissible

on the issues of causation of the fire and his injuries, but also supports the conclusion that DCC is not

liable as a matter of law because there is no evidence that Gross would have or could have heeded any

warnings that he was given.  Finally, in response to DCC's Motion For Summary Judgment, Gross has

abandoned one count of his Amended Complaint.  The remaining claims – strict liability for a defect in the

electrical system and failure to warn – both require expert testimony that plaintiff cannot produce.  None

of the arguments set forth in plaintiff's response raises a genuine issue of material fact to be determined by

a jury, thus summary judgment should be entered in DCC's favor.

## I.    GROSS CANNOT ESTABLISH THAT ANY DEFECT EXISTED IN HIS CAR WHEN IT WAS FIRST SOLD BY DCC

There is no clear evidence in the record addressing the question of whether the alleged defect is a

design or manufacturing defect.  Gross continues to dance around the issue going first one way and then

another.  Gross's response blends together elements of a design defect claim with elements of a

manufacturing defect claim in an effort to obscure the fact that he cannot produce sufficient evidence to

make a prima facie case of either.  At no point during discovery have Gross's experts been able to pinpoint

the claimed defect, and they have never clearly offered an opinion as to whether the alleged defect is a

design or manufacturing defect.[1]  The fire cause and origin report of Gross's experts states only that some

---

[1]    Deposition of Richard J. Roby (May 28, 2002) at 73, 110 (relevant portions previously filed as Ex. 23 to DCC's Appendix of Exhibits submitted Jan. 9, 2003, additional pages attached as Ex. 40); Deposition of Christopher Schemel (May 15, 2002) at 99-109 (relevant portions previously filed as Ex. 24; additional pages attached as Ex. 39);

"malfunction" in the electrical system caused the fire.[2]  When asked what the defect is, his experts say it is not identifiable,[3] and Dr. Roby's recent affidavit does not cure that deficiency.

## A.    Gross Cannot Establish the Existence of a Manufacturing Defect

To the extent Gross is alleging a manufacturing defect, his claim cannot survive because he cannot produce any direct evidence of a manufacturing defect existing in the vehicle at the time of sale.[4]  Gross has not produced any evidence that any component was manufactured out of line with its specifications.[5] There is no evidence in the record of what the design specifications were for the vehicle and/or its component parts, and there is no evidence that any part was installed improperly or misaligned.  Gross has not identified any expert who will testify about DCC's design specifications or how any component part of the vehicle failed to meet those specifications.[6]  Gross's response does not even dispute that he cannot produce any of the required evidence concerning DCC's assembly processes.[7]  Gross simply has no evidence that there was an error in the manufacture or assembly of the wiring harness or the vehicle.

---

[2]      CSE Cause and Origin Analysis of December 23, 2000 Car Fire at 1203 Nottingham Drive, Glen Burnie, Maryland at 9 ("[T]he cause of this fire was a malfunction of the electrical system which led to overheating of an electrical component resulting in the fire.") (previously filed as Ex. 1).

[3]      Roby Dep. at 110; Schemel Dep. at 99-109.

[4]      Phipps v. General Motors Corp., 363 A.2d 955, 958 (Md. 1976) (holding that a strict liability plaintiff must establish that "the product was in defective condition at the time that it left the possession or control of the seller.").

[5]      See Shreve v. Sears, Roebuck & Co., 166 F. Supp. 2d 378, 411 (D. Md. 2001); Restatement (Third) of Torts:  Products Liability § 2 cmt. c ("[A] manufacturing defect is a departure from a product unit's design specifications.").

[6]      See generally Rule 26(a)(2) Disclosures of Plaintiff Darrell M. Gross (previously filed as Ex. 6).

[7]      See Mem. of Points & Auth. in Support of DCC's Motion For Summary Judgment at 10-12.

In his opposition, Gross argues for the first time that "[t]he wiring harness installed in the Gross vehicle was installed in a manner that was susceptible to failure in an area where bundling the wires prevented the appropriate dissipation of heat in the even[t] of an unintended high resistant [sic] fault without activation of the circuit protection."[8]  To the extent that this statement suggests that the wiring harness may have been improperly placed in the vehicle when it was installed (a manufacturing defect), that claim must be barred because there is no direct evidence that the installation did not meet specifications, and there is every possibility that the harness was moved after the sale of the vehicle during one of the many repairs and modifications of the vehicle.  Since the vehicle has been dismantled and the harness ripped from it, there is no way to tell where the harness was placed at the time of the fire, if it was placed improperly, and who may have been responsible for any improper placement.  Plaintiff cannot destroy all evidence of where the harness was sitting at the time of the fire and then claim that the placement of the wiring harness in the vehicle was a manufacturing defect.[9]  And Gross lacks any real direct testimony on this point as the suggestion in his opposition is not backed up by any citations to record evidence.

Furthermore, despite plaintiff's protestations, this is not a proper case for circumstantial evidence of defect.  The important facts here are virtually identical to the facts in <u>Harrison v. Bill Cairns Pontiac of</u>

---

[8]    Opposition of Plaintiff Darrell M. Gross to Motion for Summary Judgment of Defendant DaimlerChrysler Corporation ("Pl.'s Opp.") at 8

[9]    <u>See</u> <u>Adelman v. Lupo</u>, 677 A.2d 230, 232-234 (N.J. Super. Ct. App. Div. 1996) (discussing mislocation of wiring harness and evidence necessary to determine whether mislocation is a design or manufacturing defect).  A further discussion of the impact of plaintiff's spoliation on DCC ability to investigate Gross's claims and defend against his allegations is contained in DCC's Motion for Dismissal or For Sanctions For Spoliation of Evidence and the reply brief in support thereof.

Marlow Heights, Inc.[10]  Maryland law is clear that a manufacturing defect cannot be established by

circumstantial evidence if the vehicle in question was not purchased in close temporal proximity to the fire

and/or there is evidence of intervening repairs and modifications.[11]  In other words, Gross cannot establish

the existence of a manufacturing defect without direct evidence because too much time has passed and too

many things have happened to the vehicle since it was last under DCC's control.  Although Gross

contends that Harrison is distinguishable because of "its lack of expert testimony,"[12] the Harrison court

reached two conclusions — (1) that there was no direct evidence of defect from any of the plaintiff's

experts, and (2) that circumstantial evidence would be insufficient as a matter of law.[13]  DCC relies on

Harrison for this second holding; in a case like this — where the vehicle in question was assembled over 6

years before the fire, had two previous owners, has over 77,000 miles on it, and has an undisputed record

of material changes under the hood and behind the dash — circumstantial evidence is, as a matter of law,

insufficient to establish the existence of a defect at the time of sale.  Gross also claims that Harrison is

distinguishable because there was no record of the vehicle's repair history available in that case.  While it

is true that the vehicle repair history is available here, it is undisputed that the repair history shows any

number of instances where work was done under the hood of Gross's vehicle. The repair history also

shows that work was performed on the CD player/radio of the vehicle on at least three occasions.[14]  The

---

[10]     549 A.2d 385 (Md. Ct. Spec. App. 1988).

[11]     Harrison, 549 A.2d at 391.

[12]     Pl.'s Opp. at 7.

[13]     549 A.2d at 390-92.

[14]     Deposition of William Peterson (July 19, 2002) at 6-7 (relevant portions previously filed as Ex. 22); Deposition of Darrell M. Gross (Feb. 21, 2002) at 107-08 (relevant portions previously filed as Ex. 21).  As noted in DCC's Motion to Exclude The Opinion Testimony of Richard J. Roby, Christopher

suggestion in <u>Harrison</u> was that the vehicle history may have been relevant because it could have shown that no changes or alterations were made.  Where, as here, the vehicle history shows many changes, the rationale of <u>Harrison</u> – that it is impossible to know whether the vehicle remained in its factory-issue condition – retains its vitality.

The Ohio case Gross relies on in support of his argument, <u>Cincinnati Insurance Co. v. Volkswagen of America, Inc.</u>,[15] is not only not binding on this Court, it is factually distinguishable.  There, the court recognized that "a distinction has to be made between the cause of the fire, which plaintiff's evidence indicates as the shorting and arcing of a wire in the main electrical harness, and the cause of such shorting and arcing."[16]  During his deposition, plaintiff's expert testified that there was "no evidence that the shorting and arcing of the wire was caused by any source outside the rubber shield in which it was enclosed."[17]  Thus, even though there had been many changes and additions to the electrical system of the vehicle in question, the court could conclude that the main wire harness itself had not been altered and that circumstantial evidence of defect would be allowed.[18]

---

Schemel and Jamie Ferrino and the reply brief in support of that motion, Gross's experts failed to observe changes that were made to the wiring during at least one of these installations (or de-installations) and they have not provided any explanation for this oversight.

[15]    502 N.E.2d 651 (Ohio Ct. App. 1985).

[16]    <u>Id</u>. at 655.

[17]    <u>Id</u>. at 656.

[18]    <u>Id</u>.

The situation here is completely different.  Gross has alleged that an unknown defect in an unknown component connected to the wiring harness caused the overload that eventually started the fire.[19] Gross also suggests that the fire started at an unknown spot somewhere along the harness itself, but Gross cannot produce the section of the harness where he believes the fire began or even say for sure that the fire began within the harness.[20]  Gross's theory necessarily involves components other than the wiring harness itself.  In Cincinnati Insurance, the alleged defect was a flaw in one of the wires within the wiring harness.[21]  Here, Gross alleges that it was some combination of defects in the wiring harness and other components that caused the fire.  Gross concedes that significant repairs and modifications were made to the wiring in the vehicle and does not dispute that non-standard splices were made in at least one section of the wiring harness.[22]  Roby's statement (in his affidavit) that there were no changes to the wire in the immediate area of the perceived "bubbling" does not mitigate the impact of these repairs and modifications to the wiring harness.  Because Gross's experts disrupted the circuitry of the vehicle by ripping out the wiring that remained after the fire, it is impossible to tell which components were connected to the "bubbled" wires.  Gross cannot rule out the possibility that a component that was repaired or modified was connected to the wire that he alleges was defective.[23]  And, in all cases, it is clear that the

---

[19]    Roby Dep. at 122 ("In my opinion. . . there was an overcurrent in one of the electrical components that produced sufficient heat. . . to start combustible components in the vicinity of that, and that resulted in ignition and spread of the fire.").

[20]    Id. at 104-05, 108, 121.

[21]    502 N.E.2d at 656.

[22]    See Preliminary Rule 26 Report of Robert D. Banta (June 3, 2002) at 3 (previously filed as Ex. 7). The exact location of the non-standard splices cannot be determined because the conductors on which the splices appear were severed without being photographed or properly tagged and labeled first.

[23]    Roby Dep. at 130.

alleged defect goes beyond merely the composition of the wiring harness itself.  Therefore, the analysis of Cincinnati Insurance is not applicable.

**B.    Gross Cannot Establish the Existence of a Design Defect**

In response to DCC's dispositive motions, Gross has also refocused his claim as more of a design defect claim in an effort to meet his burden of proof and avoid summary judgment.  By definition a design defect exists at the time of sale, and, therefore, it is easier to establish the first element of any product liability claim if the claimed defect is a design defect.[24]  Gross attached to his response an affidavit from his expert, Dr. Richard Roby.  In the affidavit, Roby states that "more likely than not the fire resulted from an electrical overload with resultant temperature increase to the point of ignition in the bundling of wires from the main dash area to the main wiring harness."[25]  But this statement directly contradicts the sworn testimony Roby gave at his deposition.  When questioned repeatedly, carefully and unambiguous about his opinion as to the cause of this fire, Roby testified that he could not identify the defective component:

> Q:    Do you have an opinion based upon a reasonable degree of engineering probability as to what the cause of the fire was?
>
> A:    I believe it was a defect in the electrical system?
>
> Q:    Where was the defect?
>
> A:    I don't know the specific component.[26]

---

[24]    Phipps, 363 A.2d at 959.

[25]    Declaration of Richard J. Roby, P.E., Ph.D. ¶ 8 (filed as Ex. 3 to Plaintiff's Appendix of Exhibits submitted Feb. 10, 2003).

[26]    Roby Dep. at 110; see also id. at 100-04 (stating that fire could have started "low" by the tire or "high up").

Later during the same deposition, Roby again stated unambiguously that he could not pinpoint the exact cause of the fire:

Q:    [A]re you rendering an opinion that there are multiple defects that caused the fire or was it just a single one?

A:    I believe that I've said that there is a defect in the electrical system that I cannot identify a specific component of that was responsible for this fire.

Q:    Okay.  So you don't know whether it's one or multiple?

A:    It certainly could have been multiple.[27]

The Fourth Circuit, like virtually every other federal circuit, has adopted the "sham affidavit" doctrine, which says that an affidavit offered in opposition to a motion for summary judgment cannot be used to create a sham issue of material fact.[28]  In other words, the Court should disregard an offsetting affidavit submitted to withstand a motion for summary judgment when the affidavit contradicts prior deposition testimony without adequate explanation.[29]

The exact nature of the alleged defect and the role that such a defect played in the cause of the Gross fire is of considerable importance.  Gross's experts, having been carefully questioned on these issues, are now adopting a different position without any explanation for the contradiction.[30]  "Where a

---

[27]    Id. at 124-25.

[28]    Shockely v. City of Newport News, 997 F.2d 18, 23 (4th Cir. 1993); see also Martin v. Merrell Dow Pharm., Inc., 851 F.2d 703, 706 (3d Cir. 1988) ("When . . . the affiant was carefully questioned on the issue, had access to the relevant information at the time, and provided no satisfactory explanation for the later contradiction, the courts of appeals are in agreement that the subsequent affidavit does not create a genuine issue of material fact."

[29]    Hinch v. Lucy Webb Hayes Nat'l Training School, 814 A.2d 926, 929, (D.C. 2003), citing Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572 (2d Cir. 1969).

[30]    Reetz v. Jackson, 176 F.R.D. 412, 414-15 (D.D.C. 1997) (Sham affidavit doctrine applies when a deponent has "given clear answers to unambiguous questions which negate the existence of any genuine

party emphatically and wittingly swears to a fact, it bears a heavy burden -- even in the summary judgment context -- when it seeks to jettison its sworn statement."[31]  As the Second Circuit explained, "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."[32]  Gross should not be permitted to offer Roby's affidavit simply to create a issue of material fact concerning the existence of a design defect in the wiring harness when the affidavit contradicts Roby's earlier sworn testimony.  Instead, the Court should disregard this affidavit and find plaintiff cannot produce the necessary proof of the existence of a design defect.

## II.    GROSS CANNOT PRODUCE SUFFICIENT EVIDENCE OF DESIGN DEFECT BECAUSE HE HAS NO EVIDENCE OF FEASIBLE, ALTERNATIVE, SAFER DESIGN

Even if the Court were to find that Gross has properly alleged a design defect claim, Gross's design defect claim must fail because he cannot produce any evidence of a safer alternative design.  In his response, Gross asserts that Maryland follows the "consumer expectations" test when determining whether a manufacturing defect was "unreasonably dangerous," but he skirts the more difficult issue of what test applies to a design defect claim.[33]  As explained above, under either the "consumer expectations" test or the "risk-utility" test, Gross's claims must fail because there is no direct evidence that any design or manufacturing defect existed in the vehicle at the time of sale, nor is there any evidence that

---

issues of material fact that the party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

[31]    Hancock v. Bureau of Nat'l Affairs, 645 A.2d 588, 590-91 (D.C. 1994).  (citation omitted)

[32]    Perma, 410 F.2d at 578.

[33]    See Pl.'s Opp. at 7.

a defect caused the fire.  To the extent that plaintiff is now pursuing a design defect theory, his claims must also fail because the appropriate test is the risk-utility test,[34] and Gross has not only failed to identify the specific defect, he has also failed to produce any evidence of a feasible safer alternative design for the wiring harness.

As the Maryland Court of Appeals recently explained in <u>Halliday</u>, if a product is alleged to have "malfunctioned" in some way due to a design defect, it may be more appropriate to use the risk-utility test instead of the consumer expectations test.[35]  Plaintiff has repeatedly alleged that the electrical system in his vehicle "malfunctioned."[36]  There is no suggestion here, as there might be in a gun case, that the product worked perfectly but parties were injured anyway.[37]  And the risk-utility test is the better test in this case because the consumer expectation test would be difficult to apply.[38]  In the context of a manufacturing defect claim, like the <u>Cincinnati Insurance</u> case cited by plaintiff, it is easy to conclude that a product was defective because it did not act as the consumer expected.  It is easy to say that a properly manufactured wiring harness would not be expected to start a fire, and, therefore, if a flaw in the manufacturing process

---

[34]    <u>Halliday v. Sturm, Ruger & Co., Inc.</u>, 792 A.2d 1145, 1151-53 (Md. 2002).

[35]    <u>Id.</u>; <u>see also</u> Restatement (Third) of Torts:  Products Liability § 2 ("A product . . . is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller . . . .").

[36]    CSE Cause and Origin Analysis at 8-9; Roby Dep. at 124.

[37]    <u>See Halliday</u>, 792 A.2d at 1153 ("[A] handgun does not malfunction when it shoots a bullet into a person in whose direction it is fired.").

[38]    <u>Halliday</u>, 792 A.2d at 1151.

damaged or marred the wiring harness to the point that it started a fire, then the harness was "unreasonably dangerous."[39]  But that is not the claim being made here.

In his most recent filings, Gross suggests that it may have been the "bundling" of the wires that was a defective design.[40]  There is no suggestion that the bundling of the wires was accidental or unintentional; the parties agree that bundling is part of DCC's intended design.  Thus, Gross is now arguing that the wiring harness malfunctioned even though it was "in a condition intended by the manufacturer."[41]  This makes the consumer expectations test particularly difficult and inappropriate.  As explained in the Restatement (Third) of Torts:  Products Liability:

> In contrast to manufacturing defects, design defects . . . are predicated on a different concept of responsibility.  In the first place, such defects cannot be determined by reference to the manufacturer's own design . . . standards because those standards are the very ones that plaintiffs attack as unreasonable.  Some sort of independent assessment of advantages and disadvantages, to which some attach the label "risk-utility balancing" is necessary.  Products are not generically defective merely because they are dangerous.  Many product-related accident costs can be eliminated only by excessively sacrificing product features that make products useful and desirable.[42]

In other words, there is no easy way to determine whether the design used by the manufacturer was "unreasonably dangerous" without considering why the design was chosen and what alternative designs might have been safer.[43]  It is unlikely that a reasonable consumer would have any expectations about the

---

[39]   Cincinnati Ins., 502 N.E.2d at 654.

[40]   Pl.'s Opp. at 8 ("[B]undling the wires prevented the appropriate dissipation of heat in the even[t] of an unintended high resistant [sic] fault without activation of the circuit protection.").

[41]   Phipps, 363 A.2d at 959.

[42]   Restatement (Third) of Torts:  Products Liability § 2 cmt. a.

[43]   Phipps, 363 A.2d at 959 ("[I]n a design defect case the standard of defectiveness under § 402A, involving as it does the element of unreasonable danger, still requires a weighing of the utility of risk inherent in the design against the magnitude of the risk."); see Restatement (Third) of Torts:  Products

risks and benefits of a particular wiring harness design, so it does not make sense to determine whether the design was defective using the consumer's expectations as a guide.[44]  As the Maryland Court of Appeals foresaw in Phipps, it is easier and more appropriate to analyze a design defect claim like this one using the risk-utility test, which incorporates the concepts of safer alternative design and feasibility.

As adopted by the Maryland courts, the risk-utility test "regards a product as defective and unreasonably dangerous, for strict liability purposes, if the danger presented by the product outweighs its utility."[45]  Under the risk-utility test, a plaintiff must prove six elements:

(1)    The existence of an alternative design that is safer than the design used in the suspect product;

(2)    The technological feasibility of manufacturing a product with the alternative design at the time the suspect product was manufactured;

(3)    The availability of the materials required to produce the alternative design;

(4)    The cost of production of a product that incorporates the alternative design;

(5)    The price to the consumer of a product incorporating the alternative design; and

(6)    The chances of consumer acceptance of a model incorporating the plaintiff's suggested alternative design.[46]

Gross has not and cannot produce any evidence whatsoever to establish any of these elements. Accordingly, to the extent that he is now pursuing a design defect claim, that claim must fail.[47]

---

Liability § 1 cmt. a ("[W]hen the product unit meets the manufacturer's own design specifications, it is necessary to go outside those specifications to determine whether the product is defective.").

[44]    See Restatement (Third) of Torts:  Products Liability § 2 cmt. a ("Consumer expectations as to proper product design. . . are typically more difficult to discern than in the case of a manufacturing defect."); id. at cmt. d ("How the defendant's design compares with other, competing designs in actual use is relevant to the issue of whether the defendant's design is defective.").

[45]    Halliday, 792 A.2d at 1150; see also Restatement (Third) of Torts:  Products Liability § 2.

### III.    GROSS CANNOT PRODUCE SUFFICIENT EVIDENCE OF CAUSATION BECAUSE HE CANNOT RULE OUT OTHER EQUALLY POSSIBLE CAUSES

Causation is always an element of a product liability claim based on Maryland law.[48]  Causation is an element whether the claim is design defect, manufacturing defect, or failure to warn.  Causation is an element whether plaintiff seeks to prove his case by direct or circumstantial evidence.  Here, Gross cannot prove that any defect in the vehicle and/or DCC's alleged failure to warn was a proximate cause of his injuries.

First, Gross cannot prove proximate cause because his experts have destroyed the evidence that would tend to disprove any other causes.[49]  It is undisputed that Gross's vehicle underwent several major repairs and modifications, including at least three instances where a CD player was installed or removed from the vehicle.[50]  Plaintiff's experts have testified that they do not know whether either of the two new CD players that were installed were installed on wires and circuits that were involved in the alleged

---

[46]    Nissan Motor Co., Ltd. v. Nave, 740 A.2d 102, 118 (Md. Ct. Spec. App. 1999), cert. denied, 745 A.2d 437 (Md. 2000).

[47]    Not only has Gross failed to produce evidence of a safer alternative design, he would not be able to do so because there is no evidence in the record concerning the design of the wiring harness at the as-yet-unidentified point of ignition.  It would be impossible for Gross to produce expert testimony concerning an alternate design without first pinpointing the exact specifications of the allegedly defective design.  Gross also concedes that, if his fire experts are excluded, any design or manufacturing defect claim must fail for lack of the required expert testimony.

[48]    Halliday, 792 A.2d at 1150 (elements of any strict liability claim include evidence "that the defect was a cause of the injuries"), quoting Phipps v. General Motors Corp., 363 A.2d 955, 959 (Md. 1976).

[49]    Gross may be changing his defect theory as much to avoid summary judgment as to avoid dismissal or sanctions for spoliation.  DCC has been prejudiced by plaintiff's spoliation because, regardless of which defect theory he pursues, DCC has been prohibited from fully and adequately formulating its defense and alternative explanations of what caused the fire.  See DCC's Motion For Dismissal or For Sanctions For Spoliation Of Evidence and DCC's Reply Brief in support thereof.

[50]    Peterson Dep. at 6-7; Gross Dep. at 107-08.

overcharge.[51]  They have also testified more generally that they do not know which components and which circuits were involved.[52]  Accordingly, Gross's experts cannot rule out the possibility that it was not a design or manufacturing defect that caused the fire but rather an aftermarket repair or modification.[53]  Because virtually all of the remaining wiring in the vehicle was destroyed during Gross's experts' fire investigation, including all of the wiring circuits plaintiff has identified as defective,[54] the extent and impact of the repairs and modifications can never be ascertained.[55]  As Gross can never disprove that the repairs and modifications may have played a role in the fire, he can never establish that a defect existing in the wiring harness when the vehicle was sold was more likely than not the cause of the fire or his injuries.[56]

Second, Gross is also unable to produce sufficient evidence of proximate cause to support his failure to warn claim because he testified at his first deposition that he did not read the warnings in the owner's manual and changed his testimony only when he later realized that failure to read the warnings provided could prevent him from recovering against DCC.  Nearly a year after his first deposition, when

---

[51]     Roby Dep. at 130.

[52]     Schemel Dep. at 99-109.

[53]     See Restatement (Third) of Torts:  Products Liability § 15 cmt. b ("[A] question can arise whether the misuse, alteration or modification of the product by the user or a third party contributed to the plaintiff's harm in such a way as to absolve the defendant from liability.")

[54]     See DCC's Motion For Dismissal or For Sanctions For Spoliation of Evidence and DCC's Reply Brief In Support of Its Motion For Dismissal or For Sanctions For Spoliation of Evidence.

[55]     See Patton v. Newmar Corp., 538 N.W.2d 116, 119 (Minn. 1995) (affirming grant of summary judgment on plaintiff's design defect claim where the "extent and impact" of design modifications could not longer be determined due to spoliation of critical evidence).

[56]     Id. at 120 ("Under these circumstances, it is apparent that even if the plaintiffs could demonstrate that a design defect existed at the time the motor home left Newmar's control, their failure to preserve the evidence eliminates their ability to demonstrate that the defect was present at the time of or caused the fire.").

Gross filed an amended complaint near the scheduled close of discovery, his deposition was reopened for the limited purpose of examining Gross on topics related to his failure to warn claim. At the first deposition Gross testified unambiguously that he did not read the owner's manual except to "figure out a couple of things that [he] didn't know how to work."[57] At his second deposition, Gross blatantly contradicted his earlier testimony without any explanation.[58] Gross should not be permitted to create a genuine issue of material fact on whether any alleged failure to warn was the proximate cause of his injuries merely by recanting his earlier testimony. If Gross had made the same statement by affidavit as opposed to at a second deposition, his affidavit would be disregarded under the sham affidavit doctrine discussed above. The mere fortuity that his deposition was reopened (because of his late-filed amendment) should not allow Gross to offer unexplained contradictory testimony that will be considered by this Court. Before he had any motive to testify otherwise, Gross stated on the record, under oath, that he did not read the relevant portions of the owner's manual. DCC provided adequate warnings, and Gross admitted that he did not read them. If Gross had read the warnings provided and followed them, the fire would never have occurred. His recent change of heart should not be permitted to alter the outcome of his failure to warn claim.

Finally, Gross suggests that it does not matter whether he was intoxicated or not on the night of the fire, but this argument overlooks the fact that Gross's intoxication would have prevented him from following any additional warnings if they had been provided.[59] In order to establish a failure to warn

---

[57]     Gross Dep. at 36-37.

[58]     Deposition of Darrell M. Gross (Jan. 9, 2003) at 18-26 ("Second Gross Dep.")(relevant portions attached as Ex. 42).

[59]     The issue of Gross's intoxication at the time of the fire is also relevant to the causation of the fire and the causation of his injuries. If Gross had not passed out in the driver's seat with the vehicle running,

claim, a plaintiff must be able to show that any warnings, if given, would have made a difference.[60]  Gross

admits that he either drifted off to sleep or passed out due to intoxication.  In either event, Gross has

testified that he drifted into unconsciousness without realizing that it was happening.[61]  Thus, he cannot

establish that if DCC had given different or additional warnings he would have had the presence of mind

to follow them.[62]

## IV.    GROSS'S FAILURE TO WARN CLAIM HAS SEVERAL ADDITIONAL FATAL DEFECTS

In addition to lacking proof of causation, there are several additional defects that fatally flaw

Gross's failure to warn claim.  First, adequate warnings were provided [63] and Gross ignored them, which

constitutes a misuse of the product.  Failure to read or follow the warnings provided is misuse, and misuse

---

the fire would not have started.  Also, if Gross had not been intoxicated, he would have been able to exit the vehicle.

[60]    Singleton v. International Harvester Co., 685 F.2d 112, 116 (4th Cir. 1981) (affirming use of jury instruction that read, "If you find that . . . under the circumstances the accident would have occurred even if an adequate warning had been given, then the manufacturer is not liable because the absence of a warning would not have been a proximate cause of the accident.")

[61]    Gross Dep. at 107 ("I remember — from the time when I put the CD in, after that I don't remember").

[62]    See Conti v. Ford Motor Co., 743 F.2d 195, 198 (3d. Cir. 1984) (injuries due to husband's "momentary inadvertence" would not have been avoided with different warnings); Powell v. J.T. Posey Co., 766 F.2d 131, 135 (3d Cir. 1985) (injuries associated with decision to assist patient who had released himself from a restraining vest would not have been avoided by different warnings since nurse's action to assist patient when he looked like he was falling was "instinctive."); Warner v. General Motors Corp., 357 N.W.2d 689, 693-95 (Mich. Ct. App. 1984) (holding plaintiff's disregard of other admonitions included in vehicle owner's manual admissible to show lack of causation).

[63]    See 1995 Dodge Intrepid Owner's Manual at 46 (previously filed as Ex. 13).

is a defense to strict liability.[64]  While Gross now contends that he did in fact read the warnings, it is undisputed that he did not follow them.  Gross drove home with an elevated blood alcohol level, parked his car and left it idling while he listened to music, fell asleep, etc.  He did not follow DCC's warnings concerning the proper use of the vehicle, and his misuse should bar his failure to warn claim.

Second, Gross does not dispute that DCC had no duty to warn of open and obvious dangers, but contends only that the dangers associated with falling asleep in a parked running vehicle were "latent dangers."[65]  This is incorrect for two reasons.  First, as the Maryland Court of Appeals has recognized, an individual can be in "actual physical control" of his vehicle so as to fall within the statutory definition of "drive" even if he is parked on the side of the road.[66]  Important factors to consider include whether the vehicle's engine was running, where the person was sitting or lying in the vehicle, whether the person was asleep or awake, and where the vehicle was stopped or parked.[67]  While each case will be decided on its own facts, the mere fact that the vehicle is not in operation on a public highway is not dispositive.[68]

Furthermore, the open and obvious danger here is the danger of falling asleep in a running car in general, not the more specific danger that by doing so, one might start a fire that would eventually caused burns and other injuries.  Other courts have recognized that a reasonable person can foresee that by falling

---

[64]    Halliday, 792 A.2d at 1153, citing Simpson v. Standard Container Co., 527 A.2d 1337, 1340 (Md. Ct. Spec. App. 1987).

[65]    Pl.'s Opp. at 11.

[66]    See generally Atkinson v. State, 627 A.2d 1019 (Md. 1993) (discussing various meanings of "actual physical control" requirement as pertains to whether individual in parked running car could be properly charged with driving while intoxicated).

[67]    Id. at 1027.

[68]    Id. at 1026-28.

asleep in a automobile with the engine running there is a possibility of future danger.  For example, in a

case with strikingly similar facts, <u>Martin v. General Motors Corp.</u>,[69] Martin's widow brought suit against

GM after her estranged husband died in a vehicle fire.  At the time of the fire, the vehicle was parked on

the sidewalk behind Martin's apartment building.[70]  Martin was found in the back seat.[71]  The autopsy

showed that he had a blood alcohol level of 0.19 at the time of his death.[72]

Plaintiff brought suit alleging that a defect in Martin's vehicle had been the cause of the fire.[73]  GM

argued that Martin had been drinking on the night of the fire because he was upset after returning from his

mother's funeral.[74]  GM argued that Martin, wanting to be alone, left the car running so that the air

conditioning would stay on and then fell asleep in his car.[75]  GM argued that the car idled for 4 to 6 hours,

which eventually caused the air conditioning fan to short out starting a fire.[76]  GM moved for summary

judgment on the ground that, under North Carolina law, contributory negligence is a bar to all product

---

[69]     759 F. Supp. 271 (E.D. Pa. 1991), <u>vacated without opinion by</u>, 953 F.2d 1380 (3d Cir. 1992); <u>see also</u> <u>Hinkamp v. American Motors Corp.</u>, 735 F. Supp. 176 (E.D.N.C. 1989), <u>aff'd</u>, 900 F.2d 252 (4th Cir. 1990).

[70]     759 F. Supp. at 274.

[71]     <u>Id</u>. at 271.

[72]     <u>Id</u>. at 273.

[73]     <u>Id</u>. at 271.

[74]     <u>Id</u>. at 274.

[75]     <u>Id</u>.

[76]     <u>Id</u>.

liability actions — even strict liability claims.[77]  GM argued that it was reasonably foreseeable to Martin that he was putting himself at the risk of future harm.

Martin's widow argued that summary judgment was inappropriate because there were disputed issues of material fact, including whether the fire was caused by an unspecified dashboard short circuit, and whether Martin was capable of exiting the car even though he was intoxicated.[78]  The <u>Martin</u> court sided with GM.  The court held that foreseeability should be defined not by whether Martin could have foreseen that he would die from carbon monoxide poisoning, but whether a reasonable person would have foreseen that by falling asleep in the back seat of an automobile with the engine running that there was a possibility of future danger, such as, for instance, that the engine would overheat.[79]  The court went on to explain:

> [W]ould it not be reasonable to also foresee that an overheating engine, assuming it was left to overheat for hours, could produce a fire? Foreseeability does not require clairvoyance, nor is it approached with tunnel vision.  If plaintiff's concept of foreseeability was adopted, the entire concept of negligence would be rendered meaningless.  The defense to any charge of negligence would be I cannot be held liable because I never "anticipated" that this would happen.[80]

Although the context is slightly different here, the outcome should be the same.  Maryland employs an objective standard to determine whether the danger complained of was open and obvious.[81]  To the extent that more specific warnings were not given, DCC should not be held liable for failing to identify every

---

[77]    <u>Id</u>. at 273-74.

[78]    <u>Id</u>. at 274.

[79]    <u>Id</u>. at 275 (citations omitted)

[80]    <u>Id</u>.

[81]    <u>Nicholson v. Yamaha Motor Co., Ltd.</u>, 566 A.2d 135, 145 (Md. Ct. Spec. App. 1989), <u>cert. denied</u>, 569 A.2d 1242 (Md. 1990).

possible outcome of leaving the car idling.[82]  A reasonable person would foresee that sleeping in a running

vehicle is dangerous and could potentially lead to future harm.  Thus, no more specific warnings than

those already provided were required.

In addition, plaintiff's failure to warn claim is not supported by the appropriate expert testimony.[83]

The testimony of Gross alone is insufficient to maintain a failure to warn claim.

---

[82]    See Hood v. Ryobi N. Am., Inc., 17 F. Supp. 2d 448, 452-53 (D. Md. 1998) ("[A] general warning
of danger suffices, and the manufacturer need not warn of every mishap or source of injury that the mind
can imagine flowing from the product." (internal quotation marks omitted)), aff'd, 181 F.3d 608 (4th Cir.
1999); Stalnaker v. General Motors Corp., 972 F. Supp. 335, 336 (D. Md. 1996) (holding that a
manufacturer is not required "to specify the nature of the injury to be expected from noncompliance"),
aff'd, 120 F.3d 262 (4th Cir. 1997).

[83]    See, e.g., Dhillon v. Crown Controls Corp., No. 99 C4428, 2000 WL 420747 (N.D. Ill. Mar. 14,
2000) (holding that without expert testimony, in support of claims including failure to warn claim,
plaintiff "could not possibly prevail"), aff'd, 269 F.3d 865 (7th Cir. 2001); Nelson v. Ford Motor Co., 150
F.3d 905, 907 (8th Cir. 1998) (affirming grant of summary judgment on failure to warn claim following
exclusion of plaintiff's expert's testimony concerning adequacy of warnings); Ebenhoech v. Koppers
Indus., Inc., 239 F. Supp. 2d 455, 468 (D.N.J. 2002) ("Expert testimony is generally needed as proof of an
alternative warning and a reasonable alternative design to 'help the factfinder understand 'the mechanical
intricacies of the instrumentality.''" (internal citations omitted)); Rudd v. General Motors Corp., 127 F.
Supp. 2d 1330, 1346-47 (M.D. Ala. 2001) (granting summary judgment on failure to warn claim because
"beyond the assertions in his briefs, [plaintiff] has not provided any testimony or evidence, much less
expert testimony, to suggest that it was unreasonably dangerous for GM . . . not to warn more adequately
of the dangers of fan-blade separation."); Milanowicz v. The Raymond Corp., 148 F. Supp. 2d 525,
541-42 (D.N.J. 2001) (granting summary judgment on failure to warn claim after excluding expert's
proposed warnings testimony); Hammond v. Coleman Co., Inc., 61 F. Supp. 2d 533, 542 (S.D. Miss.
1999) (holding that failure to offer admissible expert testimony relating to warning defect precluded
recovery in products liability action), aff'd, 209 F.3d 718 (5th Cir. 2000); Davidson v. Besser Co., 70 F.
Supp. 2d 1020, 1023 (E.D. Mo. 1999) (holding that failure to warn claim requires admissible expert
testimony that additional or other warnings might have altered the behavior of the plaintiff); Meyerhoff v.
Michelin Tire Corp., 852 F. Supp. 933, 947 (D. Kan. 1994) ("[I]n a warning case, a plaintiff must do more
than simply present an expert who espouses a new or different warning.  He must establish that warning's
feasibility, adequacy and effectiveness."), aff'd, 70 F.3d 1175 (10th Cir. 1995); Pruitt v. General Motors
Corp., 599 N.E.2d 723, 727-28 (Ohio Ct. App. 1991) (holding that evidence was insufficient on failure to
warn claim because plaintiff's expert expressed no opinion on lack of product warning).

## V.     CONCLUSION

Gross has brought three different product liability claims against DCC – a manufacturing defect claim, a design defect claim and a failure to warn claim.  All of these claims fail because Gross cannot establish that any defect existed at the time of sale in the car that he bought with over 77,000 miles on it

and two previous owners.  In addition, there are fatal flaws in each of Gross's claims which entitle DCC to summary judgment in its favor.

Respectfully submitted,

HOGAN & HARTSON L.L.P.

By: _/s/ Margaret E. DiPentima_____
    James A. Hourihan (Bar No. 02704)
    Margaret E. DiPentima (Bar No. 26027)
    555 Thirteenth Street, N.W.
    Washington, DC  20004
    Tel:  (202) 637-5600
    Fax:  (202) 637-5910

    Attorneys for Defendant DaimlerChrysler Corporation

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of March, 2003, a copy of the foregoing Defendant

DaimlerChrysler Corporation's Reply Brief in Support of Its Motion For Summary Judgment was served

electronically and/or via first class U.S. Mail, postage prepaid, on:

> Edward C. Bacon
> Bacon, Thornton & Palmer, L.L.P.
> Capital Office Park
> 6411 Ivy Lane
> Suite 706
> Greenbelt, MD   20770-1411
> (Attorneys for Plaintiff)

 /s/ Margaret E. DiPentima
Margaret E. DiPentima