IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DARRELL M. GROSS,                  :
        Plaintiff                  :
                                   :
        v.                         :        Civil No. AMD 01-3203
                                   :
DAIMLERCHRYSLER CORP.,             :
        Defendant                  :
                            ...o0o...

MEMORANDUM OPINION

In this product liability action arising under Maryland law, plaintiff Darrell M. Gross

seeks compensatory damages against defendant Daimler Chrysler Corporation ("DCC") for

injures he suffered on December 23, 2000, when his previously-owned 1995 Dodge Intrepid

ES motor vehicle ("the vehicle") caught fire. Discovery has concluded and now pending,

*inter alia*, are DCC's motions to exclude the opinion testimony of Gross's experts[1] and for

---

[1]The Fourth Circuit most recently summarized the standards for evaluating the admissibility of expert opinion testimony as follows:

The Federal Rules of Evidence provide that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . ." Fed.R.Evid. 702. The Supreme Court has made clear that it is the trial court's duty to play a gatekeeping function in deciding whether to admit expert testimony: "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert,* the Court announced five factors that may be used in assessing the relevancy and reliability of expert testimony: (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the

(continued...)

summary judgment.[2] I have given careful attention to the parties' submissions and a hearing

has been held. For the reasons stated below, the motion to exclude opinion testimony shall

be granted in part and denied in part; the motion for summary judgment shall granted.

I.

The material facts are straightforward and undisputed. The subject vehicle, a 1995

---

[1](...continued)

"existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. *Id.* at 593-94, 113 S.Ct. 2786. Rather than providing a definitive or exhaustive list, *Daubert* merely illustrates the types of factors that will "bear on the inquiry." *Id.* As *Daubert* emphasized, the analysis must be "a flexible one." *Id.; see also Kumho,* 526 U.S. at 141-42, 119 S.Ct. 1167 (concluding that testing of reliability should be flexible and that *Daubert*'s five factors neither necessarily nor exclusively apply to every expert).

*United States v. Crisp*, 324 F.3d 261, 265-66 (4th Cir. 2003); *see also Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 200 (4th Cir.2001).

[2]Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248-49, 252; *Celotex Corp.*, 477 U.S. at 324. Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See Felty v. Graves-Humphreys* Co., 818 F.2d 1126, 1128 (4th Cir. 1987).

Dodge Intrepid, was manufactured by DCC and had been purchased by Gross as a used car; it had been operated for more than 60,000 miles at the time of the incident. On December 23, 2000, after a night of heavy drinking at a tavern, Gross stopped at a fast food restaurant and then drove a short distance to his home while highly intoxicated. He parked on the street in front of his home with the engine idling and fell asleep in the driver's seat. Sometime within the following three hours, a fire ignited in the engine compartment of the vehicle. A neighbor alerted the fire department, which responded promptly. Gross suffered severe burns.

The vehicle, which was a total loss from the fire, was towed and stored. In anticipation of litigation, Gross hired Combustion Science & Engineering, Inc., headed by Dr. Richard J. Roby ("Roby"), who holds a doctorate in mechanical engineering, to conduct a "cause and origin" investigation of the fire.[3] There is no dispute that Dr. Roby conducted very little, if any, of the actual physical investigation of the remains of the vehicle, relying instead on the work of his associates, including an experiment conducted on an automobile electrical system seemingly bearing little resemblance to the electrical system at issue in the vehicle involved in this case. In any event, Dr. Roby purported to conclude "to a reasonable degree of engineering probability" that the fire originated in the vehicle's electrical system.

---

[3]DCC has moved for sanctions on the ground of Gross's alleged spoliation of evidence. For the reasons previously stated in a memorandum to counsel, that motion is denied, although, should the case ultimately be tried, I will consider a spoliation instruction if requested.

More particularly, Dr. Roby contends that the fire was the result of two (apparently independent) defects in the electrical system of the vehicle. First, according to Dr. Roby, there was an unidentified defect in a protective component of the electrical system, i.e., a fuse/circuit breaker, that permitted an overcurrent to flow through the copper wire conductor, unabated for some period of time, resulting in the build up of excessive heat. (Indeed, prior to Gross's purchase of the vehicle, CD players in the vehicle had been removed and replaced more than once, and other modifications to various parts of the electrical system could be observed, thus suggesting that if a short circuit of some sort occurred, it might well have resulted from post-manufacture activity.) Second, the harness used to bundle the wires under the dashboard in the engine compartment was defective in that, allegedly, the harness did not allow the dissipation of excess heat that the first defect in the electrical system generated. In contrast, DCC's experts assert that it is likely that, as Gross slept in the driver's seat of the vehicle, Gross's foot came to rest on the accelerator and thereby caused the vehicle to idle at an excessively high engine speed. This in turn caused excessive heat in the engine block to ignite some unknown material on or around the manifold.

## II.

The gravamen of the motion for summary judgment is that Gross cannot adduce proof of the existence of a manufacturing defect, *see Phipps v. General Motors Corp.,* 278

Md. 337, 344, 363 A.2d 955, 958 (1976)(elements of a strict liability claim)[4], or that, even if he is able to show the existence of a defect, that the defect was present in the vehicle at the time it left the possession and control of DCC in 1994. *See Ford Motor Co. v. General Accident Ins. Co.,* 365 Md. 321, 334, 779 A.2d 362, 369 (2001) ("We consistently have held that a plaintiff must prove the existence of a defect at the time the product leaves the manufacturer . . . ."). Gross agrees that these issues are dispositive.[5]

A.

DCC contends that Dr. Roby's opinion testimony as to a specific product defect should be excluded under Federal Rule of Evidence 702 because, *inter alia*, Gross has not demonstrated by a preponderance of the evidence that Dr. Roby's opinion testimony as to the existence of a specific product defect which was a proximate cause of the fire is reliable or that the widely-accepted methodology used in fire "cause and origin" investigations has been reliably employed by Dr. Roby in formulating his opinion as to the existence of a specific product defect in the vehicle. *See generally,* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993); *supra* n. 1; *Shreve v. Sears, Roebuck & Co.,* 166 F.Supp.2d 378, 390-405 (D.Md. 2001).

---

[4]Gross conceded on the record at the hearing that he asserts solely a manufacturing defect claim and not a design defect claim. *But see infra* n. 5.

[5]Gross asserted a separate count in the amended complaint based on failure to warn. He has not pursued that count and I regard it as abandoned. In any event, there has been no showing that the absence of a warning not to sleep in an idling vehicle could in any way constitute a proximate cause of Gross's injuries. Indeed, Gross admitted on deposition that he did not bother to read the owner's manual upon his purchase of the vehicle.

Although Gross filed a memorandum opposing DCC's motion to exclude the opinion

testimony of Dr. Roby, both in his memorandum opposing the motion for summary

judgment and on the record at the motions hearing, Gross effectively conceded that Dr.

Roby's opinion testimony as to the existence of a specific product defect as the proximate

cause of the vehicle fire is not admissible under Fed. R. Evid. 702.[6]

_____

[6]Manifestly, Dr. Roby offered merely several hypotheses as to how a vehicle fire can occur as a result of an electrical system malfunction, and thereupon connected one of those hypotheses *via his opinion* to the facts of this case. As my colloquy with counsel at the hearing showed, nothing in Dr. Roby's report shows any degree of clarity or reasonable certainty as to the existence of a product defect leading to the fire in this case.

There is no dispute between the parties as to the acceptable methodology used in fire investigations; an investigator is required to: (1) define the problem; (2) collect data; (3) analyze the data; (4) develop a hypothesis; (5) test the hypothesis; and, (6) select a final hypothesis. Dr. Roby and his colleagues ostensibly followed this protocol. They collected data that showed extensive damage under the hood, damage to the "engine compartment section of the heating duct," and observed that there was no flame damage to the interior of the vehicle except for the pedal area. They reasonably concluded that the fire did not ignite in the passenger compartment. However, Dr. Roby failed to explain in a reliable way why he concluded that the fire in this case, as opposed to the possibilities of vehicle fires in general, was electrical in origin. The only basis given seems to be the fact of damage to the dashboard and the engine compartment. From that premise, Dr. Roby and his team concluded that the cause of the ignition was an overloaded electrical wire.

However, the indisputable scientific fact that an overloaded wire will generate excessive heat, and if the resulting heat is allowed to build up and not dissipate, then the insulation of the wire will begin to bubble and melt and may ignite, is, in the context of this case, a theory in search of factual support:

> Overloads cause internal heating of the conductor. This heating occurs along the entire length of the overloaded portion of the circuit and may cause sleeving. Sleeving is the softening and sagging of the thermoplastic conductor insulation due to heating of the conductor. *If the overload is severe*, the conductor may become hot enough to ignite fuels in contact with it as the insulation melts off.

Pl.'s Opp. to Def.'s Mot. for Summ. J., Ex. 6 NAPA 921, 14-10.5 at 921-109 (emphasis added). Dr. Roby's conclusion that "the most likely scenario for this fire is one of electrical overheating which resulted from an electrical short-circuit or loose connection in the system[, i.e., a] protection systems failure occurred . . . ," *see* Pl.'s Opp. to Def.'s Mot. for Summ. J., Ex. 1 at 9, is rooted in pure speculation; there is no identification whatsoever of the source, cause or measurable "severity" of the alleged overcurrent. Specifically, Dr. Roby remains unable to make

(continued...)

-6-

B.

Gross has retreated to a fallback position in opposing summary judgment by urging me to allow the case to proceed under the so-called "malfunction doctrine" generally applicable in product liability law and which has been applied by Maryland courts in some manufacturing defect cases. *See Harrison v. Bill Cairns Pontiac of Marlow Heights, Inc.,* 77 Md.App. 41, 549 A.2d 385 (1988) (discussed with approval in *Ford Motor Co. v. General Accident Ins. Co.,* 365 Md. 321, 335-37, 779 A.2d 362, 370-72 (2001)); *see generally*, David G. Owen, *Manufacturing Defects*, 53 S.C.L.Rev. 851, 871-884 (2002). Thus, under Maryland law, proof of a product defect may be demonstrated in one or more of the following ways: "(1) direct proof based on the nature of the accident in the context of the particular product involved; (2) circumstantial proof based on an inference of a defect

---

[6](...continued)

any determination beyond a general reference as to the origin of the fire. "In this instance, the point at which the primary malfunction occurred is not necessarily the origin of the fire. It was determined that the fire originated on the right hand side of the vehicle." *Id.*

In the end, the methodological and logical gaps in Dr. Roby's flawed opinion as to the existence of a product defect is demonstrated by this excerpt from his report:

> Devices such as circuit breakers, fuses, and fusible links are used as protection against excessive current in an electrical system. In *some instances*, however, these devices *may fail* leading to a fire. Alternatively, research has shown that in *some instances*, a properly operating fuse can allow an over-current for a sufficient time to initiate a fire without blowing the fuse. Thus, *an electrical fire is consistent with known failure modes of automotive electrical systems* that can lead to fire.
>
> Such an over-current failure is consistent with the evidence of overheated wiring found in the dashboard area of the engine compartment and above the headliner in the passenger compartment . . . . The *most likely* scenario for this fire is one of electrical overheating which resulted from an electrical short-circuit or loose connection in the system . . . .

Pl.'s. Opp. to Def.'s Mot. for Summ. J., Ex. 1, pp. 8-9 (emphases added).

from a weighing of several factors; and (3) direct affirmative proof through opinion testimony by an expert witness." *Shreve*, 166 F.Supp.2d at 407-08. Gross contends that even if Dr. Roby's opinion testimony as to the existence of a specific manufacturing defect is excluded, nonetheless DCC's motion for summary judgment should be denied because circumstantial proof based on an inference of a defect can be used to show a manufacturing defect under the circumstances of this case. I am constrained to reject this contention.

To avoid summary judgment through reliance on inferential evidence of a manufacturing defect, Gross must demonstrate that it would be reasonable for a juror to find from an evaluation of the five-factor *Harrison* test[7] that a manufacturing defect existed at the time the vehicle left the possession of DCC. I am persuaded here that the *Harrison* factors do not weigh in favor of the plaintiff.

*1. Expert Testimony as to Possible Causes*

Essentially, this factor favors neither party in this case. To a very significant extent, the cause of the fire is unknown, and a healthy measure of speculation infects the opinion testimony to be offered by both parties.

_____

[7]As I reasoned in *Shreve*:

If the available evidence is such that: (1) expert testimony tends to support *the possibility* of a design or manufacturing defect (or tends to exclude causes not attributable to a defect); (2) the injury-causing occurrence takes place shortly after the product is delivered or put into use; (3) similar incidents have been reported in respect to the product; (4) other potential explanations of the injury-causing occurrence are negated; and (5) the occurrence is of a type that ordinarily might not be expected to happen in the absence of a defect, then the plaintiff will be allowed to get to the jury on the question of the presence *vel non* of a defect.

*Shreve*, 166 F.Supp.2d at 408 (emphasis added).

### 2. The Timing of the Incident

The incident occurred on December 23, 2000, more than five years after the vehicle was purchased or put into use. "In *Harrison*, the court indicated that the passage of five years between the manufacture of a vehicle and the occurrence of the accident was too long to permit such an inference [of a defect]." *Watson v. Sunbeam Corp.,* 816 F.Supp. 384, 388 (D.Md. 1993). Therefore, the period of time between the manufacture of the vehicle and the incident of December 2000 is sufficiently lengthy to negate the inference of the existence of a manufacturing defect in existence at the time of manufacture. Thus, the second factor weighs in favor of the DCC.

### 3. Similar Accidents Involving the Same Product

The third *Harrison* factor also weighs heavily in favor of DCC because Gross has not projected any admissible evidence of similar fires in the vehicle model at issue here. Although Dr. Roby purported to identify seven reports to the National Highway Transportation Safety Administration which indicate engine fires in similar vehicles manufactured from 1994 to 1998, the scanty data contained in those one-page forms are insufficient as a matter of law. Moreover, those forms are inadmissible and may not be considered for purposes of summary judgment. *See Greensboro Prof'' Fire Fighters Ass'n, Local 3157 v. City of Greensboro,* 64 F.3d 962, 967 (4th Cir.1995) (affidavits and depositions based on hearsay are "neither admissible at trial nor supportive of an opposition to a motion for summary judgment"). Therefore, factor three weighs in favor of DCC.

### 4. The Elimination of Other Causes

Prior to settling on the malfunction of the electrical system, Dr. Roby and his team ruled out the passenger compartment as the origin of the fire. The team also reviewed whether any recalls for this particular model of car had occurred and, upon discovering such a recall, also determined (by inspecting the component of concern) that the component was not the source of the fire. Finally, the team inspected the catalytic converter and undercarriage of the vehicle and eliminated an additional possibility. Thus, as the *Harrison* test does not specify *how many or which alternative causes* must be eliminated in order for this factor to weigh in the favor of the non-movant, I am constrained to conclude that the fourth factor weighs in favor of Gross.

### 5. The Nature of the Accident

Indisputably, a fire in the engine compartment of an idling automobile is an event that could occur in the absence of a defect. Other plausible reasons for such an occurrence include: (1) a broken radiator causing the car to overheat; (2) negligence on the part of a mechanic or owner; (3) a combustible substance in the engine compartment coming into contact with a heat source; or (4) an electrical malfunction not the result of a defect. Therefore, factor five weighs in favor of the DCC.

In the final analysis, only one of the *Harrison* factors weighs in favor of Gross. The conclusion is inescapable, therefore, that no reasonable juror could reasonably conclude that it is more likely than not that, at the time the vehicle left the possession of DCC, it contained a manufacturing defect that could have been the proximate cause of the fire in December

2000.

III.

For the reasons stated above, DCC's motion to exclude opinion testimony shall be granted in part and denied in part[8], and its motion for summary judgment shall be granted.

Filed:   September 29 2003                    _____/s/_____
                                              ANDRE M. DAVIS
                                              UNITED STATES DISTRICT JUDGE

---

[8]Whether, if this order is reversed in whole or in part on appeal and a trial of this action is held, any portion of Dr. Roby's opinion testimony might be admissible, is an issue that cannot be determined at this time. Thus, by denying the motion to exclude in part, I leave open the possibility that, even if Dr. Roby's ultimate opinion as to the existence of a specific manufacturing defect is not admissible under Rule 702, other portions of his testimony might be.